# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTERN DISTRICT OF NEW YORK

RAVIDATH LAWRENCE RAGBIR;                )
                                          )
NEW SANCTUARY COALITION OF                )
NEW YORK CITY;                            )
                                          )
CASA DE MARYLAND, INC.;                   )
                                          )
DETENTION WATCH NETWORK;                  )
                                          )
NATIONAL IMMIGRATION PROJECT              )
OF THE NATIONAL LAWYERS GUILD;            )
                                          )
and                                       )
                                          )       **18 CV 01159**
NEW YORK IMMIGRATION                      )
COALITION,                                )
                                          )
                      Plaintiffs,         )       Civil Action No. _____
                                          )
               v.                         )
                                          )
THOMAS D. HOMAN, in his official          )
capacity as Deputy Director and Senior    )
Official Performing the Duties of the     )
Director of U.S. Immigration and Customs  )
Enforcement;                              )
                                          )
THOMAS R. DECKER, in his official         )
capacity as New York Field Office Director )
for U.S. Immigration and Customs          )
Enforcement;                              )
                                          )
SCOTT MECHKOWSKI, in his official         )
capacity as Assistant New York Field Office )
Director for U.S. Immigration and Customs )
Enforcement;                              )
                                          )
U.S. IMMIGRATION AND CUSTOMS              )
ENFORCEMENT;                              )
                                          )

KIRSTJEN M. NIELSEN, in her official )
capacity as Secretary of Homeland Security; )
                                          )
U.S. DEPARTMENT OF                        )
HOMELAND SECURITY;                        )
                                          )
JEFFERSON B. SESSIONS III, in his         )
official capacity as Attorney General of the )
United States;                            )
                                          )
and                                       )
                                          )
U.S. DEPARTMENT OF JUSTICE,               )
                                          )
                Defendants.               )
_____   )
                                          )

## COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND HABEAS RELIEF

### NATURE OF ACTION

1.      This case is about who we are as a nation.  Whether it remains true that "[i]f there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).  Whether ours is a nation where the privilege and responsibility of prosecutorial discretion are nothing more than a thin veil for persecution of disfavored political views.  The nation's immigration laws provide for the removal of some non-citizens from the United States.  In years past, to determine who to remove and when, the Executive Branch has considered factors such as whether the individual poses a danger to the community, the impact of removal on international relations, and the "human concerns" of whether the individual "has children born in the United States, long ties to the community, or a record of distinguished military service." *Arizona v. United States*, 567 U.S. 387, 396 (2012).

2.      But with the new Administration, something has changed.  Federal immigration authorities have specifically targeted prominent and outspoken immigrant-rights activists across the country on the basis of their speech and political advocacy on behalf of immigrants' rights and social justice.  These activists have been surveilled, intimidated, harassed, and detained, their homes have been raided, many have been plucked off the street in broad daylight, and some have even been deported.  The "broad discretion exercised by immigration officials," *id.*, has been abused in a cynical effort to punish those who disagree with the Administration.  To sweep away all opposition.  The Government's targeting of activists on the basis of their core political speech is unfair, discriminatory, and un-American.  And it violates the First Amendment.

3.      Cities that protect noncitizen immigrants are called "sanctuaries" for a reason.  Many immigrants live in the shadows for fear of possible of deportation.  Many of the rights that birthright American citizens take for granted—the right to speak, to worship, to work, and to live as one pleases—are exercised only with caution by immigrants.  Yet courageously, some immigrants speak out.  They boldly educate other immigrants about their rights.  They bravely advocate for changes to our immigration laws and enforcement policies.  They fearlessly call out the injustices they see in our nation's immigration system.  They do this because the Constitution not only allows but encourages it.  Because of our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).

4.      Plaintiff Ravidath "Ravi" Lawrence Ragbir, a father, husband, and nationally-recognized immigration rights activist, is one such immigrant who has freely exercised his right to speak out against the injustices and inhumanity of our current immigration system and has been targeted for removal by federal immigration authorities on the basis of his outspoken

advocacy. Plaintiff New Sanctuary Coalition of New York City depends on Mr. Ragbir as its Executive Director. He is the lifeblood of the organization and a central figure in the broader community of immigration advocates. He has devoted his life to the dignity and well-being of others, working tirelessly at the intersection of faith and immigrant communities, and gathering support from faith leaders, elected officials at all levels of government, immigrant-rights activists, and hundreds of community members.

5.     Mr. Ragbir has lived in the United States for over 25 years, but for the last 10 years he has been subject to a final order of removal. Yet, because of his special contributions to his community, federal immigration authorities until recently allowed him to remain in the United States with his beloved U.S. citizen wife and daughter, granting him an order of supervision and four administrative stays of removal. But on January 11, 2018, with his most recent administrative stay of removal still in place, U.S. Immigration and Customs Enforcement (ICE) officials suddenly and inexplicably detained him at a routine check-in.

6.     Just ten days ago, in response to the cruel and unconstitutional actions of federal immigration officials, this Court granted Mr. Ragbir a writ of habeas corpus, requiring ICE to release him from custody. The Court wrote that "[i]t ought not to be—and it has never before been—that those who have lived without incident in this country for years are subjected to treatment we associate with regimes we revile as unjust." *Ragbir v. Sessions*, No. 18-cv-236 (KBF), 2018 WL 623557, at *1 (S.D.N.Y. Jan. 29, 2018) (Forrest, J.).

7.     Mr. Ragbir is not alone. Plaintiff immigrants' rights organizations have joined this lawsuit because they too have seen their leading advocates targeted because of their advocacy.

8.      The Government cannot silence critics of its immigration laws and policies by deporting them. The First Amendment does not allow it. It is a matter of "grave concern" indeed that Mr. Ragbir and other likeminded activists "ha[ve] been targeted as a result of [their] speech and political advocacy on behalf of immigrants' rights and social justice." *Id.* at *1 n.1. "[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *United States v. Alvarez*, 167 U.S. 709, 716 (2012) (alteration in original) (quoting *Ashcroft v. Am. Civil Liberties Union*, 535 U.S. 564, 573 (2002)).

9.      This Court should prevent Defendants from doing just that. The Court should declare that targeting immigrant-rights activists on the basis of their protected political speech violates the First Amendment, and enjoin Defendants from taking any further retaliatory actions. And the Court should restrain Defendants from taking any action to effectuate Mr. Ragbir's removal from the United States unless Defendants demonstrate to the Court's satisfaction that such action is untainted by unlawful retaliation or viewpoint discrimination.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction under 28 U.S.C. § 1331; 28 U.S.C. § 2241; and the Suspension Clause of the United States Constitution. Plaintiffs' causes of action arise under the laws and Constitution of the United States, including the First Amendment. In addition, Plaintiff Ragbir is subject to a final order of removal, which "is sufficient, by itself, to establish the requisite custody" for purposes of habeas jurisdiction. *Simmonds v. I.N.S.*, 326 F.3d 351, 354 (2d Cir. 2003); *see also Jones v. Cunningham*, 371 U.S. 236, 239-40 (1963).

11.     Nothing in the Immigration and Nationality Act (INA) strips this Court of its jurisdiction over Plaintiffs' claims. *See* 8 U.S.C. § 1252 (specifying provisions governing

judicial review of orders of removal). Plaintiffs here do not challenge underlying orders of removal or actions committed to unreviewable agency discretion. They challenge, rather, Defendants' pattern and practice of targeting immigrant-rights activists for immigration enforcement on the basis of their core protected political speech. This includes Defendants' actions targeting Mr. Ragbir, which arose long after his removal order became final. No other forum exists to address these claims. Applying any statutory provision to curb jurisdiction in this case therefore would deprive Plaintiffs of any effective judicial review of their claims, and a "serious constitutional question ... would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Webster v. Doe*, 486 U.S. 592, 603 (1988) (quotation marks omitted). And, with respect to Mr. Ragbir, the Suspension Clause guarantees review of his claims. *See INS v. St. Cyr*, 533 U.S. 289 (2001); *Simmonds*, 326 F.3d 351.

12.     Venue is proper in this district under 28 U.S.C. § 1391. A substantial part of the events giving rise to this action occurred in this judicial district.

13.     An actual and justiciable controversy exists between the parties under 28 U.S.C. § 2201, and this Court has authority to grant declaratory and injunctive relief. *Id.* §§ 1351, 2201, 2202. The Court has additional remedial authority under the All Writs Act, 28 U.S.C. § 1651.

## PARTIES

14.     Plaintiff Ravidath Lawrence Ragbir is a resident of Brooklyn, New York. He is a prominent immigrant-rights activist and Executive Director of the New Sanctuary Coalition of New York City. Mr. Ragbir became a Lawful Permanent Resident of the United States in 1994. He received a final order of removal in 2007, but has continued to live and work in the United States with authorization from ICE since his release from an initial period of immigration detention in 2008.

