**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

---

RAVIDATH LAWRENCE RAGBIR et al.,

          Plaintiffs,

          v.

THOMAS D. HOMAN et al.,

          Defendants.

Civil Action No. 18-cv-1159

---

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
<u>MOTION FOR A PRELIMINARY INJUNCTION</u>**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 2

    A.     Plaintiff Ravidath Ragbir ........................................................................... 2

    B.     Defendants' Retaliation Against Mr. Ragbir ............................................ 3

    C.     Defendants' Pattern and Practice of Targeting Immigrant-Rights Activists ........... 7

    D.     Harm to the Organizational Plaintiffs ..................................................... 8

ARGUMENT ..................................................................................................................... 9

I.     Plaintiffs Are Likely To Succeed on the Merits ................................................. 9

    A.     Plaintiffs Are Likely To Prevail on their First Amendment Claims ...................... 9

    B.     Plaintiffs Are Likely To Establish Subject-Matter Jurisdiction ........................ 16

II.     Plaintiffs Will Suffer Irreparable Harm Absent Relief ..................................... 20

    A.     Mr. Ragbir Will Suffer Irreparable Harm if He Is Deported .............................. 20

    B.     The Coalition Will Suffer Irreparable Harm if Mr. Ragbir Is Deported .............. 23

    C.     The Organizational Plaintiffs Will Suffer Irreparable Harm if Defendants' Unconstitutional Pattern and Practice Continues ................................................ 23

III.     The Balance of Hardships and the Public Interest Support a Preliminary Injunction ....... 24

CONCLUSION ................................................................................................................. 25

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdi v. Duke*,
    2017 WL 5599251 (W.D.N.Y. Nov. 17, 2017) ...................................................................19

*Aguilar v. ICE*,
    510 F.3d 1 (1st Cir. 2007) ..............................................................................................17

*Barahona-Gomez v. Reno*,
    236 F.3d 1115 (9th Cir. 2001) ......................................................................................17

*Bronx Household of Faith v. Bd. of Educ.*,
    331 F.3d 342 (2d Cir. 2003) ...................................................................................21, 22

*Buckley v. Am. Constitutional Law Found., Inc.*,
    525 U.S. 182 (1999) ......................................................................................................10

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
    868 F.3d 104 (2d Cir. 2017) .........................................................................................14

*Chalk v. U.S. District Court*,
    840 F.2d 701 (9th Cir. 1988) ........................................................................................22

*Chehazeh v. Att'y Gen.*,
    666 F.3d 118 (3d Cir. 2012) .........................................................................................17

*Citizens United v. Fed. Election Comm'n*,
    558 U.S. 310 (2010) ......................................................................................................14

*Crawford-El v. Britton*,
    523 U.S. 574 (1998) ........................................................................................................9

*Davis v. FEC*,
    554 U.S. 724 (2008) ......................................................................................................21

*Deferio v. City of Syracuse*,
    193 F. Supp. 3d 119 (N.D.N.Y. 2016) .........................................................................25

*Detroit Free Press v. Ashcroft*,
    195 F. Supp. 2d 948 (E.D. Mich. 2002) .......................................................................20

*Duran Gonzales v. DHS*,
    508 F.3d 1227 (9th Cir. 2007) ......................................................................................20

*Elrod v. Burns*,
    427 U.S. 347 (1976) ........................................................................................... 21, 22

*Gonzalez v. Hasty*,
    802 F.3d 212 (2d Cir. 2015) ................................................................................... 10

*Hartman v. Moore*,
    547 U.S. 250 (2006) ................................................................................................. 9

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982) ............................................................................................... 14

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ................................................................................................... 15

*INS v. St. Cyr*,
    533 U.S. 289 (2001) .......................................................................................... 17, 20

*Int'l Creative Mgmt., Inc. v. Abate*,
    No. 07 Civ. 1979, 2007 WL 950092 (S.D.N.Y. 2007) ......................................... 24

*Johnson v. Robison*,
    415 U.S. 361 (1974) ............................................................................................... 19

*Kabenga v. Holder*,
    76 F. Supp. 3d 480 (S.D.N.Y. Jan. 2, 2015) ........................................................ 23

*Kalaw v. Ferro*,
    651 F. Supp. 1163 (W.D.N.Y. 1987) .................................................................... 22

*Madu v. Att'y Gen.*,
    470 F.3d 1362 (11th Cir. 2006) ............................................................................. 17

*Matal v. Tam*,
    137 S. Ct. 1744 (2017) ........................................................................................... 13

*McCullen v. Coakley*,
    134 S. Ct. 2518 (2014) ...................................................................................... 21, 22

*McNary v. Haitian Refugee Ctr., Inc.*,
    498 U.S. 479 (1991) .......................................................................................... 17, 19

*Mental Disability Law Clinic, Touro Law Ctr. v. Hogan*,
    519 F. App'x 714 (2d Cir. 2013) ........................................................................... 15

*Metro. Taxicab Bd. of Trade v. City of New York*,
    615 F.3d 152 (2d Cir. 2010) ..................................................................................... 9

*Mullins v. City of New York*,
  626 F.3d 47 (2d Cir. 2010) ......................................................................................9

*N.Y. Progress & Prot. PAC v. Walsh*,
  733 F.3d 483 (2d Cir. 2013) ...................................................................................25

*N.Y. State Psychiatric Ass'n, Inc. v. UnitedHealth Grp.*,
  798 F.3d 125 (2d Cir. 2015) ...................................................................................14

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964) ................................................................................................10

*Nken v. Holder*,
  556 U.S. 418 (2009) ..........................................................................................*passim*

*Nwaokolo v. INS*,
  314 F.3d 303 (7th Cir. 2002) ..................................................................................25

*Perry v. Sindermann*,
  408 U.S. 593 (1972) ..................................................................................................9

*Preiser v. Rodriguez*,
  411 U.S. 475 (1973) ................................................................................................20

*Ragbir v. Holder*,
  389 F. App'x 80 (2d Cir. 2010) ................................................................................3

*Ragbir v. Sessions*,
  No. 18-CV-236 (KBF), 2018 WL 623557 (S.D.N.Y. Jan. 29, 2018) .............................*passim*

*Rajah v. Mukasey*,
  544 F.3d 427 (2d Cir. 2008) ..............................................................................15, 16

*Reed v. Town of Gilbert*,
  135 S. Ct. 2218 (2015) ............................................................................................13

*Reno v. American-Arab Anti-Discrimination Committee*,
  525 U.S. 471 (1999) ..........................................................................................*passim*

*Rodriguez v. Hayes*,
  591 F.3d 1105 (9th Cir. 2010) ................................................................................19

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
  515 U.S. 819 (1995) ................................................................................................13

*Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*,
  746 F.3d 538 (2d Cir. 2014) ...................................................................................11

*Simmonds v. INS*,
  326 F.3d 351 (2d Cir. 2003) ................................................................. 20

*Singas Famous Pizza Brand Corp. v. New York Advertising LLC*,
  468 F. App'x 43 (2d Cir. 2004) ............................................................ 24

*Singh v. Gonzales*,
  499 F.3d 969 (9th Cir. 2007) ................................................................ 17

*Snyder v. Phelps*,
  562 U.S. 443 (2011) ............................................................................. 10

*Sorrell v. IMS Health Inc.*,
  564 U.S. 552 (2011) ........................................................................ 13, 21

