# EXHIBIT A

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| Ravidath Lawrence Ragbir, et al., | ECF |
| Plaintiffs, | CASE NO. 18 Civ. 1159 (PKC) |
| v. | |
| Thomas D. Homan, et al., | |
| Defendants. | |

**BRIEF OF TWENTY-ONE IMMIGRANT RIGHTS ADVOCACY
ORGANIZATIONS AS *AMICI CURIAE* IN SUPPORT OF PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION**

Dated: March 6, 2018

Yosef J. Riemer, P.C.
Katherine A. Rocco
yriemer@kirkland.com
katherine.rocco@kirkland.com

KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900

*Attorneys for Amici Curiae*

## TABLE OF CONTENTS

**Page**

**INTEREST OF AMICI AND SUMMARY OF ARGUMENT**.................................. 1

**ARGUMENT**.................................................................................................. 3

    A.    Defendants' Targeting of Immigrant Speech Chills Public
              Debate By Silencing The Most Effective and Relevant
              Spokespeople Against The Injustices of the Immigration System......... 5

    B.    A Nationwide Injunction Is Necessary to Eliminate the Fear of
              Being Targeted for Speaking Out........................................................ 12

          1.    A Nationwide Injunction is Necessary to Protect
                  Immigrants' and Advocates' Political Speech............................. 13

          2.    Defendants' Retaliatory Actions Chill the
                  Constitutionally-Protected Speech of All Immigrants. .............. 14

          3.    Uniformity Counsels in Favor of a Nationwide Injunction ....... 15

    **CONCLUSION** .......................................................................................... 16

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Batalla Vidal v. Nielsen*, 16-CV-4756 (NGG) (JO),
  2018 WL 834074, -- F. Supp. 3d -- (E.D.N.Y. Feb. 13, 2018) ............. 13, 14, 15, 16

*Bridges v. Wixon*,
  326 U.S. 135 (1945) ................................................................................... 4

*Citizens United v. Fed. Election Comm'n*,
  558 U.S. 310 (2010) ................................................................................. 4

*City of Hous., Tex. v. Hill*,
  482 U.S. 451 (1987) .................................................................................. 3

*Gill v. Pidlypchak*,
  389 F.3d 379 (2d Cir. 2004) ..................................................................... 4

*Handschu v. Police Dep't of the City of N.Y.*,
  241 F. Supp. 3d 433 (S.D.N.Y. 2017) .................................................... 11

*Hedges v. Obama*,
  No. 12 CIV. 331(KBF),
  2012 WL 2044565 (S.D.N.Y. June 6, 2012) ................................... 14, 15

*In re U.S.*,
  817 F.3d 953 (6th Cir. 2016) .................................................................... 3

*Mills v. State of Ala.*,
  384 U.S. 214 (1966) ............................................................................. 3, 13

*N.Y. Progress & Prot. PAC v. Walsh*,
  733 F.3d 483 (2d Cir. 2013) ................................................................... 12

*N.Y. Times Co. v. Sullivan*,
  376 U.S. 254 (1964) .................................................................................. 3

*Plyler v. Doe*,
  457 U.S. 202 (1982) .................................................................................. 5

*Tex. v. U.S.*,
  809 F.3d 134 (5th Cir. 2015) .................................................................. 15

*U.S. v. Verdugo-Urquidez,*
    494 U.S. 259 (1990) ................................................................................ 5

*Vanasco v. Schwartz*, 401 F. Supp. 87 (E.D.N.Y. & S.D.N.Y. 1975),
    *aff'd*, 423 U.S. 1041 (1976) ................................................................. 4

*Washington v. Reno,*
    35 F.3d 1093 (6th Cir. 1994) ............................................................... 14

## Other Authorities

U.S. Const., art. I § 8, cl. 4................................................................... 15, 16

## INTEREST OF AMICI AND SUMMARY OF ARGUMENT

*Amici curiae* are 21 organizations from across the United States dedicated to organizing communities that struggle with burdens imposed by immigration laws and policies. Individual statements of interest are set forth in Appendix A attached hereto. A core part of *amici's* advocacy is amplifying the voices of immigrants, including noncitizens—by organizing public speeches, media interviews, and online campaigns in which immigrants tell their stories. When the public and elected officials hear directly from those who have been marginalized, immigrant community members have the opportunity to contest misconceptions about immigrants and bring a human face to the immigration debate. This allows immigrants to be viewed as people with solutions and not just statistics. *Amici* and their clients thus hope to inform the ongoing public debate on immigration.

