# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

RAVIDATH LAWRENCE RAGBIR, *et al.*,

        *Plaintiffs*,

    v.

THOMAS D. HOMAN, *et al.*,

        *Defendants*.

No. 18-cv-1159 (PKC)

**BRIEF OF *AMICI CURIAE* INSTITUTE FOR CONSTITUTIONAL ADVOCACY AND
PROTECTION AND KNIGHT FIRST AMENDMENT INSTITUTE
IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

Joshua A. Geltzer
Amy L. Marshak
Robert D. Friedman
Seth Wayne
Institute for Constitutional Advocacy and Protection
Georgetown University Law Center
600 New Jersey Ave NW
Washington, DC 20001
(202) 662-9042
jg1861@georgetown.edu

Jameel Jaffer
Alex Abdo
Carrie DeCell
Ramya Krishnan
Knight First Amendment Institute at Columbia
University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
Jameel.Jaffer@knightcolumbia.org
*Counsel for Amici Curiae*

## Table of Contents

INTEREST OF AMICUS CURIAE ........................................................................1

INTRODUCTION ..................................................................................................1

ARGUMENT .........................................................................................................3

I.   Mr. Ragbir's Retaliation Claim Does Not Fall Within the Reasoning Set
     Forth in *AADC* .............................................................................................3

     A.   As a General Matter, the First Amendment Prohibits Retaliation Against
          Individuals for Their Speech ..................................................................3

     B.   In *AADC*, the Supreme Court Outlined a Narrow Category of Cases to
          Which the General Rule Prohibiting First Amendment Retaliation
          Does Not Apply .....................................................................................4

     C.   *AADC* Does Not Apply to Mr. Ragbir's Case ..........................................5

          1.   Unlike the Plaintiffs in *AADC*, Mr. Ragbir Has Not Provided Material
               Support to Foreign Terrorist Organizations ......................................6

          2.   The Reasoning of *AADC* Does Not Apply When the Government Seeks
               to Carry out a Removal Order ...........................................................8

     D.   Extending *AADC*'s Reasoning Would Muzzle a Significant
          Number of Residents .............................................................................10

II.  Mr. Ragbir's Case Falls Within *AADC*'s Carve-out For Outrageous
     Government Conduct ....................................................................................11

     A.   By Targeting Mr. Ragbir for Deportation, the Government Is
          Infringing on a Core Constitutional Right .............................................13

     B.   The Government's Retaliation in This Case is Particularly Outrageous
          Because the Speech Protected Here—Peaceful Advocacy on Political
          Issues—Is Afforded the Strongest Protections Under the Law .............15

     C.   The Retaliation Is Outrageous Because the Government Has No
          Legitimate Interest in Retaliating Against Mr. Ragbir, and Its Actions
          Constitute Impermissible Viewpoint Discrimination .............................17

CONCLUSION ....................................................................................................19

## INTEREST OF AMICUS CURIAE

The mission of the Institute for Constitutional Advocacy and Protection is to use the power of the courts to defend American constitutional rights and values.  To that end, a key goal of the Institute is to ensure that national security concerns are given the respect they deserve without allowing those concerns to be used as a pretext for unchecked governmental authority. Founded in 2017, the Institute draws on its leadership's extensive background in national security law and policy, including its Executive Director's prior role as the Senior Director for Counterterrorism at the National Security Council, to pursue these aims.  The Institute thus has a strong interest in, and ability to inform the Court's adjudication of, the constitutional questions presented in this case.

The Knight First Amendment Institute at Columbia University is a non-partisan, not-for-profit organization that works to defend the freedoms of speech and the press in the digital age through strategic litigation, research, and public education.  The Institute aims to promote a system of free expression that is open and inclusive, that broadens and elevates public discourse, and that fosters creativity, accountability, and effective self-government.  The Institute is particularly committed to addressing the First Amendment implications of government surveillance and immigration policies.

## INTRODUCTION

The government has targeted plaintiff Ravi Ragbir and noncitizen activists across the country for peacefully speaking out against the government's immigration enforcement activities.  This retaliation has serious negative effects: it suppresses a critical viewpoint in an ongoing national debate, silences a crucial community voice, and chills the speech of long-time residents with substantial ties to this country, like Mr. Ragbir.  And it is prohibited by the First

1

Amendment.  In asking this Court to refuse to even entertain plaintiff Ravi Ragbir's First

Amendment retaliation claim, the government relies heavily on the Supreme Court's decision in

*Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999) (hereinafter

*AADC)*.  That reliance is mistaken for two reasons.