15.     Plaintiff New Sanctuary Coalition of New York City (the Coalition) is an interfaith network of congregations, organizations, and individuals, standing publicly in solidarity with families and communities resisting detention and deportation in order to stay together. Since its inception in 2007, the Coalition has grown from a half-dozen congregations to a city-wide movement, working in coalition with New York City's major immigrant organizations to reform immigration enforcement practices and policies, both locally and nationally. The Coalition is based in New York.

16.     Plaintiff CASA de Maryland, Inc. (CASA) is a non-profit 501(c)(3) membership organization headquartered in Langley Park, Maryland, with offices in Maryland, Virginia, and Pennsylvania. Founded in 1979, CASA is the largest membership-based immigrant-rights organization in the mid-Atlantic region, with more than 90,000 members. CASA's mission is to create a more just society by building power and improving the quality of life in low-income immigrant communities. In furtherance of this mission, CASA offers a wide variety of social, health, job training, employment, and legal services to immigrant communities in Maryland, as well as the greater Washington, DC metropolitan area, Virginia, and Pennsylvania.

17.     Plaintiff National Immigration Project of the National Lawyers Guild (NIPNLG) is a national non-profit 501(c)(3) membership organization headquartered in Boston, Massachusetts. Formed in 1971 as a committee of the National Lawyers Guild, NIPNLG became a freestanding organization in 1981. Today it is one of the few national legal support groups that specialize in defending the rights of immigrants facing incarceration and deportation. It provides technical assistance and support to community-based immigrant organizations, legal practitioners, and advocates seeking and working to advance the rights of noncitizens. NIPNLG works independently and collaboratively with immigration advocacy organizations across the

United States to educate and strengthen the capacity of immigration professionals and immigrant organizations to defend immigrant rights, and promotes public policy change through litigation, advocacy, and support for community organizing on the ground.

18.     Plaintiff New York Immigration Coalition (NYIC) is an umbrella policy and advocacy organization for more than 200 groups in New York State.  NYIC envisions a New York state that is stronger because all people are welcome, treated fairly, and given the chance to pursue their dreams.  Its mission is to unite immigrants, members, and allies so all New Yorkers can thrive.  NYIC represents the collective interests of New York's diverse immigrant communities and organizations and devises solutions to advance them; advocates for laws, policies, and programs that lead to justice and opportunity for all immigrant groups; and builds the power of immigrants and the organizations that serve them to ensure their sustainability, to improve people's lives, and to strengthen the state.

19.     Plaintiff Detention Watch Network (DWN) is a national coalition of approximately 200 organizations and individuals headquartered in Washington, DC.  Founded in 1997 in response to the explosive growth of the U.S. immigration detention and deportation system, DWN works against the injustices of those systems and for profound change that promotes the rights of dignity of all persons.  DWN is the only national network that focuses exclusively on immigration detention and deportation issues, is a go-to resource on detention issues, and is known as a critical national advocate for just policies that promote an eventual end to immigration detention.  DWN unites diverse constituencies to advance the civil and human rights of those impacted by the immigration detention and deportation systems.  DWN members, many of whom are directly affected by detention and deportation policies, are community organizers, advocates, social workers, lawyers, doctors, clergy, students, and formerly detained

immigrants and their families.  They are engaged in individual case and impact litigation, documenting conditions violations, local and national administrative and legislative advocacy, community organizing and mobilizing, teaching, and social service.

20.      Defendant Thomas D. Homan is the Deputy Director and Senior Official Performing the Duties of the Director of ICE.  He is named in his official capacity.  He is responsible for the enforcement of the immigration laws, including against Mr. Ragbir.  He supervises Defendants Decker and Mechkowski.  His address is U.S. Immigration and Customs Enforcement, 500 12th Street, SW, Washington, DC, 20536.

21.      Defendant Thomas R. Decker is the New York Field Office Director for ICE.  He is named in his official capacity.  He is responsible for the enforcement of the immigration laws in New York City and surrounding counties within New York, including against Mr. Ragbir.  He supervises Defendant Scott Mechkowski.  His address is New York Field Office, 26 Federal Plaza, 11th Floor, New York, New York, 10278.

22.      Defendant Scott Mechkowski is the New York Field Office Deputy Director for ICE.  He is named in his official capacity.  He is responsible for the enforcement of the immigration laws in New York City and surrounding counties within New York, including against Mr. Ragbir.  His address is New York Field Office, 26 Federal Plaza, 11th Floor, New York, New York, 10278.

23.      Defendant Department of Homeland Security (DHS) is an executive department of the United States Government.  DHS is headquartered in Washington, DC.

24.      Defendant ICE is a component of DHS headquartered in Washington, DC.

25.      Defendant Kirstjen M. Nielsen is the Secretary of Homeland Security.  She is named in her official capacity.  She is responsible for the administration and enforcement of the

immigration laws, including against Mr. Ragbir.  She supervises Defendants Homan, Decker,

and Mechkowski.  Her address is U.S. Department of Homeland Security, 800 K Street, NW

#1000, Washington, DC, 20528.

26.     Defendant Jefferson B. Sessions III is the Attorney General of the United States.

He is named in his official capacity.  He is responsible for the administration of the immigration

laws as exercised by the Executive Office for Immigration Review.  8 U.S.C. § 1103(g).  He is

responsible for Mr. Ragbir's removal proceedings, and supervises immigration judges and the

Board of Immigration Appeals.  His address is U.S. Department of Justice, 950 Pennsylvania

Avenue, NW, Washington, DC, 20530.

27.     Defendant Department of Justice (DOJ) is an executive department of the United

States Government.  DOJ is headquartered in Washington, DC.

## FACTUAL ALLEGATIONS

**A.      Defendants Have Engaged in a Pattern and Practice of Targeting Immigrant-Rights Activists on the Basis of their Core Protected Political Speech**

28.     Since January 2017, federal immigration authorities across the country have

engaged in a pattern and practice of targeting outspoken immigrant-rights activists who

publically criticize U.S. immigration law, policy, and enforcement.

29.     Defendants have investigated, surveilled, harassed, raided, arrested, detained, and

even deported these activists in order to silence them.  They have arrested activists immediately

following press appearances and news conferences.  They have detained spokespeople and

directors of immigration advocacy organizations.  They have surveilled the organizations'

headquarters and targeted their members.  And they have targeted communities identified by the

federal government as "sanctuary cities" to punish those communities for taking legislative,

municipal, and political action to limit official cooperation with federal immigration enforcement.

30.     This sharp spike in immigration enforcement specifically targeting the most vocal immigration activists is intended to stifle dissent. According to U.S. Representative Jerry Nadler: "These are well-known activists who've been here for decades, and [ICE is] saying to them: Don't raise your head."[1] Similarly, U.S. Representative Luis Guitierrez has stated: "I have long suspected that very vocal advocates were harshly targeted after they spoke out. ... I would go to ... an immigration hearing, and the person who made the biggest impression? I'd find out that they'd been detained. And that started last year."[2]

31.     Since 2017, media organizations have reported on many immigrants, including Plaintiff Ravidath Ragbir and others, whom ICE has detained or taken other adverse action against based on their speech or other protected activities.

**B.      Defendants Surveilled, Detained, and Seek To Deport Mr. Ragbir in Retaliation for his Outspoken Criticism of U.S. Immigration Law and Policy**

**1.      Mr. Ragbir's Activism and Political Speech**

32.     Plaintiff Ravidath Ragbir, Executive Director of the Coalition, is a father, husband, and nationally recognized immigrant-rights leader.

33.     Since his release from immigration detention with a final order of removal over a decade ago, Mr. Ragbir has dedicated his professional and personal life to speaking out against immigration policies that he considers unjust. He has been a vocal critic of ICE and other

---

[1] Maria Sacchetti and David Weigel, *Ice has Detained or Deported Prominent Immigrant Rights Activists*, Washington Post (Jan. 19, 2018), https://www.washingtonpost.com/powerpost/ice-has-detained-or-deported-foreigners-who-are-also-immigration-activists/2018/01/19/377af23a-fc95-11e7-a46b-a3614530bd87_story.html?utm_term=.5be0c8e2393b.

[2] *Id.*

components of DHS. His work and his views about immigration policy and enforcement are frequently profiled in local and national media.

34.     As Executive Director of the Coalition, Mr. Ragbir has maintained a regular presence outside ICE offices and Department of Justice immigration courts in New York, located at 26 Federal Plaza, which also houses the United States Citizenship and Immigration Services (USCIS) and other DHS and Department of Justice offices, and outside of 201 Varick Street, which houses the detained immigration court and serves as a processing center for immigrants who ICE intends to detain. At both locations, Mr. Ragbir organizes weekly prayerful vigils called "Jericho Walks" that are led by Coalition faith leaders.