*Tefel v. Reno*,
  180 F.3d 1286 (11th Cir. 1999)............................................................ 17

*Tefel v. Reno*,
  972 F. Supp. 608 (S.D. Fla. 1997) ....................................................... 19

*Ticor Title Ins. Co. v. Cohen*,
  173 F.3d 63 (2d Cir. 1999) .................................................................. 23

*Vencor Nursing Centrs, L.P. v. Shalala*,
  63 F. Supp. 2d 1 (D.D.C. 1999) ........................................................... 22

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977) ............................................................................. 12

*Villar v. City of New York*,
  135 F. Supp. 3d 105, 127 (S.D.N.Y. 2015) .......................................... 12

*Webster v. Doe*,
  486 U.S. 592 (1988) .................................................................. 18, 19, 20

**Statutes and Rules**

8 U.S.C.
  § 1221 ................................................................................................... 20
  § 1231 ................................................................................................... 20
  § 1252 ............................................................................................. 16, 20
  § 1252(a)(1) .................................................................................... 17, 18
  § 1252(b) ........................................................................................ 16, 17
  § 1252(b)(9) ................................................................................... 17, 18
  § 1252(f)(1) .................................................................................... 19, 20
  § 1252(g) ........................................................................................ 18, 19

18 U.S.C.
§ 2339B..............................................................................................................15

28 U.S.C.
§ 1331..............................................................................................................16
§ 2241........................................................................................................16, 20

8 C.F.R.
§ 241.2...............................................................................................................5
§ 241.3(a)...........................................................................................................5
§ 241.4...............................................................................................................5
§ 241.22.............................................................................................................6

**Other Authorities**

Letter from Michael R. Dreeben, Deputy Solicitor General, to Hon. William K.
Suter, Clerk of the Supreme Court (Apr. 24, 2012), https://goo.gl/2zmv6B.........................23

U.S. Immigration and Customs Enforcement, *11061.1: Facilitating the Return to
the United States of Certain Lawfully Removed Aliens* (Feb. 24, 2012),
https://goo.gl/vbPkox ............................................................................................23

## INTRODUCTION

Plaintiff Ravidath Ragbir has been targeted by federal immigration officials because of his protected advocacy on behalf of immigrants' rights. That targeting violates the First Amendment and warrants a preliminary injunction from this Court. Less than a month ago, after more than 25 years in the United States and a decade of uneventful ICE check-ins, ICE officials suddenly and without warning detained Mr. Ragbir at a regular check-in and flew him to Florida for deportation the next morning—all in direct response to Mr. Ragbir's speech shining a light on immigration laws and policies he believes to be unjust. The Government's "unnecessarily cruel" actions against Mr. Ragbir already drew a stinging rebuke from this Court, which compared the Government's conduct to that of "regimes we revile as unjust." *Ragbir v. Sessions*, No. 18-CV-236 (KBF), 2018 WL 623557, at *1 (S.D.N.Y. Jan. 29, 2018).

Undaunted, and notwithstanding Defendants' agreement to stay Mr. Ragbir's removal pending resolution of this motion, ICE officials now have ordered Mr. Ragbir to report for possible deportation on March 15, the day after Plaintiffs' reply brief is due. After more than a quarter century in this country, Mr. Ragbir is to report "with one piece of luggage not to exceed 44 pounds." The reason for the Government's relentless campaign to detain and expel Mr. Ragbir is clear: They wish to silence him, to stifle his dissent, and to gag the organization he has led for years, fellow Plaintiff the New Sanctuary Coalition of New York City.

It is not just Mr. Ragbir and the Coalition. This past year, amid intensifying national debate about U.S. immigration policy, federal immigration authorities across the country have begun targeting activists who engage in political advocacy on behalf of immigrants' rights and social justice. Suddenly, these outspoken activists have found themselves subject to unprecedented surveillance, intimidation, and detention. Some have even been deported. This retaliatory and discriminatory enforcement of the immigration laws is a blatant bid to muzzle

opposition by exiling those who dare to speak out about the injustices of the immigration system that they have seen and experienced. Wielding the immigration laws to censor core political speech about immigration law and policy is unfair, un-American, and unconstitutional. As this Court noted of Mr. Ragbir, it is a matter of "grave concern" when an activist is "targeted as a result of his speech and political advocacy on behalf of immigrants' rights." *Id.* at *1 n.1.

Defendants' targeting of Mr. Ragbir and other immigrant-rights activists on the basis of their protected political speech violates the First Amendment. Absent an order from this Court staying Mr. Ragbir's deportation and enjoining Defendants' unconstitutional pattern and practice pending resolution of this case on the merits, Plaintiffs' speech will be irreparably chilled and Mr. Ragbir will be deported, almost certainly never to return.

## BACKGROUND

### A.    Plaintiff Ravidath Ragbir

Plaintiff Ravidath Ragbir, Executive Director of Plaintiff the New Sanctuary Coalition of New York City (Coalition), is a father, husband, and nationally recognized immigrant-rights leader. Since his release from immigration detention with a final order of removal a decade ago, Mr. Ragbir has dedicated his life to speaking out against immigration policies he considers unjust. He is a vocal critic of immigration authorities. His activism is often profiled in local and national media. Through the Coalition, he organizes vigils and protests against immigration laws, policies, and enforcement actions. He has created numerous direct-services programs for immigrants and received widespread recognition for his zealous advocacy. Compl. ¶¶ 32-38.

Mr. Ragbir's activism is informed by his personal experiences. A native of Trinidad, he received Lawful Permanent Resident status in 1994. In 2006, after Mr. Ragbir served his sentence for a wire fraud conviction arising out of his employment as a low-level mortgage loan processor, ICE initiated removal proceedings against him. His order of removal became final in

2007, and the Second Circuit denied his petition for review in 2010. *Ragbir v. Holder*, 389 F. App'x 80 (2d Cir. 2010). Mr. Ragbir continues to dispute the basis of his conviction, *see Ragbir v. United States*, 1:17-cv-1256-KM (D.N.J.), and "since his release from custody, [he] has lived the life of a redeemed man," *Ragbir*, 2018 WL 623557, at *3 n.11; *see* Compl. ¶¶ 39-41.

Mr. Ragbir was detained throughout his removal proceedings and after the issuance of his removal order. But ICE released him in February 2008, concluding that he "did not commit a crime of violence[,] … does not appear to be a flight risk[,] and … is fully aware that he will have to report to ICE custody when required." ICE assured Mr. Ragbir that, before removal, he would "be given an opportunity to prepare for an orderly departure." Compl. ¶¶ 42-44.

Mr. Ragbir has always contested his removability. In addition to a pending coram nobis petition in the District of New Jersey, Mr. Ragbir has a pending petition for a presidential pardon, and a pending motion with the Board of Immigration Appeals (BIA) to reopen his removal proceedings. Mr. Ragbir has also petitioned for adjustment of status on the basis of his eight-year marriage to Amy Gottlieb, a U.S. citizen and fellow activist. Compl. ¶ 45.

Since his release, Mr. Ragbir has attended regular check-ins with ICE and complied with all conditions of supervision. He sought and received authorization to work in the United States, facilitating his employment with the Coalition. Compl. ¶¶ 46-47. In December 2011, ICE granted Mr. Ragbir an administrative stay of removal, assuring him that ICE would not seek his removal for a set period. ICE renewed the stay three times, with the last stay extending through January 19, 2018. In November 2017, Mr. Ragbir applied to renew the stay again. Compl. ¶ 48.