*Amici* submit this brief to assist the Court in understanding that the retaliatory enforcement by Defendants, the departments, agencies, and officials responsible for administering the immigration laws, places a severe chill on *amici's* advocacy—and on the public's ability to hear from people with first-hand experience of injustices imposed by the immigration laws and policies. *Amicus* Coalition for Humane Immigrant Rights (CHIRLA), for example, had a member, "Jose," who spoke publicly at a press conference organized by CHIRLA and other organizations in front of U.S. Immigrations and Customs Enforcement (ICE) headquarters in Los Angeles about his experience as an unaccompanied minor while wearing a CHIRLA t-shirt. Shortly thereafter, ICE officers came to his house and arrested and detained him. *Amicus* New Mexico Faith Coalition for Immigrant Justice bore witness as a

woman, "Lilian," made the gut-wrenching decision not to speak at a press conference to share the impact of her husband's detention by ICE because "Lilian" feared ICE would retaliate against her husband, herself, or their children if she spoke out. Even individuals with secure immigration status have stopped speaking out for fear of immigration-based retaliation. For example, *amicus* Make the Road New York lamented when a previously vocal youth member with a green card was silenced out of fear that her family would be targeted for deportation. Almost every organization that advocates for immigrants has a story to tell of a protest canceled, speakers backing out, and people experiencing injustice who are too scared to seek help because they fear they, like Mr. Ragbir, will be putting a proverbial target on their backs by going public.

First-hand narratives are one of the oldest forms of political advocacy. Perhaps the most effective use of narratives in American history was the abolitionist movement's use of slave narratives, most famously the *Narrative of the Life of Frederick Douglass*, the *Narrative of William W. Brown, a Fugitive Slave, Written by Himself*, and Solomon Northup's *Twelve Years a Slave*. People sharing their own experiences with the public have played a similar role in almost every political movement in modern history. Yet because immigrants fear to speak up as a result of Defendants' retaliatory targeting, the public discourse about immigration has been profoundly chilled.

In order to protect political advocacy by and alongside immigrants, Defendants' targeting of non-citizens for adverse immigration action based on their

speech or expressive conduct should be enjoined nationwide. The First Amendment protects *amici*'s speech, and the speech of their members, citizens or not. The notion that in the United States, a person can be locked up and exiled by the Government for criticizing its policies is an anathema to the Constitution.

## ARGUMENT

"Among the most serious allegations a federal court can address are that an Executive agency has targeted citizens for mistreatment based on their political views."[1] The right to criticize the government and its policies is fundamental to the First Amendment—so much so that the Supreme Court has held that "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."[2] The framers of the Constitution established a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open."[3] Indeed, as Judge Werker once wrote on behalf

---

[1]   *In re U.S.*, 817 F.3d 953, 955 (6th Cir. 2016) (addressing allegations of I.R.S. targeting of organizations that advocated conservative political viewpoints).

[2]   *City of Hous., Tex. v. Hill*, 482 U.S. 451, 462–63 (1987).

[3]   *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). *See also Mills v. State of Ala.*, 384 U.S. 214, 218 (1966) ("Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs.").

of a three-judge panel of the Southern and Eastern Districts, "[f]ree debate on public issues is essential to the survival of the Republic."[4]

In this Circuit, in order to establish a retaliatory enforcement claim, "a plaintiff must prove that (1) she has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by his exercise of that right; and (3) defendants' actions effectively chilled the exercise of her First Amendment right."[5]

The first prong is simple: the First Amendment protects Plaintiffs, *amici*, and their members, both citizens and non-citizens, alike. It is settled law that organizations and associations have the right to engage in political speech, fully protected by the First Amendment.[6]   Similarly, the Supreme Court has long recognized that "Freedom of speech and of press is accorded aliens residing in this country."[7] Indeed, people with substantial connections to this country have

---

[4]   *Vanasco v. Schwartz*, 401 F. Supp. 87, 97 (E.D.N.Y. & S.D.N.Y. 1975), *aff'd*, 423 U.S. 1041 (1976) (summary affirmance); *see also Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 339 (2010) ("Speech is an essential mechanism of democracy, for it is the means to hold officials accountable to the people. . . .  The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it.").

[5]   *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004).

[6]   *E.g.*, *Citizens United*, 558 U.S. at 342 (holding that non-profit political organization had First Amendment rights, and collecting cases).

[7]   *Bridges v. Wixon*, 326 U.S. 135, 148 (1945).