First, Mr. Ragbir's case falls well outside the scope of the narrow category of cases

*AADC* addressed.  Significantly, the government here does not possess the same heightened

national security interests that it did in *AADC* because, unlike the plaintiffs there, Mr. Ragbir is

not alleged to have provided material support to a foreign terrorist organization, or even dealt in

any way with foreign entities.   Moreover, this case confronts the government's decision to

withdraw an existing administrative stay of removal, refuse to issue a new stay, and carry out a

years-old final order of removal.  *AADC*'s very different posture—at the start of deportation

proceedings—implicated different governmental interests.  Expanding *AADC* to preclude relief

in the factual circumstances presented in this case would severely undercut the protections of the

First Amendment for some of the most vulnerable members of our communities. In particular,

the 900,000 residents of the United States facing final orders of removal who have been released

from custody would be denied redress if the government were to violate their constitutional

rights.

Second, even if *AADC* were to apply, the conduct of the government alleged by Plaintiffs

is outrageous, and falls within the exception preserved in that case.  Mr. Ragbir has very

substantial connections to the United States and to his local community– he has lived in this

country for decades, has a U.S. citizen spouse and child, and engages in significant advocacy

activities in his New York community.  Mr. Ragbir is therefore entitled to the full protection of

the Constitution.  And his activities targeted for retaliation—peaceful protest against government

policies—are at the very heart of core political speech protected by the First Amendment.  Nor

does the government have a legitimate interest in retaliating against Mr. Ragbir and other similar

advocates; the government's enforcement efforts here target speakers because of their opinions

and constitute impermissible viewpoint discrimination.  This outrageous pattern of suppression

of peaceful advocacy on a key political issue central to the national conversation silences a

crucial voice in our democratic process, and reflects a practice that the government has

condemned in other countries around the world.

**ARGUMENT**

I.   **Mr. Ragbir's Retaliation Claim Does Not Fall Within the Reasoning Set Forth in** <u>AADC</u>

A.   **As a General Matter, the First Amendment Prohibits Retaliation Against Individuals for Their Speech**

A core purpose of the First Amendment is "to protect unpopular individuals from

retaliation—and their ideas from suppression."  *McIntyre v. Ohio Elections Comm'n*, 514 U.S.

334, 357 (1995).  The First Amendment thus restrains the government from taking adverse

actions against individuals as retaliation for engaging in constitutionally protected speech, a

safeguard that has been extended to nearly all aspects of government action, including the use of

prosecutorial authority, *see, e.g.*, *Hartman v. Moore*, 547 U.S. 250, 256 (2006), the terms of

public employment, *see, e.g.*, *Perry v. Sindermann*, 408 U.S. 593, 597 (1972), and the provision

of benefits, *see generally Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr*, 518 U.S. 668,

674 (1996).  In short, the prohibition on retaliatory actions ensures that "[t]he power of the state .

. . not be used to 'drive certain ideas or viewpoints from the marketplace.'"  *Wollschlaeger v.*

*Governor, Fla.*, 848 F.3d 1293, 1327 (11th Cir. 2017) (quoting *Simon & Schuster, Inc. v.*

*Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991)).

3

### B. In *AADC*, the Supreme Court Outlined a Narrow Category of Cases to Which the General Rule Prohibiting First Amendment Retaliation Does Not Apply

Against this backdrop of a wide-ranging prohibition against retaliatory actions against speech, the Supreme Court in *AADC* described a discrete category of selective enforcement claims to which the general rule does not apply.  525 U.S. at 491.  The plaintiffs in *AADC* filed suit in federal district court in an effort to enjoin deportation proceedings initiated against them by the Immigration and Naturalization Service (INS).  *Id.* at 473-74.  Although INS formally charged the plaintiffs with "routine status violations," the plaintiffs alleged that INS's true motivation for initiating deportation proceedings was the plaintiffs' membership in the Popular Front for the Liberation of Palestine (PFLP), an asserted "international terrorist and communist organization."  *Id.* at 473.  The plaintiffs contended that targeting them because of their support for the PFLP ran afoul of the First Amendment's prohibition of selective enforcement, a species of retaliation claim.  *Id.* at 474.

The Supreme Court held that Congress had deprived federal courts of jurisdiction to consider the plaintiffs' selective enforcement claims as a defense to the initiation of deportation proceedings.  *Id.* at 492.  In doing so, the Court focused on two particular burdens that would be imposed on the government if respondents in similar deportation proceedings were permitted to raise that defense.  *See id.* at 490-91.  First, the Court observed that allowing these individuals' claims to proceed would enable them to delay their deportation and thereby continue their allegedly unlawful presence in the United States.  *Id.* at 490.  Second, the Court warned that examining the prosecutor's motivations for initiating a deportation proceeding would risk "the disclosure of foreign-policy objectives and (as in [*AADC*]) foreign-intelligence products and techniques."  *Id.* at 490-91.  The Court reasoned that the plaintiffs' interest in "avoiding 'selective' treatment" in deportation proceedings was less compelling than it would have been in

4

criminal prosecutions and could not "overcome" these countervailing "considerations." *Id.* at 491.[1]

Although the Court in *AADC* ruled against the plaintiffs, its decision was narrow. The Court twice highlighted that its reasoning came "in the context of claims" of selective enforcement (1) in deportation proceedings and (2) for supporting a foreign terrorist group. *Id.* at 488, 492. The Court also made clear that its conclusion might not extend to a more "outrageous" case where the competing concerns of the individual's interest in free expression and the government's law enforcement interest tipped in favor of free expression. *Id.* at 491.