35.     In his capacity as the Coalition's Executive Director, Mr. Ragbir has also had extensive contact with ICE's offices and the immigration courts through the Coalition's Accompaniment Program. This program ensures that immigrants who have immigration court dates and check-in appointments do not face these experiences alone. As part of this program, the Coalition has trained hundreds of volunteers on how to accompany immigrants to court and to check-ins (which occur at 26 Federal Plaza, 201 Varick Street, and other locations), whereby immigrants who are subject to some form of supervised release routinely meet with ICE officers. These volunteers provide critical support to those who would like to comply with the immigration laws and rules, but are scared to go to court and check-ins alone. In many cases, legal services providers now reach out to Mr. Ragbir directly to ask the Coalition to provide accompaniment for their clients. The Coalition provides an average of 11 accompaniments per week to immigrants in enforcement proceedings.

36.     Second, Mr. Ragbir created a program in which volunteers help immigrants to find attorneys to assist them in immigration proceedings, in navigating interactions with ICE, and, where possible, in speaking out about the injustices they experience.

37.     In addition to this work, Mr. Ragbir has been a vocal advocate for immigrant rights across the United States and a frequent critic of current immigration policies.  For example, Mr. Ragbir testified before the New York City Council on detention and deportation policies, met with President Obama's transition team to discuss his perspective and experiences on immigration policy, and has spoken at countless conferences, media events, and places of worship.  He coordinates workshops with attorneys and other experts to help immigrants fleeing violence in their home countries to learn about their right to apply for asylum.  And he trains advocates and elected officials on immigration issues and how to reform the deportation system.

38.     Over the years, Mr. Ragbir has received numerous accolades for his zealous advocacy.  He was awarded the 2017 Immigrant Excellence Award by the New York State Association of Black and Puerto Rican Legislators for his "deep commitment to the enhancement of their community."  He also won the 2017 ChangeMaker Award by South Asian Americans Leading Together (SAALT) for his "tremendous sacrifice, fierce advocacy, and fearless leadership" on behalf of immigrants.  He was recently awarded the Bishop's Cross from the Episcopal Diocese of Long Island for his "exceptional service to the church and to the community it serves."

### 2.     Mr. Ragbir's Immigration History

39.     Mr. Ragbir's work is informed by his personal experience of being detained and facing deportation.

40.     Mr. Ragbir received Lawful Permanent Resident status in the United States in 1994.  His daughter was born in the United States the next year.

41.     In May 2006, ICE detained Mr. Ragbir after he was convicted of criminal wire fraud—a conviction for which Mr. Ragbir served his time.[3]

42.     On August 4, 2006, an Immigration Judge entered an order of deportation in Mr. Ragbir's case, which became final when the Board of Immigration Appeals rejected his appeal in March 2007.

43.     Throughout his immigration court proceedings and after issuance of an order of deportation, Mr. Ragbir remained in detention, despite two Post Order Custody Reviews.

44.     ICE finally released Mr. Ragbir from custody following a third Post Order Custody Review in February 2008. ICE reported in the Post Order Custody Review that led to his release that Mr. Ragbir "did not commit a crime of violence and does not appear to be a flight risk and he is fully aware that he will have to report to ICE custody when required." The notice further explained, once removal was commenced, "[y]ou will, at that time, be given an opportunity to prepare for an orderly departure."

45.     Mr. Ragbir has always contested his removability, most recently with the assistance of pro bono counsel. As of today, Mr. Ragbir has three pending legal applications, a petition in the U.S. District Court for the District of New Jersey for a writ of *coram nobis*, a petition for a presidential pardon, and a motion with the Board of Immigration Appeals to reconsider, reopen, and remand his removal proceedings based on new evidence undermining the deportability ground in his case, as well as his petition for adjustment of status on the basis of his eight years of marriage to Amy Gottlieb, a U.S. citizen and attorney. Like Mr. Ragbir, Ms.

---

[3] Mr. Ragbir continues to dispute the basis of his conviction. Further, as this Court recently noted ordering his release from detention, "[i]t is uncontested that since his release from custody, [Mr. Ragbir] has lived the life of a redeemed man." *Ragbir v. Sessions*, No. 18-cv-236 (KBF), 2018 WL 623557, at *3 n.11 (S.D.N.Y. Jan. 29, 2018) (Forrest, J.).

Gottlieb is a prominent immigrant-rights advocate who has dedicated her career to the pursuit of a just immigration policy.

46.     Meanwhile, for approximately a decade, Mr. Ragbir has dutifully checked in with ICE and complied with all conditions of his release. Orders of supervision authorize individuals like Mr. Ragbir to live and work in the United States in compliance with the conditions of the order. If an order of supervision is revoked on grounds unrelated to flight risk or dangerousness, the individual will be given the opportunity for an "orderly departure," including time (generally two to three months) to get his affairs in order, purchase a ticket, and provide proof of departure.

47.     Following his order of removal, Mr. Ragbir also applied for and received work permits that allowed him to work in the United States. It was pursuant to this work authorization that he was able to work full-time for the Coalition.

48.     For several years, Mr. Ragbir has also received and renewed an administrative stay of removal (Form I-246). This stay assured Mr. Ragbir that ICE would not seek his deportation for the period covered by the administrative stay. Mr. Ragbir's first stay of removal was granted by the ICE Field Office in New York City in December 2011, and was renewed three times, in February 2013, March 2014 and January 2016. In November 2017, he filed for renewal of his administrative stay.

### 3.     Mr. Ragbir's March 9, 2017 Check-In

49.     On March 9, 2017, Mr. Ragbir was due to check in with ICE officers at 26 Federal Plaza. In the tradition of the Accompaniment Program he designed, Mr. Ragbir was accompanied by his family, lawyers and clergy.

50.     In addition, Mr. Ragbir brought with him several New York elected officials, including New York State Senator Gustavo Rivera, New York City Council Members Daniel Dromm, Ydanis Rodriguez, and Jumaane Williams, and then-New York City Council Speaker

Melissa Mark-Viverito.  Several hundred additional community members gathered outside in support of Mr. Ragbir.

51.     During the March 9, 2017 check-in, several of the elected officials accompanying Mr. Ragbir encountered then-Assistant Field Office Director Scott Mechkowski in the hallway outside the check-in room on the 9th Floor.  Mechkowski demanded that the elected officials leave the hallway.

52.     Media reports described a tense confrontation between ICE officers and the elected officials who accompanied Mr. Ragbir.  "The conference was cut short when a man … ordered the group to clear the hallway immediately.  City Councilmember Jumaane Williams observed that the group wasn't blocking the hallway and asked the man to identify himself.  The man refused, but insisted that Mr. Ragbir, his friends, and the elected officials leave the hallway. For a moment the two men squared off, eye to eye.  The unnamed federal official eventually stepped away, and Mr. Ragbir's entourage boarded elevators to descend."[4]

53.     Due in part to the high-profile detentions of other immigrant activists, there was a significant media presence at 26 Federal Plaza the morning of March 9, 2017, prior to and following Mr. Ragbir's check-in.

54.     After the check-in, several media outlets worldwide reported on Mr. Ragbir's struggle to remain in the United States and his confrontational March 9 check-in with ICE.[5]

---

[4] Nick Pinto, *Behind ICE's Closed Doors, "The Most Un-American Thing I've Seen,"* Village Voice (Mar. 10, 2017), https://www.villagevoice.com/2017/03/10/behind-ices-closed-doors-the-most-un-american-thing-ive-seen/.

[5] *See, e.g.,* Liz Robbins, *Once Routine, Immigration Check-Ins Are Now High Stakes,* N.Y. Times (Apr. 11, 2017), https://www.nytimes.com/2017/04/11/nyregion/ice-immigration-check-in-deportation.html; *Apoyado por cientos, defensor de inmigrantes evade deportación en Nueva York,* La Nación Costa Rica (Mar. 9, 2017), https://www.nacion.com/el-mundo/politica/apoyado-por-cientos-defensor-de-inmigrantes-evade-deportacion-en-nueva-york/NQTJGKHIWJAYREVGOVWMLAWJCE/story/; *New York: malgré un casier judiciaire,*

55.     Those reports also included the comments of elected officials who were present at the check-in and critical of ICE's enforcement policies.  In the resulting press coverage, Mr. Ragbir spoke publically regarding the emotional toll taken by the ICE check-in:  "When I speak about how I feel, I cannot breathe."[6]

56.     Mr. Ragbir also criticized federal immigration policy, commenting on the profit motive fueling current ICE detention policies: "So, you know how much it costs to feed—when I was locked in detention, do you know how much it cost to feed me for one day?  Seventy-five cents.  They were spending to feed one immigrant 75 cents.  And you know how we knew that?  Because they felt they were spending too much, and they wanted to bring that cost under 45 cents, so the numbers were thrown out, and we were hearing and seeing this happen.  So, the profits—the cost is low, but the profits are high, because they're being paid $120, right?"[7]

57.     In a panel discussion alongside Councilmember Mark-Viverito, Mr. Ragbir rallied community members to become involved in the sanctuary-city movement.  He insisted that "sanctuary cities can only work if everyone becomes part of the movement," saying, "we want to see sanctuary in the schools, the restaurants as well as churches."  He encouraged community members to protest ICE actions.