### B.    Defendants' Retaliation Against Mr. Ragbir

On March 9, 2017, accompanied by family, lawyers, clergy, and local elected officials, Mr. Ragbir reported to the ICE Field Office at 26 Federal Plaza for a scheduled check-in. In light of recent changes to U.S. immigration policy, hundreds of community members gathered

outside to support Mr. Ragbir, as did many members of the media.  Inside, ICE officers demanded that Mr. Ragbir's companions leave the hallway outside the check-in room, and one officer squared off eye-to-eye with a city councilmember.  Afterwards, Mr. Ragbir and elected officials called out ICE's hostile reaction to the presence of community members, clergy, and elected officials, which was widely covered in the press.  Compl. ¶¶ 49-57.

On January 3, 2018, days before Mr. Ragbir's next check-in, ICE officers arrested activist Jean Montrevil, one of the Coalition's co-founders, outside his home.  Mr. Montrevil, a green-card holder who was placed in removal proceedings as a teenager and also had spoken out against the immigration system in the media, had a motion to reopen pending before the BIA. But ICE transferred Mr. Montrevil to a detention facility in Florida and deported him to Haiti six days later.  He left behind his four children, all U.S. citizens.  During this same period, ICE officers surveilled other members of the Coalition, including Mr. Ragbir.  Compl. ¶¶ 58, 60.

On January 5, 2018, individuals associated with the Coalition met with ICE New York Field Office Deputy Director Scott Mechkowski to discuss Mr. Montrevil's case.  Unprompted, Mechkowski brought up Mr. Ragbir and his remarks to the media after his last check-in. Mechkowski stated that Mr. Ragbir's and Mr. Montrevil's were the two "highest profile" cases in his office and disparaged the elected officials who had criticized ICE after Mr. Ragbir's March 9, 2017 check-in.  Mechkowski stated that clergy members could not accompany Mr. Ragbir to his next check-in, which he described as "D-Day."  Mechkowski also stated that the manner of Mr. Montrevil's detention was intended to avoid the public protest that had accompanied Mr. Ragbir's last check-in—ICE "didn't want the display of wailing kids and wailing clergy." Mechkowski denied that ICE was surveilling Mr. Ragbir, but stated: "I know where Mr. Ragbir lives, and I have seen him walking around, and I could have taken him myself."  Compl. ¶ 61.

On January 8, 2018, Mr. Ragbir's counsel spoke with Mechkowski. Mechkowski stated that things were "different" now, and that he had heard Mr. Ragbir's media statements and continued to see him at vigils at 26 Federal Plaza. Mechkowski expressed "resentment" about the March 9, 2017 check-in, and anger about the presence of elected officials. Compl. ¶¶ 62-63.

Mr. Ragbir reported for his next scheduled check-in on January 11, 2018. In a departure from usual protocol, Mechkowski instructed that—rather than checking in with the assigned Deportation Officer—Mr. Ragbir should report directly to Mechkowski. Mechkowski also permitted only Mr. Ragbir's wife and one of his legal representatives to enter the room—even though another attorney and two law students had entered appearances. Compl. ¶¶ 64-65.

At the check-in, Mechkowski advised that ICE would not wait any longer for a decision on Mr. Ragbir's pending motion to reopen and that he would be "enforcing the order." He said that a decision had been made that very morning to deny Mr. Ragbir's pending application for a renewed administrative stay, and that he would be taking Mr. Ragbir into custody. Upon hearing the news, Mr. Ragbir briefly lost consciousness. Compl. ¶¶ 66.

At the time of his arrest, Defendants did not provide Mr. Ragbir's representatives with an arrest warrant, see 8 C.F.R. § 241.2, 241.3(a), notification of the revocation of his order of supervision, see 8 C.F.R. § 241.4, or any explanation for revoking his administrative stay. Nor did anyone inform Mr. Ragbir's counsel where Mr. Ragbir would be detained. The ambulance that took Mr. Ragbir, his wife, and ICE officers from 26 Federal Plaza dropped his wife off at one hospital, where she was led to believe Mr. Ragbir would be "medically cleared." But ICE officers instead took Mr. Ragbir to a different hospital, where they attempted to rush the clearance process. Notwithstanding the existence of several nearby detention facilities in the New York-New Jersey area, ICE officers took Mr. Ragbir to Newark Airport, processed him

curbside, and placed him on a flight to Miami, Florida.  Mr. Ragbir later learned that his prior administrative stay (valid for another eight days) had been revoked.  Compl. ¶¶ 67-68.  And ICE later disclosed that they had purchased the tickets to Miami the day before and intended to remove Mr. Ragbir the following morning, notwithstanding regulations providing that a noncitizen "shall not" be deported within the first 72 hours after being "taken into custody." 8 C.F.R. § 241.22; *see also* Das Decl. ¶ 39.

The day of his arrest, Mr. Ragbir's counsel filed a habeas petition, and this Court issued an order enjoining the Government from transferring him outside the New York Field Office's jurisdiction.  Yet ICE initially refused to return Mr. Ragbir to the New York area, relenting only after the Court held a hearing on Mr. Ragbir's motion to enforce.  During Mr. Ragbir's two-week detention, ICE officers indicated that they were aware of his activism.  Compl. ¶¶ 67, 69.

On January 29, 2018, this Court granted Mr. Ragbir's habeas petition and ordered his immediate release.  Noting that "this country allowed [Mr. Ragbir] to become a part of our community fabric … [and] to build a life with and among us," the Court held that ICE's actions evinced "unnecessary cruelty" and violated due process.  *Ragbir*, 2018 WL 623557, at *2.  The Court further "note[d] with grave concern the argument that [Mr. Ragbir] has been targeted as a result of his speech and political advocacy on behalf of immigrants' rights."  *Id.* at *1 n.1.

Since his release, Defendants have continued to seek Mr. Ragbir's removal as quickly as possible.  At his release, Mechkowski personally served Mr. Ragbir with a notice to report for removal on Saturday, February 10, 2018—less than two weeks away, and the day after a scheduled hearing on Mr. Ragbir's motion for a stay in the District of New Jersey.  On February 8, 2018, in lieu of Plaintiffs seeking a temporary restraining order, the Part I judge entered a stipulated order staying Mr. Ragbir's removal pending resolution of this motion and setting a

briefing schedule.  The next day, ICE sent Mr. Ragbir's counsel a letter stating that, unless a

"judicially ordered stay of removal [is] in effect or unless otherwise notified," Mr. Ragbir should

report for possible removal on March 15, 2018—the day after Plaintiffs' reply brief is due—

"with one piece of luggage not to exceed 44 pounds."  Das Decl. ¶ 46 & Ex. A.

### C.      Defendants' Pattern and Practice of Targeting Immigrant-Rights Activists

Mr. Ragbir is far from the only immigrant-rights activist ICE has tried to silence.  The

past year has seen a sharp spike in immigration enforcement actions across the country against

activists, protesters, and community organizers on the basis of their protected political speech.

- Daniela Vargas, a 22-year-old activist who came from Argentina when she was seven, was detained by ICE agents last March as she was leaving a news conference in Jackson, Mississippi, where she had spoken out in favor of DACA.  Compl. ¶¶ 79-80.

- The same month, in Vermont, ICE arrested José Enrique Balcazar Sanchez and Zully Victoria Palacios Rodriguez, two leading organizers with Migrant Justice, a workers-rights organization.  Despite being arrested only for overstaying a visa, Palacios was held without bail.  Compl. ¶¶ 81-84.