4

constitutional rights even if they are subject to removal under the immigration laws.[8]

As for the second and third prongs, *amici* set forth below their experience of targeting by Defendants and of how it has suppressed the ability of people affected by the immigration system to speak out about the injustice they have experienced.

### A.   Defendants' Targeting of Immigrant Speech Chills Public Debate By Silencing The Most Effective and Relevant Spokespeople Against The Injustices of the Immigration System.

Defendants' conduct has chilled and continues to chill speech about the immigration system. *Amici* have first-hand experience of the burdens imposed by Defendants' retaliatory conduct against those who dare to criticize them. For example, at least one *amicus* has experienced retaliatory detention of one of its members after he spoke at a press conference. *Amici* have repeatedly found their members and people in need of their help—even people with lawful immigration status—fearful that they will be detained or deported or have applications denied if they speak out. *Amici* have incurred substantial costs in preparing to protect themselves and their members against retaliatory enforcement. And many of *amici*

---

[8]   *See, e.g., U.S. v. Verdugo-Urquidez*, 494 U.S. 259, 271 (1990) ("[A]liens receive constitutional protections when they have come within the territory of the United States and developed substantial connections with this country."); *Plyler v. Doe*, 457 U.S. 202, 210 (1982) ("Whatever his status under the immigration laws, an alien is surely a 'person' in any ordinary sense of that term. Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments.").

have noticed apparent surveillance, and possibly electronic surveillance, of their public events.

The core of *amici*'s work is providing platforms for immigrants to make their voices heard in the political and legal systems.[9] At the heart of this is facilitating opportunities for immigrants to speak publicly about their lived experiences.[10] *Amici* organize public speeches by immigrants in which they explain their experiences.[11] *Amici* coordinate interviews with media outlets, allowing immigrants to, in their own words, reveal the injustices they face to print, radio, and television audiences.[12] Increasingly, *amici* work on online organizing too, using social media to persuade and educate—for example, through the Twitter campaign #UndocumentedAndUnafraid.[13] And while the medium may sometimes be new, the technique is anything but: it is the same reason why Abolitionist publishers before the Civil War sought to disseminate slave narratives, like Frederick Douglass's *Narrative*, the same reason why Harvey Milk implored gay people to "come out" to their friends and families, and the same reason why Black Lives Matter encouraged victims of police violence to directly share their stories with the public. Personal

---

[9]   MRNY Decl. ¶ 5.

[10]   *Id.* at ¶ 8.

[11]   *Id.* at ¶ 12.

[12]   *Id.* at ¶ 11.

[13]   *See id.* at ¶ 33.

stories encourage others experiencing similar injustices to join the movement and expose truths to the public and decision makers.[14]

Defendants' retaliatory targeting chills that speech. For example, "Jose," a member of the Coalition for Humane Immigrant Rights, arrived to the United States as a child who fled his home country alone.[15] He spoke at a press conference co-organized by CHIRLA at ICE's headquarters in Los Angeles, and told his story to the media while wearing a CHIRLA t-shirt.[16] Soon after he spoke, ICE officers suddenly appeared at his home.[17] CHIRLA and "Jose" believe that he was targeted by ICE because he had spoken out against them. ICE arrested "Jose" and detained him in the Adelanto detention facility.[18] A CHIRLA staff attorney had to drop most of her other work for two months to work on his case, including representing him at a bond hearing.[19]

Unsurprisingly, experiences like this one and those that Plaintiffs identify have made many immigrants fearful about speaking up. For example, in February 2017, a church-based immigrants' rights group, the New Mexico Faith Coalition for Immigrant Justice (the "Faith Coalition"), was launching an anti-deportation

---

[14] *Id.* at ¶ 8.

[15] CHIRLA Decl. ¶ 5.

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

campaign for a community member who had been detained.[20] The Faith Coalition planned a press conference with his family, in which his wife, "Lilian," committed to speak to hopefully raise public awareness of his situation.[21] However, on the day of the press conference, fearful that showing her face or making her name public would cause ICE to retaliate against her family, "Lilian" made the gut-wrenching decision not to appear.[22] The Faith Coalition is aware of many other volunteers and members who have similarly decided not to speak to the press, at Albuquerque City Council meetings, or with other elected officials because of fear that doing so will make them a target for ICE.[23]

The Faith Coalition's experience is typical. One of Make the Road New York's immigrant youth organizers in Queens reports meeting with at least one youth member or staffer *every week* who is scared to speak out for fear of retaliation against themselves, their loved ones, or both.[24] "Sarahi," a green card holder and active Make the Road New York member for years, frequently spoke publicly in the past; since ICE has increased its targeting of activists, she has not given speeches or made media appearances because she fears that her undocumented mother will be

---

[20]   Faith Coalition Decl. ¶ 8.