### C. *AADC* Does Not Apply to Mr. Ragbir's Case

Below, we explain why the government's effort to remove Mr. Ragbir from the United States in retaliation for his advocacy regarding immigration policies and practices is "outrageous" within the meaning of *AADC*.[2] *See infra* Section II. But this Court need not reach that issue because the reasoning of *AADC* does not apply to cases like Mr. Ragbir's, where the First Amendment interests bear no connection to foreign terrorist organizations and where the government's asserted retaliatory conduct is the withdrawal of stays of removal and the carrying out of a final order of removal.

To the extent *AADC* bars even raising certain First Amendment claims as a defense to certain deportation proceedings, it is an unusual ruling. Any decision limiting the reach of the

---

[1] The Court contrasted these considerations with those that arise in criminal prosecutions—where selective enforcement claims are permitted—finding them weightier in the deportation context because delay carries with it unlawful presence and because, in a criminal prosecution, a selective enforcement claim risks only "disclosure of normal domestic law enforcement priorities and techniques." *Id.* at 490.

[2] For purposes of this brief, *Amici* assume the truth of the facts set forth in support of Mr. Ragbir's motion for a preliminary injunction.

First Amendment's prohibition against retaliation in such a manner should be construed narrowly to ensure the government is not handed a powerful weapon to wield in silencing dissent.

      1.   Unlike the Plaintiffs in *AADC*, Mr. Ragbir Has Not Provided Material Support to Foreign Terrorist Organizations

The result in *AADC* reflected the Supreme Court's judgment that any First Amendment interest at stake in supporting a foreign terrorist organization was insufficiently compelling to "overcome" the burden on the government of "permit[ting] immediate review of the selective-enforcement claims." *Id.* at 488. But when the expression at stake is unrelated to foreign terrorist activity and is instead issue advocacy at the core of the First Amendment's protection, the scale ultimately tips in favor of finding a First Amendment violation.

The Supreme Court's regard for any First Amendment interests at stake in *AADC* reflects the fact that, there, the plaintiffs were alleged to have provided material support to a foreign terrorist organization.  *See, e.g.*, Michael Kagan, *When Immigrants Speak: The Precarious Status of Non-Citizen Speech Under the First Amendment*, 57 B.C. L. Rev. 1237, 1281 (2016) (noting that the government's brief in *AADC* explained that the plaintiffs' activities constituted "material support" and were therefore "the subject of civil and criminal prohibitions under other federal laws").[3]  Similarly, in *Holder v. Humanitarian Law Project*, the Supreme Court upheld against freedom of speech and freedom of association challenges a criminal statute making it unlawful to provide material support to a foreign terrorist organization, but made clear that the Court's

---

[3] *See also* Gerald L. Neuman, *Terrorism, Selective Deportation and the First Amendment After Reno v. AADC*, 14 Geo. Immigr. L.J. 313, 335 (2000) ("[T]he suggestion in *Reno v. AADC* that the First Amendment permits selective enforcement . . . against an alien whom the government 'believes . . . to be a member of an organization that supports terrorist activity' could be interpreted as referring to a type of non-nominal membership for which the First Amendment would permit even citizens to be penalized." (quoting *AADC*, 525 U.S. at 492) (second alteration in original)).

6

decision should not be read to "suggest that Congress could extend the same prohibition on material support at issue here to *domestic* organizations."  561 U.S. 1, 39 (2010) (emphasis added).  This differing treatment has no application in Mr. Ragbir's case, which involves no allegation of providing material support to any foreign organization, let alone a terrorist one.

In *AADC*, the Court reasoned that the First Amendment interests presented were relatively weak, while the government's interests were at their peak.  "The interest in preserving national security is 'an urgent objective of the highest order.'"  *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2088 (2017) (quoting *Humanitarian Law Project*, 561 U.S. at 28).  Thus, as *AADC* explained, allowing the plaintiffs to pursue their claims would require the disclosure "in th[at] case" of "foreign-intelligence products and techniques," one of the two core concerns discussed above (along with delay), *see supra* at 6, that animated the Court's decision.  *AADC*, 525 U.S. at 490-91.