---

*un immigré évite l'expulsion*, Le Parisien (Mar. 10, 2017), http://www.leparisien.fr/flash-actualite-monde/new-york-malgre-un-casier-judiciaire-un-immigre-evite-l-expulsion-10-03-2017-6751086.php.

[6] Tiziana Rinaldi, *It's Good News and Bad News for an Immigrant Advocate Facing Deportation*, PRI (March 10, 2017), https://www.pri.org/stories/2017-03-10/its-good-news-and-bad-news-immigrant-advocate-facing-deportation.

[7] Amy Goodman, *Exclusive: Facing Possible Deportation, Immigrant Activist Ravi Ragbir Speaks Out Before ICE Check-in*, Democracy Now! (Mar. 9, 2017), https://www.democracynow.org/2017/3/9/exclusive_facing_likely_deportation_immigrant_activist.

### 4. ICE Officials' Reaction to the March 9, 2017 Check-In

58.     On information and belief, on January 3, 2018, days before Mr. Ragbir's next scheduled check-in, one of the co-founders of the Coalition, Jean Montrevil, was arrested by ICE agents outside his home during his lunch break from work.  Mr. Montrevil, a Haitian national, immigrant rights activist, and green-card holder who was placed into removal proceedings as a teenager due to a drug charge, was in the midst of a motion to reopen his order of removal. Nonetheless, on January 3, 2018, Mr. Montrevil was transferred to detention in ICE's Krome Detention Center in Florida, and deported to Haiti just six days later, on January 9, 2018.[8]  He was forced to leave behind his four U.S. citizen children, and an active community of organizers who worked with him to advance immigrant rights, including Mr. Ragbir.

59.     On information and belief, Mr. Montrevil's lawyer asked Scott Mechkowski, ICE's Deputy Field Office Director for New York, why the agency had sent a team to apprehend Mr. Montrevil at home months before his scheduled check-in.  Mechkowski responded that "We [ICE] war-gamed this over and over," adding, "[t]his was the best time and place to take him."

60.     On information and belief, during this same period, ICE officials surveilled Mr. Ragbir and members of the Coalition.[9]

61.     On information and belief, on January 5, 2018, Rev. Juan Carlos Ruiz, one of the co-founders of the Coalition, and an immigrant-rights organizer, went with three other faith leaders to discuss Mr. Montrevil's situation with ICE Director Thomas Decker at 26 Federal Plaza.  The clergy were told that Director Decker was not available and instead met with Deputy

---

[8] Nick Pinto, *No Sanctuary*, Intercept (Jan. 19, 2018), https://theintercept.com/2018/01/19/ice-new-sanctuary-movement-ravi-ragbir-deportation/
[9] *Id.*

Director Scott Mechkowski to discuss Mr. Montrevil's case. Without prompting, Mechkowski brought up Mr. Ragbir's case and his remarks to the media after his last check-in. In addition:

      a.      Mechkowski stated that Mr. Ragbir and Mr. Montrevil's cases were the two "highest profile" cases in his office.

      b.      Mechkowski made negative remarks about the elected officials who spoke out about ICE practices after Mr. Ragbir's last check-in.

      c.      Mechkowski stated that he would not permit the clergy members to accompany Mr. Ragbir to this check-in, as they had in the past, and described the upcoming check-in as "D-Day."

      d.      Mechkowski stated that the manner of Mr. Montrevil's detention was intended to avoid the sort of noisy protest that had accompanied Mr. Ragbir's previous check-in, and stated that ICE "didn't want the display of wailing kids and wailing clergy." Clergy members reported that he added: "That can't happen this time around."[10]

      e.      Lastly, although Mechkowski denied that ICE was surveilling Mr. Ragbir, he stated: "I know where Mr. Ragbir lives, and I have seen him walking around, and I could have taken him myself."

    62.      On information and belief, on January 8, 2018, Mr. Ragbir's counsel spoke with ICE Deputy Director Mechkowski. Speaking of Mr. Ragbir, Mechkowski stated that things were "different" now than they were in the past, referring to changes in leadership. Significantly, Mechkowski stated that he felt "resentment" about the March 9, 2017 check-in.

    63.      In addition, Mechkowski stated that:

---

[10] *Id.*

a.       Mechkowski heard Mr. Ragbir's statements to the press, and that he

continued to see him at vigils at 26 Federal Plaza; and

b.       Mechkowski was angry about the presence of the elected officials in 26

Federal Plaza, specifically naming Melissa Mark-Viverito and "that guy from

Brooklyn" (presumably Councilmember Jumaane Williams).

### 5.       Defendants' Unnecessarily Cruel Detention of Mr. Ragbir

64.       As noted above, Mr. Ragbir's counsel applied for renewal of his administrative

stay in November 2017.  At that time Mr. Ragbir's current administrative stay was due to expire

on January 19, 2018.  His counsel received an e-mail from Mechkowski on January 10, 2018

stating that Mr. Ragbir's request for renewal of his administrative stay was pending, and that no

decision had been reached.

65.       Mr. Ragbir's January 11, 2018 check-in was atypical in several respects:

a.       First, in advance of Mr. Ragbir's scheduled January 11, 2018 check-in,

Mechkowski suggested that—rather than following the normal protocol by which

Mr. Ragbir would check-in with the Deportation Officer assigned to his case—

Mr. Ragbir should report directly to him on January 11, 2018.

b.       Second, upon meeting Mechkowski as instructed on January 11, 2018, the

group was told that only one of Mr. Ragbir's legal representatives and his wife

would be allowed to enter.  The undisputed fact that another attorney and two law

students had entered G-28 Notices of Appearance on behalf of Mr. Ragbir was

disregarded.

66.       In the ensuing meeting, Mechkowski reported that ICE would no longer await a

pending decision from the Office of Chief Counsel on Mr. Ragbir's motion to reopen his

removal proceedings.  He stated that he was not willing to wait longer and would be "enforcing

the order." He said that a decision was made that morning to deny Mr. Ragbir's application for a renewed stay of removal, and handed his counsel a letter from Director Decker stating that his request for the renewed stay was denied.  He then said he would be taking Mr. Ragbir into custody.  Upon hearing the news, Mr. Ragbir briefly lost consciousness.

67.     In the subsequent few hours, Mr. Ragbir's representatives were not given any arrest warrant authorizing Mr. Ragbir's arrest.  Further, ICE officers engaged in evasive maneuvers to separate Mr. Ragbir from his wife and transfer him to a Florida detention center, rather than one of the many detention centers typically used by ICE in New York and New Jersey.  Specifically:

      a.     Mr. Ragbir's counsel was not told what detention facility he would be taken to; ICE officers simply stated that they did not know.

      b.     The ambulance that took Mr. Ragbir, his wife, and ICE officers to a local hospital dropped his wife off at one hospital, where his wife believed Mr. Ragbir would be "medically cleared," and then took Mr. Ragbir to a second hospital.

      c.     At the hospital, ICE officers attempted to rush the process of medical clearance.

      d.     Although several detention centers are typically used by ICE in the New York-New Jersey area, ICE officers took Mr. Ragbir in a van to Newark Airport, and then to a plane to Miami, Florida to be booked at a facility there.  ICE later disclosed that they had purchased the tickets to Miami the day before.

      e.     ICE initially refused to return Mr. Ragbir to the New York area despite this Court's January 11 order enjoining the Government from transferring him

21

outside the jurisdiction of the New York field office.  Mr. Ragbir was returned

only after filing a motion to enforce the Court's order.

68.     Mr. Ragbir was "processed" curbside at Newark Airport, had his fingerprint

placed on various papers but not given copies of any documents other than the letter denying his

stay application.  He learned later that his current stay (which was valid until January 19, 2018)

and ongoing order of supervision had been revoked.  He has never been provided with a reason

for the revocation.

69.     Mr. Ragbir spent more than two weeks in detention.  His movements were

restricted and monitored.  Contact with his wife and his counsel was extremely limited,

particularly while detained in Florida.  He was unable to receive calls at all, nor could he make

outgoing calls unless funds were placed in his phone account.  In-person visits were strictly

limited in Florida, and family could only visit for a one-hour period, through plexiglass.  During

Mr. Ragbir's detention, ICE officers indicated that they were aware of his activism.