- In June, ICE arrested two other Migrant Justice activists, Yesenia Hernández-Ramos and Esau Peche-Ventura, after they took part in a demonstration outside a Ben and Jerry's plant on behalf of predominantly noncitizen dairy-farm workers.  Compl. ¶¶ 85-86.

- In December, ICE initiated removal proceedings against Maru Mora Villalpando, an outspoken critic of ICE's removal and detention practices in Seattle.  Compl. ¶¶ 87-89.

- Also in December, ICE arrested Baltazar Aburto Gutierrez, a clam harvester in Washington State, after he was quoted in local papers about his girlfriend's deportation.  "You're the one from the newspaper," the ICE agent who detained him reportedly said.  "My supervisor asked me to come find you because of what appeared in the newspaper."  Compl. ¶¶ 90-92.

- In January, ICE agents in Colorado arrested Eliseo Jurado after his wife publicly took sanctuary in a church to avoid deportation to Peru.  Compl. ¶¶ 93-94.

- Also in January, Amer Othman Adi, a 57-year-old Cleveland deli owner, began a hunger strike while in ICE custody.  As his case drew media attention, his Congressman introduced a private bill to allow him to remain in the country.  The bill passed the House Judiciary Committee, but before it could become law, ICE deported Adi to Jordan.  Compl. ¶¶ 95-96.

D.        **Harm to the Organizational Plaintiffs**

Beyond individuals, immigrant-rights organizations also have suffered from Defendants' pattern and practice of targeting activists on the basis of their protected political speech.  Each of the organizational Plaintiffs in this action—the Coalition, CASA, Detention Watch Network, the National Immigration Project of the National Lawyers Guild, and the New York Immigration Coalition (NYIC)—have put pre-existing plans on hold and diverted enormous resources to mitigate the harms suffered by their leaders and members and the communities they serve.

ICE has already deported one of the Coalition's leaders and co-founders, Mr. Montrevil, and, absent relief, it will deport its executive director, Mr. Ragbir.  ICE deported several of CASA's leaders and most vocal activists shortly after they received extensive media coverage for their advocacy for DACA and DAPA.  Escobar Decl. ¶¶ 13-14.  ICE has targeted members of Detention Watch Network, including Mr. Ragbir, Mr. Montrevil, and Ms. Villalpando, as well as members of NYIC.  Small Decl. ¶¶ 19-24; Choi Decl. ¶¶ 12-15.  In the wake of these actions, members and volunteers for these organizations, as well as recipients of their services, have expressed fear about attending workshops and clinics, as well as check-ins and immigration court dates.  Escobar Decl. ¶¶ 9, 13-16; Choi Decl. ¶ 22; Small Decl. ¶¶ 15-16, 22-27.

In response to ICE's targeting of activists, CASA, the National Immigration Project, NYIC, and Detention Watch Network have dramatically expanded efforts to educate immigrants about their rights.  Escobar Decl. ¶¶ 15-16; Kesselbrenner Decl. ¶ 6; Choi Decl. ¶¶ 19-21; Small Decl. ¶¶ 13-18, 25-31.  The National Immigration Project has spent substantial resources identifying and recruiting counsel for activists who may be targets of ICE retaliation.  Kesselbrenner Decl. ¶¶ 5-6.  And Detention Watch Network has spent considerable resources monitoring Defendants' targeting of immigrant-rights activists and mobilizing against it.  Small Decl. ¶¶ 13-31.

# ARGUMENT

To obtain preliminary relief in this Circuit, a movant must demonstrate "(1) irreparable harm absent injunctive relief; (2) either a likelihood of success on the merits, or a serious question going to the merits to make them a fair ground for trial, with a balance of hardships tipping decidedly in the plaintiff's favor; and (3) that the public's interest weighs in favor of granting an injunction." *Metro. Taxicab Bd. of Trade v. City of New York*, 615 F.3d 152, 156 (2d Cir. 2010). When seeking an injunction that will affect government action taken pursuant to a statutory or regulatory scheme, "the plaintiff must typically show a likelihood of success on the merits." *Mullins v. City of New York*, 626 F.3d 47, 53 (2d Cir. 2010); *see also Nken v. Holder*, 556 U.S. 418, 434 (2009). Each of the relevant factors favors preliminary relief here.

## I.    Plaintiffs Are Likely To Succeed on the Merits

### A.    Plaintiffs Are Likely To Prevail on their First Amendment Claims

1. Retaliation by the Government for the exercise of a constitutional right "offends the Constitution [because] it threatens to inhibit exercise of the protected right." *Crawford-El v. Britton*, 523 U.S. 574, 588 n.10 (1998). The law thus "is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions … for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006). The Government may not take action against an individual "because of his constitutionally protected speech," even if the Government could lawfully take such action for "any number of [other] reasons." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). To sustain a First Amendment retaliation claim, a plaintiff must show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Gonzalez v. Hasty*, 802 F.3d 212, 222 (2d Cir. 2015). Mr. Ragbir and the Coalition are likely to prove each of those three elements.

9

*First*, Mr. Ragbir and the Coalition have engaged in speech protected by the First Amendment. They have criticized U.S. immigration policies, connected noncitizens with lawyers and volunteers, and organized rallies and vigils. "[D]ebate on public issues should be uninhibited, robust, and wide-open, and … may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). Speech on topics like immigration policy therefore "occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quotation marks omitted). Because Mr. Ragbir's and the Coalition's speech "involves interactive communication concerning political change," it constitutes "core political speech," where "First Amendment protection … is at its zenith." *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 186-87 (1999).

*Second*, Defendants have taken severe adverse actions against Mr. Ragbir and the Coalition. In direct response to their core protected political speech, Defendants have targeted Mr. Ragbir and the Coalition. They arrested and quickly deported Mr. Montrevil, one of the Coalition's leaders and co-founders. They surveilled the Coalition's offices and Mr. Ragbir's home. They barred individuals associated with the Coalition from attending Mr. Ragbir's check-in. They arrested Mr. Ragbir and transferred him to Florida, more than a thousand miles from his home, family, and community. And Defendants continue to seek Mr. Ragbir's removal. The day after agreeing to a stay of removal pending this Court's resolution of this motion, ICE ordered him to report for possible removal the day after Plaintiffs' reply brief is due.

*Third*, there is a clear causal connection between Mr. Ragbir's and the Coalition's protected speech and Defendants' adverse actions. A plaintiff makes the required showing under this element where the protected speech "was a substantial or motivating factor in an adverse

decision taken by the defendant." *Royal Crown Day Care LLC v. Dep't of Health & Mental Hygiene*, 746 F.3d 538, 544 (2d Cir. 2014) (quotation marks and emphasis omitted). Defendants' statements and actions surrounding Mr. Montrevil's and Mr. Ragbir's arrests show that Mr. Ragbir's and the Coalition's speech was a crucial factor in the relevant decisions.

To begin with, Defendants have linked Mr. Ragbir's case with Mr. Montrevil's, demonstrating their intent to target the Coalition and its leaders. The same day they arrested Mr. Montrevil, ICE agents surveilled the Coalition's offices and Mr. Ragbir's home. Two days later, in a meeting with Coalition representatives regarding Mr. Montrevil's case, Mechkowski himself drew a connection between Mr. Montrevil and Mr. Ragbir, describing them as his office's two "highest profile" cases and referencing the public attention at Mr. Ragbir's last check-in. The Coalition provides the obvious common thread connecting these two cases.