[21]   *Id.*

[22]   *Id.*

[23]   *Id.*

[24]   MRNY Decl. ¶ 27.

put at risk if she does so.[25] Similarly, "Maria," an entrepreneur and member of CHIRLA who has been fighting deportation since she was defrauded by a person falsely claiming to be an immigration attorney, was one of CHIRLA's most active and compelling spokespeople for years—but fearing retaliation, she has "gone dark."[26]

"Maria" also exemplifies another aspect of the chill on debate over immigration. She had posted publicly on social media about her experiences with the immigration system and those of other immigrants for years.[27] She sought to inform her community and the broader public about the challenges she faced. But based on reports that ICE has contracted for social media monitoring and other forms of online surveillance, including leaked audio indicating that ICE intends to search social media by "tone,"[28] "Maria" feared being targeted because of her prior political speech about immigration and about government officials.[29] Consequently, she deleted her past posts, wiped her social media pages, and even changed her screen name on social media to try to avoid association with her past political advocacy.[30] Thus, even speech she had *previously* made has been silenced.

---

[25]   *Id.* at ¶ 28.

[26]   CHIRLA Decl. ¶ 6.

[27]   *Id.*

[28]   MRNY Decl. ¶ 32.

[29]   CHIRLA Decl. ¶ 6.

[30]   *Id.* at ¶ 7.

Indeed, CHIRLA and other organizations have been forced to advise their members to self-censor to reduce the chances of retaliation. For example, when DACA recipients speak out about the urgency of a Congressional solution to their status, CHIRLA commonly advises them not to state when their own deferred action status and work authorization expires because it reveals when they are most vulnerable to targeted retaliation.[31] CHIRLA has also diverted two attorneys' time to assess the risk of retaliatory enforcement against members before they speak to media or at public events.[32] Similarly, Make the Road New York has had to devote resources to counseling its members and their communities about the threat of surveillance of their political speech online.[33]

Multiple *amici* have noticed that fewer immigrants are attending public speeches and protests.[34] That is understandable: Make the Road New York's Long Island office has noticed unidentified law enforcement lurking at the edges of the crowds at its rallies and taking photographs.  It has also noticed sudden disruption to cellphone service and draining of cellphone batteries, tell-tale signs that a "stingray"—a device that obliges cellphones to send identifying information—is present.[35] In addition, the New Mexico Faith Coalition for Immigrant Justice has

---

[31]  *Id.* at ¶¶ 9, 11.

[32]  *Id.* at ¶ 9.

[33]  MRNY Decl. ¶ 33.

[34]  *E.g.*, CHIRLA Decl. ¶ 12; MRNY Decl. ¶ 35; Faith Coalition Decl. ¶¶ 14, 15.

[35]  MRNY Decl. ¶ 34.

observed ICE agents questioning attendees at press conferences and other events in Albuquerque about what organization they are affiliated with.[36] This causes apprehension that attendees who are associated with pro-immigrant organizations may face retaliation. There is thus credible reason to fear that federal immigration enforcement officers are surveilling protests and gathering identifying information about attendees.[37]

These are just a few examples of the chilling effects of Defendants' retaliatory enforcement. There are far more—*amici* have, for example, had to divert money they would have spent on advocacy and outreach to security consultants and assessments of the risk of retaliation for every event where an immigrant speaks.[38] Because so many advocates have been silenced due to fear, the burden of speaking up falls disproportionately on the few willing to risk Defendants' retaliation. These individuals are forced to re-live their traumatic experiences more often which takes a psychological toll.[39] *Amici* have had their speech chilled in numerous different ways, and when one of *amici*'s members is detained shortly after speaking out, that chill becomes even greater. Correspondingly, elected officials and the broader public

---

[36]   Faith Coalition Decl. ¶ 17.

[37]   Nor would this be the first time that this District has had to step in to address unlawful targeted surveillance of political or religious groups. *E.g.*, *Handschu v. Police Dep't of the City of N.Y.*, 241 F. Supp. 3d 433 (S.D.N.Y. 2017) (recounting 46-year history of lawsuit challenging unlawful surveillance of wide range of political and religious groups).