These dueling concerns are inverted in Mr. Ragbir's case and others like it.  On the one hand, the speech for which Mr. Ragbir has allegedly been targeted concerns domestic policy, and the people with whom he has associated are in the United States.  Indeed, as Mr. Ragbir explains, the force of his speech comes in large part from his presence in the United States, *see* Pls.' Br. at 21, contrasting sharply with the type of cross-border activity at issue in *AADC*.[4]  On the other hand, the government has not argued that national security concerns justify its conduct with respect to Mr. Ragbir or any of the other individuals affected by the troubling pattern of

---

[4] In *AADC,* the Court suggested that the only "consideration on the other side of the ledger" was the avoidance of deportation, further revealing its limited view of the First Amendment interests at stake.  *See* 525 U.S. at 491.  Here, by contrast, the right Mr. Ragbir seeks to vindicate—issue advocacy related to domestic policy—is at the core of what the First Amendment protects.  *See infra* Section II.B.

retaliation challenged in this case.[5]  Simply put, the circumstances that prompted the Supreme

Court to foreclose selective enforcement claims in the context there presented do not exist here.

> 2.  The Reasoning of *AADC* Does Not Apply When the Government Seeks to
> Carry out a Removal Order

      *AADC* does not apply to Mr. Ragbir's case for a second reason: the retaliatory action that

Mr. Ragbir challenges is the decision to withdraw an existing administrative stay, refuse to issue

a new stay, and carry out a years-old final order of removal.  *AADC*, by contrast, considered

claims raised at the start of deportation proceedings.  Just as the force of the competing concerns

underlying *AADC* changes because of the different First Amendment interests at stake here, so

too does it change because of the different procedural posture.  Both the government's interest in

avoiding delay and the risk of impinging on prosecutorial discretion—the twin considerations

underlying *AADC*—are weaker here.[6]

      First, with respect to delay, the government cannot establish a vital interest in expedited

removal when—as here—it has already approved of the person subjected to retaliatory action

remaining in the United States for *years* after the entry of a final order of removal.  The potential

harm that follows from the "ongoing violation of United States law" when an individual remains

in the United States without authorization, *AADC*, 525 U.S. at 491 (emphasis omitted), should be

given little weight where the government has acquiesced in any purported "harm"—or, more

likely, repeatedly determined that no such harm exists.

---

[5] The mere existence of an order of removal does not raise a national security concern, particularly not of the type at issue in AADC, where the government raised individualized concerns about personal ties to a terrorist organization.

[6] For the avoidance of doubt, as explained above, *Amici* do not interpret *AADC*'s reasoning to apply to the retaliatory initiation of deportation proceedings unrelated to support for foreign terrorist organizations.  But this Court need not determine whether *AADC* extends to such action because, as explained below, it is clear that the Supreme Court's reasoning is inapplicable when the government retaliates by carrying out a final order of removal.

Second, the imposition on the "prosecutor" is greatly mitigated in a case like this one. The charging decision, including the evaluation of factors such as the "strength of the case" and competing enforcement priorities, *AADC* 525 U.S. at 490 (citation omitted), has already been made, sometimes years earlier, when deportation proceedings were adjudicated. Although the decision to carry out a final order of removal can, in theory, be related to the Executive Branch's foreign policy, the mere possibility of foreign policy implications does not alone suffice to justify a categorical refusal to hear a claim. *Cf. e.g.*, *Int'l Refugee Assistance Project v. Trump*, 857 F.3d 554, 594 (4th Cir. 2017), *vacated and remanded on other grounds Trump v. Int'l Refugee Assistance*, 138 S. Ct. 353 (2017) (adjudicating Establishment Clause challenge to limits on entry to the United States for foreign citizens); *United States v. Lindh*, 212 F. Supp. 2d 541, 564 (E.D. Va. 2002) (entertaining selective prosecution claim brought by al-Qaeda suspect).

The post-final-order posture here is also more susceptible to abuse. When the government *begins* deportation proceedings with a retaliatory motivation, it still must prove to the Immigration Court, the Board of Immigration Appeals, and, on petition for review, an Article III Court of Appeals that the respondent committed some independent wrong—such as overstaying a visa or committing a crime—that renders him removable. By contrast, when the government decides to carry out a removal order for retaliatory reasons, it does so without having to prove any change of circumstances or unlawful act by the target of the retaliation and without any independent check. *See, e.g.*, 8 C.F.R. § 241.6(b) (denial of an administrative stay is not appealable). Thus, what is normally understood as a *presumption* of regularity would become irrebuttable and insulated from all outside review if *AADC* were stretched to apply to post-final-order conduct.