70.     Mr. Ragbir's counsel filed a petition for Writ of Habeas Corpus on January 11,

2018 in this Court, challenging ICE's detention of Mr. Ragbir as unlawful.

71.     On January 29, 2018, this Court granted that petition, ordering his immediate

release from detention.  The Court noted ICE's abrupt detention was both cruel and unusual.

> [W]hen this country allowed petitioner to become a part of our
> community fabric, allowed him to build a life with and among us
> and to enjoy the liberties and freedom that come with that, it
> committed itself to avoidance of unnecessary cruelty when the
> time came.  By denying petitioner these rights, the Government has
> acted wrongly.

*Ragbir*, 2018 WL 623557, at *2.

72.     This Court also indicated that ICE's motivation for Mr. Ragbir's detention

merited further scrutiny:

> *The Court also notes with grave concern the argument that*
> *petitioner has been targeted as a result of his speech and political*
> *advocacy on behalf of immigrants' rights and social justice.*
> "[A]s a general matter, the First Amendment means that
> government has no power to restrict expression because of its
> message, its ideas, its subject matter, or its content."

*Id.* at *1 n.1 (emphasis added) (quoting *Alvarez*, 567 U.S. at 716).

### 6.    ICE's Ongoing Efforts To Deport Mr. Ragbir

73.    Mr. Ragbir was released from detention on January 29, 2018, as a result of the

Court's decision.  ICE's treatment of Mr. Ragbir was unusual even in the final moments of his

detention.  Before he was released, ICE officers shackled him once more for the duration of his

return from Orange County Correctional Facility in Goshen, New York, to New York City.[11]  He

was then processed for release and personally served a notice to report for deportation on

Saturday, February 10, 2018 by Mechkowski at 26 Federal Plaza.

74.    Nonetheless, Mr. Ragbir has continued his activism since his release.[12]  On

January 31, 2018, Mr. Ragbir returned to 26 Federal Plaza, the site of his detention, and led a

Jericho walk in protest.[13]  Speaking to a crowd, he stated, "There is a psychological warfare out

there and they want us to be weak . . . . They want us to cave . . . so our spirits are broken."  *Id.*

75.    Meanwhile, Defendants continue to employ extraordinary tactics to remove Mr.

Ragbir as quickly as possible and without regard to this Court's order holding that Mr. Ragbir

---

[11] *Exclusive: Ravi Ragbir Speaks Out After Being Freed from "Unnecessarily Cruel" ICE Detention*, Democracy Now! (Jan. 30, 2018), https://www.democracynow.org/2018/1/30/exclusive_immigrant_leader_ravi_ragbir_freed.

[12] Kristin Toussaint, *Immigrant rights leader Ravi Ragbir released from ICE detention*, Metro (Jan. 30, 2018), https://www.metro.us/news/local-news/new-york/immigrant-rights-leader-ravi-ragbir-released-ice.

[13] Molly Crane-Newman, *Immigrant activist Ravi Ragbir returns to site of his arrest for Manhattan protest march: "They want us to cave,"* Daily News (Feb. 1 2018), http://www.nydailynews.com/new-york/manhattan/ravi-ragbir-returns-site-arrest-nyc-protest-march-article-1.3793363.

was entitled to an orderly departure.  In fact, as of today's date, ICE has ordered Mr. Ragbir to check in again on Saturday, February 10, 2018, less than two weeks after the date of this Court's Order, with "one piece of luggage not to exceed 44 pounds."[14]

76.    ICE's check-in date, February 10, 2018, is notable.  It provides Mr. Ragbir less than two weeks from the date of this Court's Order to prepare himself to leave the country where he has lived for over two decades, and where he will leave a wife and daughter.  In addition, it is the day after a scheduled hearing on Mr. Ragbir's motion for a stay of his removal pending adjudication of his *coram nobis* petition in the District Court of the District of New Jersey.  On information and belief, ICE is aware that the New Jersey District Court has ordered that Mr. Ragbir shall not be removed until it has reached a decision on that motion, and aware that February 9 is a hearing date, and not likely to be the date that the motion is decided.

77.    Upon information and belief, it is highly unusual to require an individual to check in or report to ICE on a Saturday, when ICE offices—and courts—are typically closed.  Counsel for Mr. Ragbir noted that the Saturday reporting date would impede his access to the courts, and asked for a weekday report date, but this request was rejected.

C.    **Defendants Have Targeted Numerous Other Immigrant-Rights Activists on the Basis of Their Core Protected Political Speech on Immigration Issues**

78.    The arrests of Mr. Ragbir and Jean Montrevil are not unique.  Rather, under the current Administration, ICE has engaged in a pattern and practice of targeting immigrants who exercised their fundamental First Amendment rights to criticize immigration policy and immigration enforcement.

---

[14] Letter of Thomas Decker to Alina Das (Feb. 5, 2018).

### 1.    Daniela Vargas

79.    On information and belief, on March 1, 2017, in Jackson, Mississippi, ICE agents detained Daniela Vargas, a 22-year-old activist and DACA recipient as she left a news conference where she had spoken alongside other immigration advocacy groups.[15] Vargas had witnessed ICE's arrest of her family the previous month, and was not detained at that time because she explained to the officers that she had DACA status.  That status had expired, but Vargas was in the process of applying for renewal.  At the conference, she asked President Trump to protect her.

80.    ICE agents arrested Vargas minutes after she spoke to reporters outside Jackson City Hall.  A person present at the arrest reported that ICE agents opened the car door saying "you know who we are and you know why we're here."  Although she had a pending DACA case, ICE agents claimed that she was listed as a "visa overstay" and would have to be detained.[16]

### 2.    Migrant Justice

81.    On information and belief, ICE has targeted multiple members of Migrant Justice, a community based non-profit organization of Vermont dairy farmworkers and their families.  A majority of Vermont dairy workers are immigrants, and Migrant Justice has engaged in campaigns to defend the rights of their members as workers and as immigrants.  In particular, Migrant Justice has sought to hold immigration enforcement agencies including ICE accountable for rights violations.

---

[15] Phil Helsel, *'Dreamer' Applicant Arrested After Calling for Immigrant Protection*, NBC News (Mar. 2, 2017), https://www.nbcnews.com/news/us-news/dreamer-applicant-arrested-after-calling-immigrant-protections-n727961.

[16] *ICE Intimidates Latino Community With Arrest of DACA Recipient Practicing Free Speech*, HuffPost (Mar. 3, 2017), https://www.huffingtonpost.com/entry/ice-intimidates-latino-community-with-arrest-of-daca_us_58b9dd6de4b02b8b584dfb6d

82.     On April 21, 2016, ICE arrested Jose Victor Garcia Diaz outside a Mexican cultural event in Stowe, Vermont.[17]  Mr. Garcia Diaz is a public spokesperson for Migrant Justice's Milk with Dignity campaign.  The day before his arrest, he had returned from a gathering of the Food Chain Workers Alliance in Los Angeles, California. Mr. Garcia Diaz represented Vermont farmworkers at the meeting in an effort to build a unified movement for respect for human rights in food supply chains.  His immigration removal proceedings are ongoing.

83.     On March 17, 2017, the day after Migrant Justice announced an escalation of its Milk with Dignity campaign with respect to Ben & Jerry's, ICE arrested Jose Enrique Balcazar Sanchez shortly after he left a meeting at Migrant Justice's office.  ICE had previously identified Balcazar as a target for enforcement.[18]  He has been a very visible representative of Migrant Justice and publicly promoted policies to limit ICE's entanglement with local law enforcement. Over the past few years, Balcazar Sanchez has served as one of Migrant Justice's primary spokespeople in its campaigns for driver's licenses and for a fair and impartial policing policy. He served on a task force established to advise the Vermont Attorney General on immigration issues, which resulted in guidance for Vermont cities and towns to limit their role in immigration law enforcement.

84.     On March 17, 2017, ICE also arrested Zully Victoria Palacios Rodriguez, who was a passenger in Balcazar Sanchez's car. Palacios Rodriguez is a key Migrant Justice

---

[17] Compl. ¶ 16, *Migrant Justice v. U.S. Dep't of Homeland Sec.*, No. 17-cv-197 (D. Vt. Oct. 11, 2017).