Defendants also have explained their actions against Mr. Ragbir by referencing the public attention he and the Coalition have generated. At a meeting with Mr. Ragbir's counsel just three days before his arrest, Mechkowski specifically mentioned Mr. Ragbir's statements to the press and his presence at Coalition vigils. Mechkowski also expressed "resentment" about Mr. Ragbir's March 9, 2017 check-in and the attendance of local elected officials.

Further, Defendants have repeatedly "[d]epart[ed] from the normal procedural sequence," indicating that "improper purposes are playing a role." *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 267 (1977); *see also Villar v. City of New York*, 135 F. Supp. 3d 105, 127 (S.D.N.Y. 2015) (applying this principle to a retaliation claim). ICE treated Mr. Ragbir and Mr. Montrevil as low enforcement priorities for years, yet now seeks to remove them with "unnecessary cruelty." *Ragbir*, 2018 WL 623557, at *2. ICE agents arrested Mr. Montrevil not at a check-in, but while he was on a lunch break from work. Despite having told Mr. Ragbir that

11

he would be afforded "an orderly departure" and granting him a stay, ICE arrested him without notice and revoked his stay without explanation. ICE agents dropped off Mr. Ragbir's wife at one hospital and drove him to another, rushed the medical clearance process, and then flew him to Florida for deportation the next morning. Throughout this ordeal, multiple guards and ICE officials specifically mentioned Mr. Ragbir's activism. While this Court ordered ICE not to transfer Mr. Ragbir outside the jurisdiction, ICE officials stated that they were "not inclined" to return him to New York, and relented only after a hearing on Mr. Ragbir's motion to enforce. And while Mr. Ragbir was later transferred back to the New York area and eventually released under order of this Court, Defendants gave him less than two weeks to report for removal, far less than the customary 30 to 90 days. Nothing about this case is normal.

Finally, Defendants' actions against Mr. Ragbir and the Coalition fall into a pattern and practice of retaliation against immigrant-rights activists on the basis of their protected speech about U.S. immigration law and policy. Over the past year, media outlets have reported on numerous immigrants across the country whom ICE has surveilled, detained, deported, or otherwise targeted based on their protected speech and expressive conduct. Discovery will reveal details about Defendants' pattern and practice. But as this Court has recognized, there is already a strong basis to believe that Mr. Ragbir "has been targeted as a result of his speech and political advocacy on behalf of immigrants' rights." *Ragbir*, 2018 WL 623557, at *1 n.1. Indeed, if Defendants were not targeting Mr. Ragbir and the Coalition (and other activists) based on their speech, what explains this otherwise extraordinary pattern of aggressive enforcement?

2.  Defendants' pattern and practice of targeting activists independently violates the First Amendment because it burdens protected speech on the basis of its content, viewpoint, and speaker. "Content-based laws—those that target speech based on its communicative content—

are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling state interests." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015). Because Defendants' actions against immigrant-rights activists across the country are based upon "the topic discussed or the idea or message expressed," *id.* at 2227—namely, criticism of U.S. immigration law and policy—they are patently content-based. This targeting serves no legitimate governmental interest at all, let alone a compelling one.

Indeed, Defendants' targeting of activists constitutes "an egregious form of content discrimination"—"viewpoint discrimination." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Id.* Such viewpoint discrimination is always unconstitutional. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011); *Matal v. Tam*, 137 S. Ct. 1744, 1763 (2017); *id.* at 1768 (Kennedy, J., concurring in part and concurring in the judgment). This case illustrates the grave danger of viewpoint discrimination. Defendants have targeted critics of their own enforcement policies and the laws they administer, and sought to banish those critics from this country.

Defendants' pattern and practice also unconstitutionally discriminates against particular speakers. "Quite apart from the purpose or effect of regulating content, … the Government may commit a constitutional wrong when by law it identifies certain preferred speakers." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010). Because "[t]he First Amendment protects speech and speaker, and the ideas that flow from each," the Government may not "deprive the public of the right and privilege to determine for itself what speech and speakers are worthy of consideration." *Id.* at 341. Yet that is precisely what Defendants are doing here—singling out certain speakers for surveillance, detention, and worse.

13

All Plaintiffs have standing to challenge Defendants' unconstitutional pattern and practice. Defendants have directly targeted Mr. Ragbir and the Coalition. And Defendants' pattern and practice has chilled the speech of members of the Coalition, CASA, the National Immigration Protect, NYIC, and DWN. *See N.Y. State Psychiatric Ass'n, Inc. v. UnitedHealth Grp.*, 798 F.3d 125, 130 (2d Cir. 2015). Defendants' pattern and practice also has chilled the organizational Plaintiffs' own speech, obstructed their missions, and forced them to divert resources from other projects. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110 (2d Cir. 2017). Those injuries are redressable by this Court, but only by a nationwide injunction against Defendants targeting any noncitizens on the basis of their protected speech. Nothing less will lift the chill on their speech and allow them to return to their other important work.

3. Cases that have rejected selective enforcement claims preserved the possibility of a valid claim on facts like those here. In *Reno v. American-Arab Anti-Discrimination Committee (AADC)*, 525 U.S. 471 (1999), the Supreme Court addressed a selective enforcement claim by members of "a group that the Government characterize[d] as an international terrorist and communist organization." *Id.* at 473. According to the Government, the group was responsible for violent attacks around the world, and the individuals in question had raised funds for its fighters. Br. for Pet'rs at 1 & n.1, 4, *AADC*, 525 U.S. 471 (No. 97-1252), 1998 WL 411431. Today, the Government would consider that conduct the crime of providing material support to a terrorist organization, 18 U.S.C. § 2339B, an offense the Supreme Court upheld against a First Amendment challenge in *Holder v. Humanitarian Law Project*, 561 U.S. 1, 39 (2010). *AADC* thus involved conduct that Congress could criminally prohibit without violating the First Amendment. In that context, the Court stated that, "[a]s a general matter … an alien unlawfully

14

in this country has no constitutional right to assert selective enforcement as a defense against his deportation."  525 U.S. at 488.  "[T]he Government does not offend the Constitution by deporting [such an alien] for the additional reason that it believes him to be a member of an organization that supports terrorist activity."  *Id.* at 491-92.  Here, Defendants have not selectively enforced the law against Mr. Ragbir and other immigrant-rights activists on the basis of their membership in a group; Defendants have retaliated and discriminated against them on the basis of their core protected political speech.  *E.g.*, *Mental Disability Law Clinic, Touro Law Ctr. v. Hogan*, 519 F. App'x 714, 718 (2d Cir. 2013) (distinguishing between selective prosecution and First Amendment retaliation claims).  And *AADC* expressly left open "the possibility of a rare case in which the alleged basis of discrimination is so outrageous that the [general rule against selective immigration enforcement claims] can be overcome."  *Id.* at 491.