[38]   *E.g.*, CHIRLA Decl. ¶ 15; MRNJ Decl. ¶ 8.

[39]   MRNJ Decl. ¶ 10.

lose the ability to learn from *amici*'s members' stories. Public debate and policymaking have suffered as a result.

### B.   A Nationwide Injunction Is Necessary to Eliminate the Fear of Being Targeted for Speaking Out.

A preliminary injunction enjoining Defendants' actions is necessary in this case. Defendants' targeting of Plaintiffs and other similarly situated individuals and groups, including *amici*, violates the First Amendment and can only be prevented through an injunction. "The loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury."[40] Indeed, "[t]he harm is particularly irreparable where, as here, a plaintiff seeks to engage in political speech, as timing is of the essence in politics and a delay of even a day or two may be intolerable."[41] Immigration remains at the center of the political debate—yet immigrants fear to speak up about it.

Moreover, an injunction cannot be limited to this District. The harm from Defendants' targeted immigration enforcement actions is felt nationwide. It is particularly troubling that this enforcement retaliates against the exercise of political speech about immigration issues. As Justice Black stated in *Mills*, "[w]hatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment

---

[40]   *N.Y. Progress & Prot. PAC v. Walsh*, 733 F.3d 483, 486 (2d Cir. 2013).

[41]   *Id.*

was to protect the free discussion of governmental affairs."[42] This Court should therefore issue a nationwide preliminary injunction to prevent Defendants from chilling the First Amendment rights of Plaintiffs as well as all other people and immigrant rights organizations.

      1.     A Nationwide Injunction is Necessary to Protect Immigrants' and Advocates' Political Speech.

Across the country, immigrants, their families, and advocates need to be able to tell their stories to advocate for reforms. Like Plaintiffs, *amici* operate in many different states, but are joined together by a common goal. But unless an injunction is extended nationwide, the advocacy efforts of Plaintiffs and other advocates for reform will be stifled as soon as they step outside the Southern District of New York. A narrower injunction would simply be insufficient to protect their rights.[43]  It would also lead to absurdities: an immigrant on the 6 train would be protected from retaliatory targeting her whole ride; an immigrant riding the 5 train would lose protection as she crosses the East River. An immigrant who travels to Rockland County up I-87 and the Tappan Zee Bridge in order to meet with an elected official and tell his story would be protected his whole journey; an immigrant who takes the George Washington Bridge to get there would be unprotected. Organizations would have to tailor their multi-state work to the relative risk of retaliation in different

---

[42]  384 U.S. at 218.

[43]  *See Batalla Vidal v. Nielsen*, 16-CV-4756 (NGG) (JO), 2018 WL 834074, at *25, -- F. Supp. 3d -- (E.D.N.Y. Feb. 13, 2018) (issuing a nationwide injunction because it was "hard to conceive of how the court would craft a narrower injunction that would adequately protect Plaintiffs' interests").

places. To avoid this balkanization of the First Amendment, this Court should

enjoin Defendants' targeted enforcement actions across the United States.

       2.    Defendants' Retaliatory Actions Chill the Constitutionally-Protected Speech of All Immigrants.

Moreover, the relief sought by Plaintiffs in this case would alleviate the harm

felt by all similarly situated activists. *See Washington v. Reno*, 35 F.3d 1093, 1104

(6th Cir. 1994) (affirming a nationwide injunction despite the absence of a

nationwide class because the relief for the named plaintiffs would necessarily

extend to all similarly situated individuals); *see also Batalla Vidal*, 2018 WL

834074, at *25 (issuing a nationwide injunction when an injunction limited to

plaintiffs' interests would be "unworkable").  For example, in *Hedges v. Obama*, a

court in this District issued a nationwide injunction against the enforcement of

Section 1021(b)(2) of the National Defense Authorization Act.[44] The court stated

that "the plaintiffs in this case hail from across the nation, and . . . represent the

interests of similarly situated individuals not party to this case."[45] Here too, the

geographical scope of political speech impacted by Defendants' actions extends

across the nation, far beyond these Plaintiffs and this district. The *Hedges* court

explained that "the injunction in this action is intentionally expansive because

persons whose expression is constitutionally protected [and not party to the instant

litigation] may well refrain from exercising their rights for fear of criminal

---

[44]  No. 12 CIV. 331(KBF), 2012 WL 2044565 (S.D.N.Y. June 6, 2012).