9

To be sure, *AADC* does allow a risk that improper retaliation will go undetected.  But that danger exists only in an exceedingly narrow range of cases described above in which national security concerns—and thus deference to the Executive—are at their highest.  Extending *AADC* beyond those discrete circumstances threatens to turn legitimate interests into a pretext for government suppression of dissent.

### D.  Extending *AADC*'s Reasoning Would Muzzle a Significant Number of Residents

Extending *AADC* to cases like Mr. Ragbir's would severely undercut the protections that the First Amendment affords and the societal benefits it fosters.  The freedom of speech that millions of noncitizens otherwise enjoy, *see infra* at 16, would be cast into doubt because few noncitizens would risk voicing unpopular views with the knowledge that doing so could trigger deportation proceedings.  "If a foreign national has no First Amendment rights in the deportation setting, he has no First Amendment rights anywhere; the fear of deportation will always and everywhere restrict what he says."  David Cole, *Are Foreign Nationals Entitled to the Same Constitutional Rights As Citizens?*, 25 T. Jefferson L. Rev. 367, 377 (2003).

This danger is particularly stark for the approximately 900,000 individuals who, like Mr. Ragbir, are facing final orders of removal but have been released from custody.[7]  If *AADC* is extended to shelter the government from claims of First Amendment retaliation when it withdraws stays and deferrals or carries out removal orders, individuals removed for expressing a view with which the government disagrees will have no recourse to an independent forum before they are separated from their families, their homes, and potentially the only country they have ever known.  Many of these individuals, like Mr. Ragbir, remain in the United States with the

---

[7] Tiziana Rinaldi, *As immigration detention soars, 2.3 million people are also regularly checking in with immigration agents*, PRI, May 23, 2017, https://www.pri.org/stories/2017-05-23/immigration-detention-soars-23-million-people-are-also-regularly-checking.

government's knowledge and approval for years—and, in some instances, for the remainder of their lives—after a final order of removal is entered. Extending *AADC* would force these individuals to muzzle themselves indefinitely.

It is easy to imagine how this unbridled power could be abused. ICE would be free, for example, to remove deportable noncitizens for supporting a disfavored political party. Or, if an ICE agent sexually abused or harassed a noncitizen, the victim would have to face the risk of retaliatory removal (against which she would have no recourse) should she choose to report the misconduct. The list of potential wrongs is too long to catalogue here, but it is indisputable that no valid government interest is achieved by allowing such unchecked authority.

## II. Mr. Ragbir's Case Falls Within *AADC*'s Carve-out For Outrageous Government Conduct

Even if *AADC* applies to the factual circumstances of Mr. Ragbir's case, the government's retaliation against him and other vocal proponents of immigrants' rights falls within the exception preserved by that case. As explained above, the *AADC* Court expressly left open "the possibility of a rare case in which the alleged basis of discrimination [against a noncitizen] is so outrageous" that a claim of improper prosecutorial action could be recognized. *AADC*, 525 U.S. at 491. While the Supreme Court only clarified that it is not outrageous when the government deports a noncitizen because "it believes him to be a member of an organization that supports terrorist activity[,]" *id.* at 492, a review of case law following *AADC* reveals a framework that examines the importance of the right being infringed and whether the government's actions are rationally related to a legitimate purpose. Critically, no court ruling addressing the *AADC* exception has evaluated facts coming close to the egregious targeting of Mr. Ragbir and his fellow activists because of their advocacy.

The lion's share of cases that have addressed the *AADC* exception stem from the use of NSEERS,[8] a noncitizen registration program based on national origin.  In determining that application of the program was not outrageous, the First Circuit found that it "serves legitimate government objectives of monitoring nationals from certain countries to prevent terrorism and is rationally related to achieving these monitoring objectives." *Kandamar v. Gonzales*, 464 F.3d 65, 74 (1st Cir. 2006), (citing *Hadayet v. Gonzales*, 458 F.3d 659, 665 (7th Cir. 2006)) (evaluating same program and finding that "conclusory comments" regarding its "allegedly discriminatory effect" did not establish outrageousness); *see also Ali*, 502 at 665 (finding that "bare allegations of discrimination" did not meet *AADC* exception).  The Second Circuit adopted the same rationale to uphold the program because it had a "rational national security basis." *Rajah v. Mukasey*, 544 F.3d 427, 438 (2d Cir. 2008).[9]

In *Carranza v. INS*, 277 F.3d 65, 72 n. 5 (1st Cir. 2002), the First Circuit described the "outrageous" exception in *AADC* as "[i]n much the same vein" as the standard laid out in *Bordenkircher v. Hayes*, 434 U.S. 357 (1978).  That is, selection would be unconstitutional—and thereby outrageous for the purposes of the *AADC* exception—when "deliberately based on an unjustifiable standard such as race, religion, or other arbitrary classification."  *Id.* at 364; *see also id. at* 363 ("[T]o pursue a course of action whose objective is to penalize a person's reliance on his legal rights is patently unconstitutional.") (internal quotation marks and citations omitted).