[18]     On September 22, 2016, ICE arrested Miguel Alfredo Alcudia Gamas, another Migrant Justice member. Mr. Alcudia Gamas is also a public spokesperson for Migrant Justice's Milk with Dignity campaign. When ICE arrested Mr. Alcudia Gamas, ICE officers made statements implying that they were targeting a fellow Migrant Justice leader, Jose Enrique Balcazar Sanchez. *Id.* ¶ 18.

organizer. Just prior to her arrest, she had also just left Migrant Justice's office. Notably,

Palacios was arrested on the grounds that she had overstayed her visa—a civil violation—by

approximately eight months. She was held without bail, which is extremely atypical treatment

for an immigrant who has merely overstayed a visa.[19]

85.     On June 17, 2017, two more Migrant Justice activists were arrested for

immigration violations as they returned home from a march for better work conditions. Esau

Peche and Yesenia Hernandez participated in the march with approximately 200 others walking

from Montpelier Vermont, to a Ben & Jerry's factory in Waterbury. After the March, they drove

home to East Franklin, which is north of Waterbury. They were stopped by Border Patrol,

arrested and turned over to ICE. A Border Patrol spokesperson stated that the two Mexican

nationals "appeared to the agent to have come across the border" and were stopped as part of

routine operations.[20]

86.     Migrant Justice is currently engaged in litigation to confirm through a Freedom of

Information Act request whether its members have been targeted by ICE because of their

advocacy on behalf of migrant workers.[21]

### 3.     Maru Mora Villalpando

87.     On information and belief, in December 2017, ICE served Maru Mora

Villalpando with a Notice to Appear for removal proceedings.[22] Villalpando is a renowned

---

[19] Milton J. Valencia, *Hundreds in Boston Will Protest Vermont ICE Arrests*, The Boston Globe (Mar. 26, 2017), https://www.bostonglobe.com/metro/2017/03/26/hundreds-protest-vermont-ice-arrests-boston-monday/MdxOtwc9TP6sVHsgEjEAY/story.html

[20] Elizabeth Murray, *Protesters decry farmworkers' arrest after Ben & Jerry's march* (June 19, 2017), http://www.burlingtonfreepress.com/story/news/local/vermont/2017/06/19/border-patrol-arrests-2-immigrants-east-franklin/408333001/.

[21] Compl., *Migrant Justice, et. al v. United States Dep't of Homeland Security, et. al*, No. 17-cv-197 (D. Vt. Oct. 11, 2017).

immigrants' rights activist in Washington State with no criminal record. She has lived in the

United States for 22 years, and during that time, has taken an active and public role in speaking

out for immigrant rights.

88.     On information and belief, Villalpando was originally admitted to the United

States under a tourist visa, and did not leave the country when the visa expired.  She has now

resided in the United States for over 25 years.  She raised a daughter in the United States:

Josefina Alanis Mora, who is now a university student.  She has no criminal history.

89.     On information and belief, Villapando was well-known to federal officials for

many years before she was issued a Notice to Appear.  She met with federal officials during the

Obama administration, when she helped publicize detainees' hunger strikes and other protests in

Washington State.  She acted as a spokeswoman for immigrants held at the Northwest Detention

Center in Tacoma, Washington.  There is no explanation for her ICE's sudden issuance of a

Notice to Appear.  She explained to the *Washington Post* that, "There's no way for them to know

about me except for the work that I do[.]"[23]

### 4.     Baltazar Aburto Gutierrez

90.     On information and belief, in early December 2017, Baltazar "Rosas" Aburto

Gutierrez was detained by an ICE agent who explicitly referenced  the fact that he had spoken to

a newspapers in November 2017.[24]  Though his comments were made anonymously in a *Seattle*

---

[22] Maria Sacchetti & David Weigel, *ICE Has Detained or Deported Prominent Immigration Activists*, Washington Post (Jan. 19, 2018), https://www.washingtonpost.com/powerpost/ice-has-detained-or-deported-foreigners-who-are-also-immigration-activists/2018/01/19/377af23a-fc95-11e7-a46b-a3614530bd87_story.html?utm_term=.64d28708d652.

[23] *Id.*

[24] Nina Shapiro, *ICE Tracks Down Immigrants Who Spoke to Media in SW Washington: "You Are the One from the Newspaper,"* Seattle Times (Dec. 3, 2017), https://www.seattletimes.

*Times* article, a second article in the *Chinook Observer* referenced his nick-name ("Rosas").[25]  In addition, his partner's full name and details of the ICE action to arrest and deport her were reported in both articles.

91.     On information and belief, Gutierrez had commented to the press about the wrenching circumstances of his partner's arrest by ICE and her deportation to Mexico in November 2017.  ICE at that time declined to arrest Gutierrez as well, stating that while his partner had a prior deportation order, he did not.

92.     On information and belief, the next month, the agent who arrested Gutierrez approached him again stating, "You are Rosas," and "You are the one from the newspaper."[26]  Gutierrez also stated that the agent told him "My supervisor asked me to come find you because of what appeared in the newspaper."[27]  ICE did not explain why the rationale that prevented Gutierrez's arrest the month before had changed.

### 5.     Eliseo Jurado

93.     On information and belief, Eliseo Jurado was born in Mexico and came to the United States as a teenager.  His father is a United States citizen; his mother is a green card holder.  He is married to Encalada Latorre, a Peruvian woman who has taken sanctuary in churches in Boulder Colorado since December 2016.  The couple has two U.S. citizen children.  Jurado's wife, Latorre has been the subject of extensive news coverage since she moved into  a local church to avoid deportation.

---

com/seattle-news/ice-tracks-down-immigrant-who-spoke-to-media-in-sw-washington-you-are-the-one-from-the-newspaper.

[25] *Id.*

[26] *Id.*

[27] *Id.*

94.     On information and belief, although local ICE Field Office Director Jeffrey Lynch

denied that Jurado's arrest was related to his wife's decision to take sanctuary, he confirmed in a

statement that Jurado came to the agency's attention during an investigation into Encalada

Latorre.[28]

### 6.     Amer Othman Adi

95.     Amer Othman Adi, a 57-year-old businessman, husband and father, arrived in

the United States at 19 years old.  He was placed into removal proceedings decades ago, accused

of entering into a "sham" marriage to secure Lawful Permanent Resident status.  Adi was told

that he would be deported in 2016, and prepared himself and his United States citizen second-

wife for a scheduled departure on January 7 departure.  Then, ICE granted a temporary stay that

prevented his January 7 deportation.

96.     On January 16, 2018, ICE arrested Adi and placed him in detention.  To protest

his deportation, Adi began a hunger strike.  Ohio Democratic congressman Tim Ryan introduced

a private bill to grant Adi lawful permanent resident status, which would allow him to remain in

the United States. The House Judiciary Subcommittee on Immigration and Border Security

approved the private bill, asking ICE to grant Adi a six-month stay of deportation. In an

extraordinary move, ICE reversed its prior stay and rejected the congressional request to stay

Adi's deportation.  Adi was deported to Jordan on January 29, 2018.

### 7.     Immigrant Sanctuaries

97.     On information and belief, ICE has also targeted communities that it identifies as

"sanctuary cities" to punish those communities for taking legislative, municipal and political

---

[28] John Bear & Jenn Fields, *Husband of Peruvian Woman Taking Sanctuary at Boulder Church Detained by ICE*, The Denver Post (Jan. 11, 2018), https://www.denverpost.com/2018/01/11/ingrid-encalada-latorre-husband-detained-immigration-boulder-sanctuary.

action to limit official cooperation with federal immigration enforcement.[29]  These are communities where activists have successfully lobbied to prevent local government from assisting the federal government in immigration enforcement actions against immigrant residents.

98.     In September 2017, ICE announced that it would undertake a series of raids designed to target sanctuary cities, and publically designated the action, "Operation Safe City." According to ICE, Operation Safe City would target cities and regions "where ICE deportation officers are denied access to jails and prisons to interview suspected immigration violators or jurisdictions where ICE detainers are not honored."[30]  Operation Safe City resulted in hundreds of arrests in communities that had taken actions to limit local government's cooperation with federal immigration enforcement.  These communities included New York, Philadelphia, Los Angeles, Boston, Denver, and Portland, Oregon.[31]

99.     Following the Operation Safe City raids, on October 5, 2017, California Governor Jerry Brown signed SB54 into law, a statute cancelling almost all state and local cooperation

---

[29] These activities align with broader efforts of the current administration.  On January 25, 2017, the President issued an Executive Order entitled, "Enhancing Public Safety in the Interior of the United States."  Exec. Order No. 13,768, 82 Fed. Reg. 8799 (Jan. 25, 2017).  The Executive Order announces that it is the Executive Branch's policy to withhold federal funds from "sanctuary jurisdictions," directs the Attorney General and Secretary of Homeland Security to ensure that sanctuary jurisdictions do not receive federal grants, and directs the Attorney General to take enforcement action against any local entity that "hinders the enforcement of Federal law." *Id.* at 8801.  In July 2017, the Department of Justice increased pressure on sanctuary cities by imposing additional requirements for federal grants.  Pete Williams, *Attorney General Sessions Raises Stakes for Sanctuary Cities*, NBC News (July 25, 2017), https://www.nbcnews.com/politics/politics-news/attorney-general-sessions-raises-stakes-sanctuary-cities-n786546.