The Second Circuit in *Rajah v. Mukasey*, 544 F.3d 427 (2d Cir. 2008), went even further in preserving a remedy for a case like this one.  *Rajah* rejected claims by four noncitizens identified through a program that "required non-immigrant alien males over the age of 16 from designated countries to appear for registration and fingerprinting."  *Id.* at 432.  The noncitizens argued that "the immigration laws [had been] selectively enforced against them based on their religion, ethnicity, gender, and race."  *Id.* at 438.  Noting the program's initiation as a security measure in the wake of the terrorist attacks of September 11, 2001, the Second Circuit found no evidence of animus and upheld the program as "clearly tailored" to identifying noncitizens who presented "a greater security risk."  *Id.* at 439.  But the court not only quoted *AADC*'s observation about the "possibility" of a valid claim based on sufficiently outrageous discrimination; it expressly "agree[d]" that "a selective prosecution based on an animus of th[e] kind [they alleged] would call for some remedy."  *Id.* at 438.

This is the outrageous case that *AADC* and *Rajah* envisioned.  Defendants are trying to silence critics of U.S. immigration law and policy by surveilling, detaining, and deporting them. This is conduct "we associate with regimes we revile as unjust."  *Ragbir*, 2018 WL 623557, at *1.  It is hard to imagine more outrageous facts.  Plaintiffs are likely to prevail on the merits.

### B.    Plaintiffs Are Likely To Establish Subject-Matter Jurisdiction

This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims "aris[e] under the Constitution, laws, or treaties of the United States"—in particular, the First Amendment.  The Court also has jurisdiction over Mr. Ragbir's claims under 28 U.S.C. § 2241 and the Suspension Clause.  While certain provisions of 8 U.S.C. § 1252 limit and channel jurisdiction over immigration matters, those provisions do not apply here.

1. Section 1252(b)(9) does not apply here.  Section 1252(b) provides:

With respect to review of an order of removal under subsection (a)(1), the following requirements apply: …

(9) Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section. Except as otherwise provided in this section, no court shall have jurisdiction … to review such an order or such questions of law or fact.

This provision "consolidate[s] 'judicial review' of immigration proceedings into one action in the court of appeals" via a petition for review under § 1252(a)(1).  *INS v. St. Cyr*, 533 U.S. 289, 313 (2001).  The review-limiting language of § 1252(b)(9) is thus cabined by the prefatory language in § 1252(b), and "applies only '[w]ith respect to review of an order of removal under subsection (a)(1).'"  *Id.* (quoting § 1252(b)).  Courts thus have held that § 1252(b)(9) does not bar district courts from hearing claims that do not seek review of a removal order.  *E.g.*, *Singh v. Gonzales*, 499 F.3d 969, 978 (9th Cir. 2007); *Chehazeh v. Att'y Gen.*, 666 F.3d 118, 132 (3d Cir. 2012); *Madu v. Att'y Gen.*, 470 F.3d 1362, 1367 (11th Cir. 2006).

Here, Plaintiffs do not seek review of any removal order. Mr. Ragbir's and the Coalition's retaliation claims do not challenge Mr. Ragbir's removal order itself, but Defendants' retaliatory execution of the order in violation of the First Amendment. Indeed, Mr. Ragbir and the Coalition could not have raised their current claims in his removal proceedings or a petition for review. Those removal proceedings closed years ago, and the factual basis for the claims here arose just recently. Nor do Plaintiffs' content, viewpoint, and speaker discrimination claims "require review of an order of removal." *Singh*, 499 F.3d at 972. These claims are "wholly collateral to[] the removal process," *Aguilar v. ICE*, 510 F.3d 1, 11 (1st Cir. 2007), challenging a broad pattern and practice that chills Plaintiffs' speech and impedes the organizational Plaintiffs' missions and operations. *See McNary*, 498 U.S. at 494; *Barahona-Gomez v. Reno*, 236 F.3d 1115, 1121 (9th Cir. 2001); *Tefel v. Reno*, 180 F.3d 1286, 1298 (11th Cir. 1999).

Regardless, the Government has long maintained that immigration judges and the BIA lack authority to hear claims like those here, *see* U.S. Br., *AADC*, 525 U.S. 471 (1999), 1998 WL 411431, at *38, so resort to administrative proceedings would have been futile. For the same reason, a court of appeals adjudicating a petition for review would lack an adequate record on which to address Plaintiffs claims, and courts of appeals are both institutionally ill-suited and statutorily prohibited to "order the taking of additional evidence." 8 U.S.C. § 1252(a)(1). Only a federal district court can adjudicate Plaintiffs' claims in the first instance.

2. Section 1252(g) also poses no bar to this Court's jurisdiction. It provides:

> Except as provided in this section and notwithstanding any other provision of law (statutory or nonstatutory) …, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under this chapter.

Like § 1252(b)(9), § 1252(g) "channels judicial review of … some decisions and actions" into a single proceeding before a court of appeals via a petition for review. *AADC*, 525 U.S. at 483

(emphasis omitted).  As explained, Mr. Ragbir and the Coalition could not have raised their recently-accrued retaliation claims in administrative and petition-for-review proceedings that closed years ago, and no Plaintiff could have developed the record for any of their claims in any such proceeding.  Section 1252(g) should not be read to channel claims that cannot be channeled. As for Plaintiffs' discrimination claims, again, they are collateral to removal proceedings and challenge Defendants' broader pattern and practice.  At a minimum, § 1252(g) "applies only to three discrete actions that the Attorney General may take: her 'decision or action' to 'commence proceedings, adjudicate cases, or execute removal orders.'"  *Id.* at 482.  Plaintiffs' discrimination claims challenge additional actions, such as surveillance and opening investigations.  *See id.*

Moreover, reading § 1252(g) to bar review here would preclude *any* effective judicial review of Plaintiffs' constitutional claims.  "[W]here Congress intends to preclude judicial review of constitutional claims[,] its intent to do so must be clear."  *Webster v. Doe*, 486 U.S. 592, 603 (1988).  "[T]his heightened showing" is required "in part to avoid the serious constitutional question that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim."  *Id.* (quotation marks omitted).  This principle applies with full force in the immigration context.  *See McNary*, 498 U.S. at 497. Section 1252(g) does not mention constitutional claims, and it functions as a "channeling provision."  *AADC*, 525 U.S. at 478 (quoting Government brief); *see also id.* at 483.  The statute therefore lacks the "clear and convincing" evidence of congressional intent necessary to bar review.  *Johnson v. Robison*, 415 U.S. 361, 373 (1974).  Holding otherwise, moreover, would mean that Congress could render the First Amendment and the rest of the Constitution a dead letter by withdrawing federal courts' jurisdiction to hear constitutional claims.

*AADC* implicitly acknowledged the force of this argument.  The Court there addressed

the "contention that … the doctrine of constitutional doubt require[d] [the Court] to interpret § 1252(g) in such a fashion as to permit immediate review of their selective-enforcement claims."  525 U.S. at 488.  The Court rejected that argument because the noncitizens there had no valid claim.  *Id.*  The Court did not dispute, however, that constitutional avoidance *would* require interpreting § 1252(g) to allow effective review of a constitutional claim that was colorable. Plaintiffs' First Amendment claims here are not just colorable, but exceptionally strong.

> 3.  Nor does § 1252(f)(1) preclude jurisdiction.  That subsection provides:

> Regardless of the nature of the action or claim or of the identity of the party or parties bringing the action, no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of the provisions of part IV of this subchapter … other than with respect to the application of such provisions to an individual alien against whom proceedings under such part have been initiated.