[45]  *Id.* at *3.

sanctions by a statute susceptible of application to protected expression."[46] That sentiment applies equally well here. Absent a nationwide injunction, hundreds of thousands of immigrant activists are effectively silenced by the knowledge that if they exercise their First Amendment rights in an attempt to change policy, they risk ICE's retaliation against themselves and their loved ones.

      3.      Uniformity Counsels in Favor of a Nationwide Injunction

Finally, a geographically-limited injunction raises the possibility of disparate rulings across the country on this issue. But both Congress and the Supreme Court have noted that the immigration laws should be enforced uniformly—after all, the Constitution states that "The Congress shall have Power . . . [t]o establish an uniform Rule of Naturalization."[47] In *Batalla Vidal v. Nielsen*, a court in the Eastern District of New York issued a nationwide injunction against the rescission of the Deferred Action for Childhood Arrivals ("DACA") program.[48] The court explained that "[b]ecause the decision to rescind the DACA program had a 'systemwide impact,'" a "systemwide" remedy was warranted.[49] Here too, Defendants' actions have had a "systemwide impact," chilling political speech across the nation, far beyond these Plaintiffs and this district. Further, "[t]here is a strong

---

[46]  *Id.* (internal quotation marks and citations omitted).

[47]  U.S. Const., art. I § 8, cl. 4; *see also Tex. v. U.S.*, 809 F.3d 134, 188 (5th Cir. 2015) (affirming nationwide injunction concerning the immigration laws).

[48]  2018 WL 834074.

[49]  *Id.*

federal interest in the uniformity of federal immigration law."[50] Given this interest, a nationwide injunction is particularly appropriate here, where the federal government's selective and retaliatory enforcement of the nation's immigration laws is at issue.

## CONCLUSION

Unless Defendants are enjoined from targeting immigrants who speak out for detention, deportation, and denial of immigration relief, public debate over the immigration system will continue to be chilled because those who have experienced its injustices fear to speak. For the foregoing reasons, this Court should enjoin Defendants on a nationwide basis from targeting immigrants for adverse action on the basis of their protected First Amendment activity about the immigration system.

---

[50] *Batalla Vidal*, 2018 WL 834074, at *25 (issuing a nationwide injunction concerning the immigration laws); *see also* U.S. Const. art. I, § 8, cl. 4 (empowering Congress to "establish an uniform Rule of Naturalization").

16

Dated:      New York, NY
            March 6, 2018

                                    Kirkland & Ellis LLP

                                    _____
                                    Yosef J. Riemer, P.C.
                                    Katherine A. Rocco
                                    KIRKLAND & ELLIS LLP
                                    601 Lexington Avenue
                                    New York, NY 10022
                                    Telephone: (212) 446-4800
                                    Facsimile: (212) 446-4900


                                    Trudy S. Rebert
                                    NATIONAL IMMIGRATION LAW
                                    CENTER
                                    P.O. Box 721361
                                    Jackson Heights, NY 11372
                                    Telephone: (646) 867-8793

Of Counsel                          Amy S. Taylor
Nicholas Espiritu                   Sienna Fontaine
Jessica R. Hanson                   Kendal K. Nystedt
NATIONAL IMMIGRATION                MAKE THE ROAD NEW YORK
LAW CENTER                          301 Grove Street
3450 Wilshire Blvd., #108-62        Brooklyn, NY 11237
Los Angeles, CA 90010               Telephone: (718) 418-7690
Telephone: (213) 639-3900           Facsimile: (866) 420-9169


                                    *Attorneys for Amici Curiae*

# APPENDIX A

The mission of the Center for Community Change is to build the power and capacity of low-income people, especially low-income people of color, to change their communities and public policies for the better. CCC's focus areas include jobs and wages, retirement security, affordable housing, racial justice, barriers to employment for formerly incarcerated individuals, and immigration. CCC has housed the Fair Immigration Reform Network (FIRM) since its inception in 2003. FIRM is the nation's largest coalition of immigrant rights groups, fighting for immigrant rights at the local, state, and federal levels.

The Illinois Coalition for Immigrant and Refugee Rights (ICIRR) is a non-profit, nonpartisan statewide organization dedicated to promoting the rights of immigrants and refugees in Illinois to full and equal participation in the civic, cultural, social, and political life of our diverse society. In partnership with member organizations, ICIRR educates and organizes immigrant and refugee communities to assert their rights; promotes citizenship and civic participation; monitors, analyzes, and advocates on immigrant-related issues; and, informs the general public about the contributions of immigrants and refugees. ICIRR has advocated for policy changes that protect immigrant families from deportation and separation, and uphold their rights to due process and equal protection under the law.