Few cases in the district courts have addressed the exception.  Those that have are brief in

---

[8] NSEERS stands for the ICE National Security Entry-Exit Registration System.
[9] The same program was also upheld by the Third, Fifth, Ninth, and Eleventh Circuits, without substantive discussion of the "outrageous" exception.  *See Daud v. Gonzales*, 207 Fed. Appx. 194, 203 (3d Cir. 2006); *Ahmed v. Gonzales*, 447 F.3d 433, 439-40 (5th Cir. 2006); *Adenwala v. Holder*, 341 Fed. Appx. 307, 309 (9th Cir. 2009); and *Zafar v. U.S. Att'y Gen.*, 461 F.3d 1357, 1367 (11th Cir. 2006).

their treatment but appear to have based their holdings on the limited importance of the right

being infringed by the government's action.  A court in this District has held that an allegation of

retaliation for filing a lawsuit is not outrageous under *AADC*.  *Gadria v. Gantner*, 2008 U.S.

Dist. LEXIS 19792, at *16 (S.D.N.Y. Mar. 6, 2008).  Similarly, a district court in Illinois found

that allegations that an administrative stay was revoked without sufficient individual

consideration of the equities involved in the plaintiff's case did not raise a constitutional issue

that met the *AADC* exception.  *Nino v. Johnson*, No. 16-cv-2876, 2016 U.S. Dist. LEXIS

164706, at *17 (N.D. Ill. Nov. 30, 2016).

The framework developed by these cases provides that claims of outrageous government

conduct can be met depending on (1) the importance of the right being infringed; and (2) whether

the government's actions are rationally related to a legitimate purpose, and are not arbitrary or

malicious.  Under this framework, Plaintiffs have sufficiently pled that the government's

retaliation against Mr. Ragbir and other similarly situated activists qualifies as outrageous.

### A.  By Targeting Mr. Ragbir for Deportation, the Government Is Infringing on a Core Constitutional Right

The government's retaliation as alleged by Plaintiffs based on First Amendment

protected advocacy infringes on one of the most closely guarded constitutional freedoms for all

people within its borders, whether or not they are citizens.

All persons present in the United States are protected from retaliation by the government

based on the exercise of their free speech rights.  Notably, the First Amendment prohibits

Congress from making a "law. . . abridging the freedom of speech," without limiting the

Amendment's application to U.S.  citizens or any other specific group of people.  U.S. Const.

amdt. I. Although, in certain contexts, some noncitizens present in the United States may have

more limited constitutional rights, these limitations have been applied primarily to noncitizens

who have spent little time in the United States. *See, e.g. United States v. Verdugo-Urquidez*, 494 U.S. 259 (1990) (Fourth Amendment does not apply to use of evidence from the search of a dwelling in Mexico against a foreign resident who had been arrested in Mexico and brought involuntarily to the United States). But even where limitations have been recognized, noncitizens are "accorded a generous and ascending scale of rights" that increases in step with the noncitizen's "identity with our society." *Johnson v. Eisentrager*, 339 U.S. 763, 770 (1950). In *Verdugo-Urquidez*, the Supreme Court, in determining the scope of the Fourth Amendment's protections, noted that its textual reference to "the people," while not conclusive, "suggests that 'the people' protected by the Fourth Amendment, and by the First and Second Amendments . . . refers to a class of persons who are part of a national community or who have otherwise developed sufficient connection with this country to be considered part of that community." *Verdugo-Urquidez*, 494 U.S. at 265.

Mr. Ragbir undeniably possesses substantial ties to his community in New York City and the country as a whole. His spouse and daughter are U.S. citizens who reside in this country, and he has lived here for over two decades. Through his work, worship, and advocacy, Mr. Ragbir has become an integral part of his community in New York, and the community of activists around the country, in which he plays a crucial role in the lives of people around him, citizen and noncitizen alike. He is thus at the zenith of the "ascending scale" of protection of constitutional rights described in *Eisentrager*. The extent of free speech protections enjoyed by Mr. Ragbir is therefore governed by the same standard that applies to citizens. *See Harisiades v. Shaugnessy*, 342 U.S. 580 (1952) (applying same First Amendment standard to noncitizens' claims that then applied to citizens).