[30] ICE, *ICE Arrests over 450 on federal immigration charges during Operation 'Safe City,'* (Sept. 28, 2017), https://www.ice.gov/news/releases/ice-arrests-over-450-federal-immigration-charges-during-operation-safe-city.

[31] Miriam Jordan, *Immigration Agents Arrest Hundreds in Sweep of Sanctuary Cities*, N.Y. Times (Sept. 28, 2017), https://www.nytimes.com/2017/09/28/us/ice-arrests-sanctuary-cities.html.

with federal deportation officers. On information and belief, the statute was the result of, among other things intense lobbying from immigrant rights organizations. The next day , Acting Director Thomas Homan, in direct response to the California legislation, made the following threats in an official statement:

> SB54 will negatively impact ICE operations in California by nearly eliminating all cooperation and communication with our law enforcement partners in the state, voiding the delegated authority that the Orange County Sheriff's Office has under the 287g program, and prohibiting local law enforcement from contracting with the federal government to house detainees.

> *ICE will have no choice but to conduct at-large arrests in local neighborhoods and at worksites, which will inevitably result in additional collateral arrests, instead of focusing on arrests at jails and prisons where transfers are safer for ICE officers and the community. ICE will also likely have to detain individuals arrested in California in detention facilities outside of the state, far from any family they may have in California.*[32]

**D.      ICE's Retaliatory Enforcement Actions Cause Grave Harm to Plaintiffs**

**1.      Mr. Ragbir**

100.     Mr. Ragbir's sudden detention has inflicted long-lasting and irreparable harm. The stress of his recent unexpected detention and the prospect of imminent deportation has exacerbated symptoms of depression and post-traumatic stress disorder. Mr. Ragbir's symptoms are also intensified by worry that those who care about him are suffering as well.

101.     Nearly all of Mr. Ragbir's family resides in the United States. Mr. Ragbir has not lived in Trinidad in nearly three decades.

---

[32] ICE, Statement from ICE Acting Director Tom Homan on California Sanctuary Law (Oct. 6, 2017), https://www.ice.gov/news/releases/statement-ice-acting-director-tom-homan-california-sanctuary-law (emphasis added).

102.   If Mr. Ragbir is deported to Trinidad, he will be indefinitely separated from his family and community.  Mr. Ragbir's wife and daughter are U.S. citizens and unable to move to Trinidad.

103.   Mr. Ragbir is continuing to challenge the basis for his removal.  But even in the event that Mr. Ragbir prevails on his challenge, there is no indication that ICE would facilitate his return to the United States.

104.   The trauma of deportation to Trinidad will further exacerbate Mr. Ragbir's depression and post-traumatic stress disorder, resulting in long-lasting psychological harm.

### 2.   New Sanctuary Coalition of New York City

105.   The Coalition has grown rapidly in the past year, with numerous programs throughout the week providing support and services to immigrant communities.  However, as a direct result of ICE's targeting of the Coalition leaders, the organization was deprived of its sole full-time employee and Executive Director, Mr. Ragbir, for several weeks while Mr. Ragbir was in detention, and may lose Mr. Ragbir completely if he is deported.

106.   Mr. Ragbir's deportation would be devastating to the Coalition.  Mr. Ragbir is the face of NSC, and was the primary point of contact with funders, elected officials, faith leaders, legal services organizations, and community partners.  Mr. Ragbir's deportation would greatly diminish NSC's network

107.   The sudden execution of Mr. Ragbir's final removal order has made it extremely difficult to maintain the organization's day-to-day administrative activities.  Mr. Ragbir is the organization's sole full-time employee.  NSC has had to divert immense resources to litigation challenging Mr. Ragbir's imminent deportation.

108.    ICE's targeting of critics of federal immigrant-rights advocates has also sown fear in the immigrant community, impeding NSC's pursuit of its mission.  NSC staff receive numerous calls from worried immigrants asking whether they should go to their ICE check-ins.

109.    In the wake of Mr. Ragbir's and Mr. Montrevil's detentions, both volunteers and recipients of the Coalition's services have expressed fear about attending workshops, clinics, and check-ins and immigration court dates.  The Coalition has had to respond to numerous requests for advice and support from these individuals.

110.    Immigrants are increasingly reluctant to participate in the Coalition's activities for fear of attracting the attention of ICE authorities.

111.    In addition to targeting Mr. Ragbir, ICE's pattern and practice of targeting critics of federal immigration policy against immigrant rights activists has directly impeded the Coalition's ability to carry out its mission.  ICE has directly interfered with the Coalition's legal activities in support of immigrants.  For example, in the summer of 2017, ICE officers at 26 Federal Plaza began to interfere with the Coalition's accompaniment program by restricting public access to the ICE check-in room at 26 Federal Plaza—thwarting volunteers from the Accompaniment Program who sought to assist immigrants during their check-ins.  Even clergy who attempted to accompany people at their check-ins were often turned away.

112.    ICE also appears to have surveilled the Coalition's gatherings in an attempt to intimidate its members.[33]

---

[33] Several Coalition members saw evidence of ICE officers surveilling a meeting on the eve of Mr. Ragbir's arrest.  In addition, clergy have spoken to ICE officers who appeared to surveil Coalition members at a religious service. Nick Pinto, *No Sanctuary*, The Intercept (Jan. 19, 2018), https://theintercept.com/2018/01/19/ice-new-sanctuary-movement-ravi-ragbir-deportation/.

### 3.   National Immigration Project of the National Lawyers Guild

113.   NIPNLG has had to expend considerable resources in response to ICE's targeting of the members and leaders of immigration advocacy organizations.  For example, NIPNLG provided technical assistance to Villalpando on her removal proceedings when she was served with an NTA by ICE after decades of working without incident as an organizer.  Recognizing ICE's pattern and practice of targeting activists, NIPNLG has had to identify and recruit counsel for certain activists that it anticipated would be targets of retaliatory action.  NIPNLG has also published several substantial guides and hosted workshops to advise activists in the immigrant rights community of best practices under the Trump Administration, which included preparing a plan of action.[34]

114.   Further, NIPNLG's members—which include Mr. Ragbir and his wife, Amy Gottlieb—have been directly affected by ICE's targeting of immigrant activists.

### 4.   CASA de Maryland

115.   Defendants' retaliatory actions have had a highly negative impact on the community that CASA serves, and is also extremely detrimental to the mission and purpose of the organization.  ICE's actions will harm CASA's mission in multiple ways and has already forced CASA to divert valuable resources away from its usual activities.

116.   CASA has observed ICE targeting members of CASA's community and has responded to more than 50 reported ICE raids over the last year.  CASA has seen blatant

---

[34] *See, e.g.*, Julie (Yihong) Mao, Jan Collatz, *Understanding the Federal Offenses of Harboring, Transporting, Smuggling and Encouraging under 8 U.S.C. § 1324(a)* (Sept. 28, 2017), http://www.nipnlg.org/PDFs/practitioners/practice_advisories/pr/2017_28Sep_memo-1324a.pdf; NIPNLG/Mijente, *In Defense of Organizing*, (May 2017), https://www.nationalimmigrationproject.org/PDFs/community/2017_05June_in-defense-of-mijente-en.pdf.

instances of racial profiling, including ICE targeting two Latinos at a convenience store in Baltimore.

117.    As CASA raises its profile, including through increasing impact litigation, the risks of CASA's leaders and their families being targeted have increased.  Leaders like Missael Garcia and Monica Camacho, two of CASA's most outspoken activists and both plaintiffs in CASA's DACA lawsuit, face potential retaliation for continuing to defend their families and their communities.  As they lose protections like DACA and TPS, these leaders become vulnerable to increasingly aggressive ICE enforcement action.

118.    Over the past year, ICE has deported several CASA leaders, including Liliana Cruz, Catia Paz, and two young brothers, Diego and Lizandro Claros.  All of these leaders had been vocal supporters of CASA and immigration programs like DACA and DAPA.  They had received extensive media coverage for their advocacy and engagement with elected officials. Each of them was effectively silenced by ICE through their deportation, which in the case of Diego and Lizandro happened a mere five days after reporting for a routine ICE check-in.

119.    The selective targeting of CASA leaders has required an increased dedication of resources to defending these members, including through legal services, organizing and communications.  Although CASA will never stop advocating for the community it serves, its mission is inherently negatively affected whenever one of its members, and particularly when one of its leaders, is deported.

120.    CASA has had to redirect resources to deal with ICE's increasingly vindictive and unrestrained enforcement activity.  CASA has dramatically expanded its Know Your Rights (KYR) presentations across the organization, helping to educate thousands of immigrants over

the past year about their constitutional rights and how to protect their families from immigration enforcement.