By its terms, § 1252(f)(1) bars lower courts from restraining "the operation of" certain statutory provisions.  Here, Plaintiffs are not seeking to enjoin operation of any provision; they are "seeking its implementation under the appropriate standard."  *Tefel v. Reno*, 972 F. Supp. 608 (S.D. Fla. 1997); *see also Rodriguez v. Hayes*, 591 F.3d 1105, 1120 (9th Cir. 2010); *Abdi v. Duke*, 2017 WL 5599251, at *26 (W.D.N.Y. Nov. 17, 2017).  Reading § 1252(f)(1) to bar this Court from enjoining Defendants' pattern and practice, moreover, would leave Plaintiffs with no effective remedy for serious constitutional violations.  Even if the Supreme Court ultimately were to grant review and enter an injunction, that remedy would come too late to prevent the ongoing burden and chill on Plaintiffs' speech.  Again, leaving Plaintiffs without any effective judicial review would raise a "serious constitutional question."  *Webster*, 486 U.S. at 603.

At a minimum, § 1252(f)(1) plainly does not apply to all of the relief Plaintiffs seek.  The provision "prohibits federal courts from granting classwide injunctive relief against the operation of §§ 1221-1231, but specifies that this ban does not extend to individual cases."  *AADC*, 525 U.S. at 481-82.  On its face, § 1252(f)(1) thus does not bar Plaintiffs' requested injunctive relief

as to Mr. Ragbir.  Nor does it bar an injunction against activities like opening investigations or conducting surveillance, which are not governed by §§ 1221-1231.  *See Duran Gonzales v. DHS*, 508 F.3d 1227, 1232-33 (9th Cir. 2007); *Detroit Free Press v. Ashcroft*, 195 F. Supp. 2d 948, 955 (E.D. Mich. 2002); *cf. AADC*, 525 U.S. at 483 (similar as to § 1252(g)).[1]

4. The Court independently has jurisdiction over Mr. Ragbir's claims under the federal habeas statute and the Suspension Clause.  Mr. Ragbir is "in custody" under 28 U.S.C. § 2241 because "subjecting an alien to a final order of removal is to place that alien in custody within the meaning of the habeas statute."  *Simmonds v. INS*, 326 F.3d 351, 354 (2d Cir. 2003); *see also Preiser v. Rodriguez*, 411 U.S. 475, 487-88 (1973).  And under the Suspension Clause, "some judicial intervention in deportation cases is unquestionably required by the Constitution."  *St. Cyr*, 533 U.S. at 300.  Section 1252 therefore cannot preclude all review of Mr. Ragbir's claims.

## II.   Plaintiffs Will Suffer Irreparable Harm Absent Relief

### A.   Mr. Ragbir Will Suffer Irreparable Harm if He Is Deported

1. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."  *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  Thus, in cases involving specific, direct restrictions on speech, "the irreparable nature of the harm may be presumed."  *Bronx Household of Faith v. Bd. of Educ.*, 331 F.3d 342, 349 (2d Cir. 2003).

Mr. Ragbir faces the imminent, irreparable, and indefinite loss of his First Amendment freedom to express his views on the U.S. immigration system.  Unless this Court grants relief, Mr. Ragbir will be deported to Trinidad.  Mr. Ragbir has spent more than a decade advocating for immigrants' rights in the United States.  His impending removal from this country will stifle this speech by frustrating his ability to effectively express his views on U.S. immigration policy.

---

[1] Section 1252(f)(2) does not restrict courts' inherent authority to issue temporary stays of removal pending adjudication.  *Nken*, 556 U.S. at 426-32.

In analogous circumstances, the Supreme Court has held that restrictions that render speech less effective—even if speech is not banned altogether—may impermissibly burden expression.  In *McCullen v. Coakley*, 134 S. Ct. 2518 (2014), for example, the Court invalidated a law imposing a buffer zone around abortion clinics.  The law did not prohibit the plaintiffs— individuals who sought to counsel women on alternatives to abortion—from speaking.  But the law rendered their speech "far less frequent" and "far less successful" by preventing them from engaging in personal conversations with the women they wished to counsel.  The loss of these "primary methods" of expression "effectively stifled" the plaintiffs' speech.  *Id.* at 2536-37; *see also Sorrell*, 564 U.S. at 564; *Davis v. FEC*, 554 U.S. 724, 736 (2008).

So too here.  Mr. Ragbir's presence in the United States is essential to his ability to effectively convey his ideas and views about U.S. immigration law and policy.  Mr. Ragbir expresses his views about the immigration system through meetings with elected officials, presentations at conferences and media events, and by visiting places of worship to speak out.  Absent relief from this Court, Mr. Ragbir will lose all of these avenues for expression.  It is "no answer" to say that Mr. Ragbir can continue to voice his opinions about U.S. immigration policy from outside the United States.  *McCullen*, 134 S. Ct. at 2537.  That mode of expression is no substitute for the direct contact and exchange that is essential to Mr. Ragbir's advocacy and speech.  The harm Mr. Ragbir faces is not just a chill on his protected speech, but also a deprivation of his ability to engage in effective and meaningful speech in support of immigrant rights in the United States.  *Cf. Bronx Household of Faith*, 331 F.3d at 349.  This specific and imminent deprivation "unquestionably constitutes irreparable injury."  *Elrod*, 427 U.S. at 373.

2.  Deportation will inflict other irreparable harms on Mr. Ragbir.  "[R]emoval is a serious burden for many aliens," *Nken v. Holder*, 556 U.S. 418, 435 (2009), involving the

"enormous hardship" of being wrenched from their communities and families, *Kalaw v. Ferro*, 651 F. Supp. 1163, 1167 (W.D.N.Y. 1987). Mr. Ragbir has not lived in Trinidad for decades. If deported, he faces the prospect of indefinite separation from his family, and the relinquishment of his life's work as an immigrant-rights activist in the United States. Mr. Ragbir already suffers from symptoms of depression and post-traumatic stress disorder related to his prior detention and his uncertain immigration status. The trauma of deportation would inflict devastating and irreparable psychological harm. *Cf. Chalk v. U.S. District Court*, 840 F.2d 701, 709 (9th Cir. 1988); *Vencor Nursing Centrs, L.P. v. Shalala*, 63 F. Supp. 2d 1, 12 (D.D.C. 1999).

    3. The Supreme Court's holding in *Nken* that the harm from wrongful removal is not "categorically irreparable" is immaterial here and of doubtful precedential value. 556 U.S. at 435. That holding rested on the Government's representations that petitioners who ultimately prevailed on a petition for review from a final removal order "can be afforded effective relief by facilitation of their return along with restoration of the immigration status they had upon removal." *Id.* Those representations have since been discredited. *See* Letter from Deputy Solicitor General to Clerk of the Supreme Court (Apr. 24, 2012), https://goo.gl/2zmv6B; *Kabenga v. Holder*, 76 F. Supp. 3d 480, 487 (S.D.N.Y. Jan. 2, 2015) (granting stay of removal and noting that the government's representations in *Nken* had "proved illusory").

    Regardless, there is no guarantee that ICE would facilitate Mr. Ragbir's return even if he prevails on the merits. After *Nken*, ICE announced its policy for return of wrongfully removed individuals, but the policy on its face applies only to individuals who prevail in a court of appeals on a petition for review. ICE, *11061.1: Facilitating the Return to the United States of Certain Lawfully Removed Aliens* (Feb. 24, 2012), https://goo.gl/vbPkox; *see also* Hoppock Decl. ¶¶ 1-

14. Given ICE's recent actions against Mr. Ragbir, there is every indication that ICE will do nothing to facilitate his return to the United States if he ultimately prevails.