Make the Road Connecticut (MRCT) is a nonprofit membership-based community organization formed at the end of 2015 that integrates member education and community organizing in order for low-income immigrant Connecticut to improve their lives and neighborhoods. In its short history, MRCT has grown to 10 staff and has more than 250 members and two offices in Hartford and Bridgeport. Since MRCT believes that those directly impacted by injustice are the best positioned to create change, our immigrant members and staff regularly speak out against the inhumane deportation system at rallies and hearings as well as via social media and in the press and courtrooms.

Make the Road New Jersey (MRNJ) is a community-based organization that strengthens immigrant communities to achieve dignity and respect through high quality legal services, community organizing, transformative education, and policy advocacy. Founded in late 2014 in Elizabeth, New Jersey, MRNJ serves thousands of immigrant families each year. MRNJ works on many fronts to uplift the stories of our members who have experienced navigating through and often defending themselves against unjust immigration enforcement.

Make the Road Nevada (MRNV) works with working class and immigrant communities to provide emergency relief services alongside relentless and effective advocacy.

Make the Road New York (MRNY) is a nonprofit membership-based community organization that integrates adult and youth education, legal and survival services, and community organizing in order for low-income immigrant New Yorkers to improve their lives and neighborhoods. MRNY has 197staff, over 21,000 members, and five offices spread throughout New York City, Long Island, and Westchester. Since MRNY believes that those directly impacted by injustice are the best positioned to create change, our immigrant members and staff regularly speak out against the inhumane deportation system at rallies and hearings as well as via social media and in the press and courtrooms.

Make the Road Pennsylvania (MRPA) is a nonprofit community member organization that integrates adult and youth education, legal and survival services, and community organizing in order for low-income immigrant Pennsylvanians to improve their lives and neighborhoods. MRPA has 14 staff, 5,000 members, and three offices spread throughout Eastern Pa. Since MRPA believes that those directly impacted by injustice are the best positioned to create change, our immigrant members and staff regularly speak out against the inhumane deportation system at rallies and hearings as well as via social media and in the press and courtrooms.

OneAmerica is Washington State's largest non-profit immigrant advocacy organization working to build power in immigrant and refugee communities and shift policy at the local, state, and federal level. Founded in the aftermath of the 9/11 terrorist attacks, and resulting backlash against Muslim, immigrant and refugee communities, OneAmerica works to organize immigrant communities of color across Washington to advance justice and democracy. OneAmerica's core programmatic work includes building leadership with immigrant members to stand up and speak out publically against injustice and the issues most impacting their lives, including ending deportations, ensuring family unity, and advocating for comprehensive immigration reform. Many OneAmerica leaders with vulnerable immigration status have disclosed their stories publicly at events, rallies, marches, press conferences and legislative hearings as part of a statewide and national immigrant rights movement.

The Progressive Leadership Alliance of Nevada (PLAN) is a coalition of nearly 30 organizations in Nevada that are aimed at achieving social and environmental justice in the state. PLAN provides substantial immigrants' rights services and works to change policy to protect immigrant families.

Services Immigrant Rights & Education Network (SIREN) is an organization that seeks to empower low-income immigrants and refugees in Northern and Central California through community education and organizing, leadership development, policy advocacy, and legal services. To achieve this goal, SIREN engages immigrant and refugee community members to engage in campaigns and speak out regarding immigration-related policies and practices that affect their lives.

The Adelante Alabama Worker Center (Adelante) is a non-profit organization based in Birmingham, Alabama that unites day laborers, domestic workers, and other low-wage and immigrant workers and their families in the Birmingham area to defend their rights, promote their dignity, and pursue justice for all.  Adelante engages in campaign-based organizing, media advocacy, community education, and legal representation and litigation to challenge wage theft, workplace exploitation, deportation, prolonged detention, racial profiling, and other unlawful practices that affect immigrant workers in Alabama.

The Coalition for Humane Immigrant Rights (CHIRLA) was founded in 1986. CHIRLA is a California leader with national impact made of diverse immigrant families and individuals who act as agents of social change to achieve a world with freedom of mobility, full human rights, and true participatory democracy. CHIRLA's mission is to achieve a just society fully inclusive of immigrants. CHIRLA organizes and serves individuals, institutions and coalitions to build power, transform public opinion, and change policies to achieve full human, civil and labor rights. Guided by the power, love, and vision of our community, CHIRLA embraces and drives progressive social change. CHIRLA was formed in response to the Immigration Reform and Control Act (IRCA) of 1986 which made hiring undocumented workers illegal, thus creating a situation ripe for worker exploitation and abuse which have increased since that time.