Moreover, the First Amendment rights of citizens are also at stake in this case.  The Supreme Court has recognized that "the First Amendment rights of those who seek personal communication" with a noncitizen weighs against government actions that would infringe upon those rights.  *Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972); *see also Am. Academy of Religion v. Napolitano*, 573 F.3d 115, 117 (2d Cir. 2009) ("The Supreme Court has recognized a First Amendment right to 'hear, speak, and debate with' a visa applicant.").  The government's retaliation here therefore infringes on the fully vested First Amendment rights of Mr. Ragbir and those of his U.S. citizen wife and child, co-workers, supporters, and community members.

**B.  The Government's Retaliation in This Case is Particularly Outrageous Because the Speech Protected Here—Peaceful Advocacy on Political Issues—Is Afforded the Strongest Protections Under the Law**

A long line of precedent confirms that peaceful speech critical of the government—the type of expression against which the government is retaliating in this case—merits the highest protection under the law.  Freedom to speak is at "the core of the First Amendment."  *In re Application of Herald Co.*, 734 F.2d 93, 100 (2d Cir. 1984).  Accordingly, impairment of the right to free speech "threatens the most fundamental of constitutional values." *Id.*  Its abridgement "not only silences one speaker, it also inhibits others from exercising their rights of expression." *Id.*

Even within that core protected right, dissent against the government receives special attention.  "There is no question that speech critical of the exercise of the State's power lies at the very center of the First Amendment." *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1034 (1991).  "The Supreme Court has declared that. . . political demonstrations and protests [are] activities at the heart of what the Bill of Rights was designed to safeguard." *Papineau v. Parmley*, 465 F.3d 46, 56 (2d Cir. 2006) (citing *Boos v. Barry*, 485 U.S. 312, 318 (1988)); *see*

15

*also Butterworth v. Smith*, 494 U.S. 624, 632 (1990) ("[I]nformation relating to alleged governmental misconduct" is speech at the "core of the First Amendment."); *Velez v. Levy*, 401 F.3d 75, 97 (2d Cir. 2005) (Voicing "unsympathetic political views" is "at the core of what is protected by the First Amendment.").  Mr. Ragbir's peaceful advocacy efforts and criticism of government immigration policies and practices—including marches, community education programs, and media outreach—are emblematic of the traditional "political demonstrations and protests" that the First Amendment was so clearly designed to protect.

The outrageousness of the government's retaliation against Mr. Ragbir for his constitutionally protected speech is highlighted by the fact that Congress has set aside "issue advocacy"—speech that does not expressly advocate for or against a political candidate—as the sole form of participation in the democratic process for noncitizens who are not legal permanent residents.  *See Bluman v. FEC*, 800 F. Supp. 2d 281, 284 (D.D.C. 2011), *aff'd* 565 U.S. 1104 (2012) (finding that statute preventing foreign nationals from contributing to campaigns does not bar foreign nationals from issue advocacy). The fact that Congress has permitted this form of political expression by foreign nationals while limiting others demonstrates its intent to protect issue advocacy by noncitizens, who, while not entitled to participate as fully as citizens, nonetheless have an important role to play in informing domestic policy debates. Protecting issue advocacy from retaliation is therefore essential to ensure that these crucial community voices are not silenced. *See* Brief of New York Elected Officials as Amicus Curiae (Doc. 41-2).  The government's actions against Mr. Ragbir and other activists across the country strike at the very core of these zealously guarded rights.

C.  **The Retaliation Is Outrageous Because the Government Has No Legitimate Interest in Retaliating Against Mr. Ragbir, and Its Actions Constitute Impermissible Viewpoint Discrimination**

The government has no legitimate interest in retaliating against Mr. Ragbir.  Unlike in *AADC* and other cases that have followed it, Mr. Ragbir is not a member of any group that advocates for violence and has no associations with terrorism, and the government has not claimed that his national origin presents any foreign policy implications.  In *AADC*, as discussed *supra* at 6, the plaintiffs belonged to a group that the government characterized as "an international terrorist and communist organization." 525 U.S. at 473.  Similarly, in the NSEERS cases, the government's actions were found not to be outrageous because the government had a legitimate objective to "prevent terrorism." *Kandamar*, 464 F.3d at 74.  No similar interest lies here.

Viewpoint discrimination is a particularly "egregious form of content discrimination" in which "the government targets not subject matter, but particular views taken by speakers on a subject." *Rosenberger v. Rector & Visitors of the Univ. of Va.*, 515 U.S. 819, 829 (1995).  "The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction." *Id.*  Under the First Amendment, "the government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of Chi. v. Mosley*, 408 U.S. 92, 95 (1972). In this case, the circumstances surrounding the government's decision to withdraw an existing administrative stay, refuse to issue a new stay, and carry out a years-old final order of removal, as well as similar targeting efforts across the country, suggest that there is good reason to believe that the government's purpose is retaliation against those who oppose the government's immigration enforcement activity, as shown in the internal document regarding outspoken

17

advocate Maru Mora-Villalpando which describes her as an "anti-ICE" activist.[10]  This viewpoint-based retaliation offends core principles of the First Amendment and falls within the "outrageous" exception of *AADC*.