121.    CASA has restructured its services to deal with the termination of DACA and TPS, and has increased the number of comprehensive immigration screenings it provides to its members, in anticipation of continuing excessive ICE enforcement activity.

122.    CASA has significantly expanded its litigation efforts to challenge the Administration's unconstitutional actions against its members and the broader immigrant community.  All of these changes have taken resources away from other vital CASA programming and advocacy efforts.

### 5.    New York Immigration Coalition

123.    Defendants' targeting of immigrant-rights activists like Mr. Ragbir directly interferes with NYIC's mission of advancing immigrant rights throughout New York. Defendants' retaliatory measures against the Coalition—one of NYIC's own member organizations—weakens NYIC's unified strength as a coalition and spreads fear among the immigrant communities that NYIC serves.

## CLAIMS FOR RELIEF

### COUNT I
### (Retaliation in Violation of the First Amendment)

124.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

125.    To sustain a First Amendment retaliation claim, a plaintiff must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Gonzalez v. Hasty*, 802 F.3d 212, 222 (2d Cir. 2015) (quotation marks omitted).

126.    Plaintiffs have engaged in speech protected by the First Amendment.  They have criticized U.S. immigration law and policy, organized rallies and protests against the U.S. immigration system, helped noncitizens navigate that system, and urged government officials to change it.  Plaintiffs' speech about U.S. immigration law and policy pertains to matters of public concern and seeks political change.  It is therefore entitled to the highest level of protection under the First Amendment.

127.    Defendants have taken adverse actions against Plaintiffs.  Defendants have detained Mr. Ragbir and seek to deport him.  Defendants have deported one of the Coalition's leaders and are seeking to deport another.  And Defendants have engaged in a nationwide pattern and practice of selectively enforcing the immigration laws against immigration-rights activists on the basis of their protected speech regarding U.S. immigration law and policy.

128.    There is a causal connection between Plaintiffs' protected speech and Defendants' adverse actions.  Defendants have selectively enforced the immigration laws against Plaintiffs and their leaders and members on the basis of their protected speech regarding U.S. immigration law and policy.

129.    As a result, this Court should declare that Defendants' retaliatory actions violate the First Amendment; enter a preliminary and permanent injunction restraining Defendants from taking any action to effectuate Mr. Ragbir's removal from the United States unless Defendants demonstrate to the Court's satisfaction that such action is untainted by unlawful retaliation; and enter a preliminary and permanent injunction restraining Defendants from selectively enforcing the immigration laws against any individual based on the individual's protected speech regarding U.S. immigration law and policy.

## COUNT II
### (Content, Viewpoint, and Speaker Discrimination in Violation of the First Amendment)

130.    Plaintiffs incorporate the preceding paragraphs as if fully set forth herein.

131.    Government action that targets speech based on its content is presumptively unconstitutional and is justified only if the Government demonstrates that it is narrowly tailored to serve a compelling state interest. *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218 (2015).

132.    Defendants' pattern and practice of selectively enforcing the immigration laws against immigration-rights activists on the basis of their protected speech regarding U.S. immigration law and policy targets speech based on its content, does not serve a compelling state interest, and is not narrowly tailored.

133.    Government action that targets private speech based on the viewpoint taken by the speaker is unconstitutional. *Matal v. Tam*, 137 S. Ct. 1744 (2017); *Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011).

134.    Defendants' pattern and practice of selectively enforcing the immigration laws against immigration-rights activists on the basis of their protected speech regarding U.S. immigration law and policy targets private speech based on the viewpoint of the speaker.

135.    Government action that targets speech based on the identity of the speaker is presumptively unconstitutional and is justified only if the Government demonstrates that it is narrowly tailored to serve a compelling state interest. *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310 (2010).

136.    Defendants' pattern and practice of selectively enforcing the immigration laws against immigration-rights activists on the basis of their protected speech regarding U.S. immigration law and policy targets speech based on the identity of the speaker, does not serve a compelling state interest, and is not narrowly tailored.

137.    As a result, this Court should declare that Defendants' pattern and practice of targeting immigration-rights activists on the basis of their protected speech regarding U.S. immigration law and policy violates the First Amendment; enter a preliminary and permanent injunction restraining Defendants from taking any action to effectuate Mr. Ragbir's removal from the United States unless Defendants demonstrate to the Court's satisfaction that such action is untainted by unlawful discrimination; and enter a preliminary and permanent injunction restraining Defendants from selectively enforcing the immigration laws against any individual based on the individual's protected speech regarding U.S. immigration law and policy.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court enter judgment in their favor and:

a.      Declare that Defendants' retaliatory enforcement of the immigration laws against against Mr. Ragbir and other immigrant-rights activists on the basis of their protected political speech about U.S. immigration law and policy violates the First Amendment;

b.      Declare that Defendants' pattern and practice of discriminatorily enforcing the

immigration laws against Mr. Ragbir and other immigrant-rights activists based on the content

and viewpoint of their speech and the identity of the speaker violates the First Amendment;

c.      Enter a preliminary and permanent injunction restraining Defendants from taking

any action to effectuate Mr. Ragbir's removal from the United States unless Defendants

demonstrate to the Court's satisfaction that such action is untainted by unlawful retaliation or

discrimination against protected speech;

d.      Enter a preliminary and permanent injunction restraining Defendants on a

nationwide basis from selectively enforcing the immigration laws against any individual—

including, without limitation, through investigation, surveillance, detention, deportation, or any

other adverse enforcement action—based on the individual's protected political speech about

U.S. immigration law and policy;

e.      Award Plaintiffs costs and reasonable attorneys' fees; and

f.      Order such other relief as this Court may deem just and proper.

February 8, 2018

Respectfully submitted,

*Anthony Boccanfuso*

Alina Das, Esq. (AD8805)
Jessica Rofé, Esq. (JR5231)
Brittany Castle, Legal Intern
Jeremy Cutting, Legal Intern
WASHINGTON SQUARE
   LEGAL SERVICES, INC.
Immigrant Rights Clinic
New York University School of Law
245 Sullivan Street, 5th floor
New York, New York 10012
Tel: (212) 998-6430
alina.das@nyu.edu
jessica.rofe@nyu.edu

R. Stanton Jones*
John L. Freedman
William C. Perdue*
Daniel F. Jacobson*
Sally Pei*
Stephen K. Wirth*
Andrew T. Tutt*
ARNOLD & PORTER
   KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
(202) 942-5999 (fax)
stanton.jones@arnoldporter.com

Anthony Boccanfuso
Ada Añon
ARNOLD & PORTER
   KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
(212) 836-8000
(303) 836-8689 (fax)
anthony.boccanfuso@arnoldporter.com

Emily Newhouse Dillingham*
ARNOLD & PORTER
   KAYE SCHOLER LLP
70 West Madison Street
Suite 4200
Chicago, IL 60602
(312) 583-2300
(312) 583-2360 (fax)
emily.dillingham@arnoldporter.com

* Pro hac vice application forthcoming

*Counsel for Plaintiffs*

42

## VERIFICATION

STATE OF NEW YORK        )
                                     ) ss.:

COUNTY OF NEW YORK     )

       Ravidath Ragbir, being duly sworn, deposes and says:

       I am Ravidath Ragbir, a plaintiff in the within action; I have read the foregoing Verified

Complaint and know the contents thereof; except as to matters therein alleged on information

and belief, and except as to matters within the personal knowledge of another plaintiff, I have

learned of the facts alleged therein, either through my own personal knowledge or through

information reported to me in the ordinary course of business; as to those matters as to which I

do not have personal knowledge, I believe them to be true.

                                                Ravidath Ragbir

Sworn to and subscribed this
7th  day of February, 2018

                Notary Public

Jessica L. Rofe
Notary Public, State of New York
No. 02RO6353709
Qualified in Kings County
Certificate on File in New York County
Commission Expires January 30, 2021

Verification Statements.docx

## VERIFICATION

STATE OF NEW YORK          )
                           )  ss.:
COUNTY OF NEW YORK         )

Kaji Douša, being duly sworn, deposes and says:

I am co-chair of the New Sanctuary Coalition of New York City, a plaintiff in the within

action; I have read the foregoing Verified Complaint and know the contents thereof; except as to

matters therein alleged on information and belief, and except as to matters within the personal

knowledge of another plaintiff, I have learned of the facts alleged therein, either through my own

personal knowledge or through information reported to me in the ordinary course of business; as

to those matters as to which I do not have personal knowledge, I believe them to be true.

This verification is made by deponent because plaintiff is an organization.

_____
                Rev. Kaji Douša

Sworn to and subscribed this
04 day of February, 2018

_____
               Notary Public

Jessica L. Roié
Notary Public, State of New York
No. 02RO6353705
Qualified in Kings County
Certificate on File in New York County
Commission Expires January 30, 2021

Verification Statements.docx