### B.   The Coalition Will Suffer Irreparable Harm if Mr. Ragbir Is Deported

Absent relief, the Coalition likewise faces irreparable injury.  Mr. Ragbir is the Coalition's Executive Director and its only full-time staff member.  The Coalition thus stands to lose the foundation and the face of the organization.  His loss will be irreplaceable.

"Services that are not simply of value to [an organization], but that may also truly be said to be special, unique or extraordinary may entitle an [organization] to injunctive relief." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 70 (2d Cir. 1999); *see also Int'l Creative Mgmt., Inc. v. Abate*, No. 07 Civ. 1979, 2007 WL 950092, at *6 (S.D.N.Y. 2007).  Mr. Ragbir's extraordinary contributions to the Coalition fit this description.  He is the primary point of contact between the Coalition, funders, elected officials, faith leaders, and legal services organizations.  Mr. Ragbir's deportation would deal a severe blow to these relationships and would hamper the Coalition's ability to continue its activities.  *See, e.g.*, *Singas Famous Pizza Brand Corp. v. New York Advertising LLC*, 468 F. App'x 43, 45-46 (2d Cir. 2004).

Mr. Ragbir's deportation would deprive the Coalition of its leader and guiding force.  Mr. Ragbir is uniquely and personally invested in the Coalition's mission.  He conceived, built, and sustains most of the Coalition's programs.  The loss of Mr. Ragbir would devastate the Coalition.

### C.   The Organizational Plaintiffs Will Suffer Irreparable Harm if Defendants' Unconstitutional Pattern and Practice Continues

Absent relief, the organizational Plaintiffs will continue to suffer irreparable harm from Defendants' ongoing pattern and practice of targeting immigrant-rights activists on the basis of their protected political speech.  Defendants' conduct has substantially frustrated Plaintiffs' abilities to carry out their missions and to advocate on behalf of the people and communities they

serve.  It has targeted these organizations' leaders and members.  And it has made individuals afraid to participate in the organizational Plaintiffs' programs.

The organizational Plaintiffs have also been forced to divert enormous resources to mitigate the harms Defendants' conduct has inflicted upon Plaintiffs' leaders and members, and the communities they serve.  Plaintiffs have had to substantially expand programs aimed at teaching immigrants about their constitutional and First Amendment rights.  And they have diverted resources from their normal programming to new legal efforts aimed at protecting activists' First Amendment rights and challenging Defendants' unconstitutional conduct.

## III.     The Balance of Hardships and the Public Interest Support a Preliminary Injunction

"These [two] factors merge when the government is the opposing party."  *Nken*, 556 U.S. at 435.  Here, the balance of hardships overwhelmingly favors Plaintiffs.  Plaintiffs face enormous irreparable injury if an injunction is not granted.  Conversely, neither the public nor the Government faces any substantial hardship from a preliminary injunction.

"Of course there is a public interest in preventing aliens from being wrongfully removed."  *Nken*, 556 U.S. at 436.  Any countervailing interest the Government or the public has in the "prompt execution of removal orders," *id.*, carries no weight here.  ICE itself has not sought to deport Mr. Ragbir for the past 11 years, undermining any argument that his removal from the United States is somehow urgently needed.  *Cf. Nwaokolo v. INS*, 314 F.3d 303, 310 (7th Cir. 2002) (granting a stay of removal and noting that "the INS has known for years exactly where Ms. Nwaokolo resides and has not actively sought to expedite her removal").

ICE's agreement to allow Mr. Ragbir to remain in the United States underscores that the balance of hardships supports granting temporary relief.  Mr. Ragbir is not a danger to the community, as ICE repeatedly recognized in initially releasing him from detention and then granting him four administrative stays of removal.  *Cf. Nken*, 556 U.S. at 436 (interest in removal

may be heightened if the alien is "particularly dangerous"). Mr. Ragbir has complied with every condition of his release, including regular check-ins with ICE. If anything, Mr. Ragbir is an asset to the community. He is a respected leader in the immigrant-rights field and has devoted himself to advocating tirelessly on behalf of underserved and vulnerable immigrant communities.

As for Plaintiffs' claims challenging Defendants' broader pattern and practice, an injunction against targeting immigration-rights activists will do no more than prohibit Defendants from doing what the Constitution itself already forbids. "[T]he Government does not have an interest in the enforcement of an unconstitutional [pattern and practice]." *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013) (quotation marks omitted).

Finally, "securing First Amendment rights is in the public interest." *New York Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 488 (2d Cir. 2013). Conversely, "it is decidedly against the public interest to abide the continued enforcement of an unconstitutional policy or law." *Deferio v. City of Syracuse*, 193 F. Supp. 3d 119, 131 (N.D.N.Y. 2016). The public interest weighs heavily in favor of an injunction staying Mr. Ragbir's removal and restraining Defendants' unconstitutional pattern and practice.

## CONCLUSION

This Court should grant a preliminary injunction (1) staying Mr. Ragbir's removal and (2) restraining Defendants from taking any adverse immigration enforcement action against any noncitizen on the basis of protected speech or expressive conduct. In the alternative to (2), the Court should preliminarily enjoin Defendants from opening an investigation into, surveilling, accelerating proceedings against, detaining, or altering the provisions of any order against any noncitizen on the basis of protected speech or expressive conduct.

February 12, 2018

Alina Das, Esq. (AD8805)
Jessica Rofé, Esq. (JR5231)
Brittany Castle, Legal Intern
Jeremy Cutting, Legal Intern
WASHINGTON SQUARE
  LEGAL SERVICES, INC.
Immigrant Rights Clinic
New York University School of Law
245 Sullivan Street, 5th floor
New York, New York 10012
Tel: (212) 998-6430
alina.das@nyu.edu
jessica.rofe@nyu.edu

Respectfully submitted,

/s/ Anthony D. Boccanfuso
R. Stanton Jones*
John L. Freedman
William C. Perdue*
Daniel F. Jacobson*
Sally Pei*
Stephen K. Wirth*
Andrew T. Tutt*
ARNOLD & PORTER
  KAYE SCHOLER LLP
601 Massachusetts Ave. NW
Washington, DC 20001
(202) 942-5000
(202) 942-5999 (fax)
stanton.jones@arnoldporter.com

Anthony D. Boccanfuso
Ada Añon
ARNOLD & PORTER
  KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
(212) 836-8000
(303) 836-8689 (fax)
anthony.boccanfuso@arnoldporter.com

Emily Newhouse Dillingham*
ARNOLD & PORTER
  KAYE SCHOLER LLP
70 West Madison Street
Suite 4200
Chicago, IL 60602
(312) 583-2300
(312) 583-2360 (fax)
emily.dillingham@arnoldporter.com

* Pro hac vice application forthcoming

*Attorneys for Plaintiffs*

26

## <u>AFFIRMATION OF SERVICE</u>

I, Anthony D. Boccanfuso, the undersigned attorney at law duly admitted to practice in the State of New York, respectfully show that on the 12th day of February, 2018, I caused a copy of the attached to be served by email, by agreement of the parties, upon:

Joseph N. Cordaro
Brandon M. Waterman
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Telephone:   (212) 637-2745, 2741
Facsimile:   (212) 637-2786
Email: joseph.cordaro@usdoj.gov
        brandon.waterman@usdoj.gov

/s/ Anthony D. Boccanfuso
Anthony D. Boccanfuso

27