The Colorado Immigrant Rights Coalition (CIRC) is a statewide, membership-based coalition of immigrant, faith, labor, youth, community, business and ally organizations founded in 2002 to improve the lives of immigrants and refugees by making Colorado a more welcoming, immigrant-friendly state. CIRC achieves this mission through non-partisan civic engagement, public education, and advocating for workable, fair and humane immigration policies. CIRC believes in the inherent dignity and human rights of every person, regardless of immigration status. CIRC envisions a society in which all people are treated with dignity and respect and have equal access to fair and just work, housing, health care, and education and the opportunity to live united with family members. Immigrant leaders of our member organizations regularly speak out against ICE policies, share their stories at the capitol to affect legislative change, and challenge ICE leadership with rallies and press conferences to stop deportations.

Migrant Justice works to build the voice, capacity, and power of the farmworker community and engage community partners to organize for economic justice and human rights.  As part of this focus, Migrant Justice works with a broad coalition to pass legislation affecting immigrant rights.

The Pennsylvania Immigration and Citizenship Coalition (PICC) is a diverse coalition of over 50 member organizations, including community groups, social, health and legal service providers, advocacy organizations, labor unions, and faith communities. Our mission is to advance immigrants' rights and promote immigrants'

full integration into society by advocating with a unified voice for greater public understanding and welcoming public policies throughout Pennsylvania. PICC staff, board, and leaders regularly speak at public events, with media, and with public officials about the need to end unjust deportations and to advocate for policy changes at the local, state, and federal levels.

The New Mexico Faith Coalition for Immigrant Justice strives to serve the immigrant community through compassionate accompaniment.  Volunteer teams walk with families facing the threat of deportation or the hardship of immigration detention. Its advocacy work focuses on local, statewide and national laws that affect immigrant families.

Workers Defense Project (WDP) is a nonprofit member-based organization that empowers low-income workers to achieve fair employment through education, direct services, organizing, and strategic partnerships. Founded in 2002, WDP has offices in Austin, Dallas, and Houston, Texas. WDP staff and members organize in support of policies to improve the living and working conditions for immigrants and workers throughout Texas, and regularly speak publicly against anti-immigrant policies including during direct actions such as protests and vigils, on social media, and to the press.

The Tennessee Immigrant and Refugee Rights coalition (TIRRC) is a statewide, immigrant and refugee-led collaboration whose mission is to empower immigrants and refugees throughout Tennessee to develop a unified voice, defend their rights, and create an atmosphere in which they are recognized as positive contributors to the state.  TIRRC believes that real and lasting change must be led by those directly affected by injustice, and for this reason community organizing and leadership development are the core strategies they use to realize their vision.

Pineros y Campesinos Unidos del Noroeste (PCUN) is Oregon's farmworkers union and the largest Latino organization in the state.  Founded in 1985 by 80 farmworkers, PCUN has since registered more than 6,000 members, 98% of which are Mexican and Central American immigrants.   PCUN's fundamental goal is to empower farmworkers to understand and take action against systematic exploitation and all of its effects.  To achieve this end, PCUN is involved in community and workplace organizing, including on immigration and immigrants' rights issues.

Mujeres Latinas en Accion is a non-profit organization that empowers Latinas through providing services which reflect their values and culture and being an advocate on the issues that make a difference in their lives. We offer culturally relevant services including domestic violence services, sexual assault services, parenting classes, supervised visitation and safe exchange, entrepreneurship classes, citizenship outreach, leadership development, community education and opportunities for civic engagement. Programs are designed to lead a client from crisis

to leadership and empower women to make a difference in their lives and communities.

The National Immigration Law Center (NILC) is one of the leading organizations in the United States dedicated to defending and advancing the rights of immigrants with low income. NILC engages in lawsuits, policy advocacy, and communications work to defend the fundamental and constitutional rights of all Americans, including low-income immigrants and their families. This work has included working with individuals who have been directly affected by immigration policy, including enforcement, and supporting them in speaking out against unjust policies. NILC engages in this work to help empower these communities to be able to influence public policy in ways that ensure that all people who live in the United States have the opportunity to achieve their full potential.