The government's conduct is made even more outrageous because the allegations describe a pattern of suppression of advocacy on a political issue central to the national conversation, and reflect a practice that the government has condemned in other countries around the world.  Plaintiffs' complaint, and the filings of amici, detail a pattern of speech retaliation against government critics on the key issue of immigration.  Immigration, including the treatment of noncitizens in the United States, has been a touchstone of political debate in the United States for years.[11]  The pattern of retaliation alleged here has the outrageous effect of prohibiting foreign nationals present in the United States, including those like Mr. Ragbir with deep and enduring ties to this country, from protesting for better treatment for themselves and others similarly situated. This suppression constitutes impermissible viewpoint discrimination on a national scale, silencing one critical voice in the ongoing and contentious national debate.

The outrageous effect of this suppression is to allow the government to use deportation as a retaliatory tool against those who nonviolently express positions on domestic policy contrary to the position of the government.  The United States has long condemned targeted enforcement of protesters, government critics, and dissidents in other countries.  Less than a year ago, the United

---

[10] Gene Johnson, *Washington immigrant targeted for deportation came to ICE's attention after protests and newspaper interview, document shows*, Seattle Times, Feb. 26, 2018, https://www.seattletimes.com/seattle-news/immigrant-targeted-for-deportation-came-to-ices-attention-after-protests-and-newspaper-interview-document-shows/.

[11] *See, e.g.,* Danielle Renwick & Brianna Lee, *Where does the immigration debate stand under President Trump?*, PBS, Apr. 6, 2017, https://www.pbs.org/newshour/nation/why-the-u-s-immigration-debate-is-difficult-to-resolve ("Immigration has been a touchstone of the U.S. political debate for decades[.]").

States Permanent Mission to the United Nations made the point clear when criticizing a verdict

against a human rights activist in Bahrain:

> [N]o one anywhere should be prosecuted or imprisoned for exercising their human
> rights or fundamental freedoms, including the freedoms of expression or peaceful
> assembly.  [The U.S. Government] believe[s] societies are strengthened, not
> threatened, by expressions of opinion and dissent, and that opposition voices can
> play a vital role helping societies become more tolerant and inclusive.[12]

## CONCLUSION

Because plaintiffs' First Amendment arguments are not foreclosed by *AADC, amici*

respectfully request the Court grant plaintiffs' Motion for a Preliminary Injunction.

Dated:  March 23, 2018                    Respectfully submitted,

                                          */s/ Amy L. Marshak*
                                          Joshua A. Geltzer
                                          Amy L. Marshak (AM-1418)
                                          Robert D. Friedman
                                          Seth Wayne*
                                          Institute for Constitutional Advocacy and Protection
                                          Georgetown University Law Center
                                          600 New Jersey Ave NW
                                          Washington, DC 20001
                                          (202) 662-9042
                                          as3397@georgetown.edu

                                          *Admitted solely to practice law in Louisiana, not
                                          admitted in the District of Columbia.  Practice is
                                          limited pursuant to D.C. App. R. 49(c)(3).

---

[12] *U.S. Disappointed by the Verdict Sentencing Human Rights Activist Nabeel Rajab*, Press
Statement by Heather Nauert, Department Spokesperson, Mission of the United States in
Geneva, Switzerland, July 10, 2017, *available at* https://geneva.usmission.gov/2017/07/11/u-s-
disappointed-by-the-verdict-sentencing-human-rights-activist-nabeel-rajab/; *see also U.S. Slams
Vietnam for Jailing Dissidents*, VOA News, Aug. 27, 2014, https://www.voanews.com/a/us-
slams-vietnam-for-jailing-dissidents/2429357.html (U.S. government criticizing selective
enforcement of traffic laws against activists in Vietnam); Jennifer Rubin, *The State Department
speaks up against Russia*, Wash. Post, Mar. 21, 2017, https://www.washingtonpost.com/blogs/
right-turn/wp/2017/03/27/the-state-department-speaks-up-against-russia/?utm_
term=.29ccc4a67b2b (U.S. government "strongly condemns" detention of peaceful protesters,
human rights proponents, and journalists in Russia as "an affront to core democratic values.").

*/s/ Jameel Jaffer*
Jameel Jaffer (JJ-4653)
Alex Abdo (AA-0527)
Carrie DeCell (CD-0731)
Ramya Krishnan (application for bar admission
pending)
Knight First Amendment Institute at Columbia
University
475 Riverside Drive, Suite 302
New York, NY 10115
(646) 745-8500
Jameel.Jaffer@knightcolumbia.org

*Counsel for Amici Curiae*