**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| RAVIDATH LAWRENCE RAGBIR et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Civil Action No. 18-cv-1159 |
| | ) | |
| RONALD VITIELLO et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................. iii

INTRODUCTION ......................................................................................... 1

BACKGROUND ........................................................................................... 1

I.     Defendants Have Targeted Immigrant-Rights Activists for Protected Speech.................. 1

II.    ICE Targeted Plaintiff Ravidath Ragbir on the Basis of His Protected Speech ................ 3

III.   The Organizational Plaintiffs Have Been Injured by ICE's Unlawful Conduct................ 7

IV.   Plaintiffs Seek to Enjoin Defendants' Unconstitutional Actions ....................................... 7

ARGUMENT ................................................................................................. 8

I.     THIS COURT HAS JURISDICTION OVER PLAINTIFFS' FIRST
AMENDMENT CLAIMS CHALLENGING ICE'S NATIONWIDE PATTERN
AND PRACTICE OF RETALIATING AGAINST IMMIGRANT-RIGHTS
ACTIVITISTS.......................................................................................... 8

    A.   This Court Has Federal-Question Jurisdiction ...................................... 8

    B.   Section 1252(g) Does Not and Cannot Strip This Court of Jurisdiction
Over Plaintiffs' Pattern-and-Practice Claims ........................................ 9

    C.   Section 1252(b)(9) Does Not Apply to Plaintiffs' Pattern-and-Practice
Claims ...................................................................................... 10

    D.   Section 1252(f)(1) Does Not Apply to Plaintiffs' Pattern-and-Practice
Claims ...................................................................................... 11

II.    THE ORGANIZATIONAL PLAINTIFFS' CLAIMS ARE JUSTICIABLE ................. 12

    A.   Organizational Plaintiffs Have Standing To Sue on Their Own Behalf.............. 12

    B.   Organizational Plaintiffs Have Standing to Sue on Behalf of their
Members.................................................................................... 15

    C.   Laird v. Tatum Does Not Bar Plaintiffs' Pattern-and-Practice Claims.............. 18

III.   THE AMENDED COMPLAINT STATES VIABLE FIRST AMENDMENT
CLAIMS CHALLENGING ICE'S RETALIATORY PATTERN AND
PRACTICE ........................................................................................... 19

    A.   The Amended Complaint States a First Amendment Retaliation Claim ............. 19

    B.   The Amended Complaint States a First Amendment Claim for Content-
and Viewpoint-Based Discrimination ................................................. 25

CONCLUSION............................................................................................. 25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aguilar v. Ice*,
    510 F.3d 1 (1st Cir. 2007)..................................................................9

*All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*,
    651 F.3d 218 (2d Cir. 2011), *aff'd sub nom. Agency for Int'l Dev. v. All. for
    Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013) ........................................19

*Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius*,
    901 F. Supp. 2d 19 (D.D.C. 2012), *aff'd*, 746 F.3d 468 (D.C. Cir. 2014) ............................18

*Bldg. & Const. Trades Council of Buffalo, New York & Vicinity v. Downtown
Dev., Inc.*,
    448 F.3d 138 (2d Cir. 2006) ..............................................................18

*Buckley v. Am. Constitutional Law Found., Inc.*,
    525 U.S. 182 (1999)..........................................................................22

*Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*,
    868 F.3d 104 (2d Cir. 2017) ..............................................................16

*City of Houston v. Hill*,
    482 U.S. 451 (1987)..........................................................................25

*Delgado v. Quarantillo*,
    643 F.3d 52 (2d Cir. 2011) ................................................................12

*Duran Gonzales v. DHS*,
    508 F.3d 1227 (9th Cir. 2007) ...........................................................13

*Garcia v. SUNY Health Sciences Ctr.*,
    280 F.3d 98 (2d Cir. 2001)................................................................22

*Gonzalez v. Hasty*,
    802 F.3d 212 (2d Cir. 2015) ..............................................................22

*Hartman v. Moore*,
    547 U.S. 250 (2006)..........................................................................21

*Havens Realty Corp. v. Coleman*,
    455 U.S. 363 (1982)..........................................................................16

*Hunt v. Wash. State Apple Adver. Com'n*,
    432 U.S. 333 (1977)..........................................................................17

*INS v. St. Cyr*,
   533 U.S. 289 (2001) ...................................................................................12

*Jennings v. Rodriguez*,
   138 S. Ct. 830 (2018) .................................................................................12

*Johnson v. Robison*,
   415 U.S. 361 (1974) ...................................................................................10

*Laird v. Tatum*,
   408 U.S. 1 (1972) ............................................................................. 19, 20, 21, 25

*Lozman v. City of Riviera*,
   138 S. Ct. 1945 (2018) ...............................................................................21

*Lujan v. Defs. of Wildlife*,
   504 U.S. 555 (1992) ...................................................................................14

*Meyer v. Grant*,
   486 U.S. 414 (1988) ...................................................................................22

*N.Y. Times Co. v. Sullivan*,
   376 U.S. 254 (1964) ...................................................................................24

*Nat'l Ass'n of Coll. Bookstores v. Cambridge Univ. Press*,
   990 F. Supp. 245 (S.D.N.Y.1997)................................................................19

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
   138 S. Ct. 2361 (2018) ...........................................................................26, 27

*Nnebe v. Daus*,
   644 F.3d 147 (2d Cir. 2011) .......................................................................14

*Ragbir v. Homan*,
   No. 18-1597 (2d Cir.) ...................................................................................8

*Ragbir v. Sessions*,
   2018 WL 1446407 (D.N.J. Mar. 23, 2018) .................................................12

*Ragbir v. Sessions*,
   2018 WL 623557 (S.D.N.Y. Jan. 29, 2018) .........................................*passim*

*Ragbir v. United States*,
   No. 2:17-cv-1256-KM, Dkt. 16 (D.N.J. Jan. 11, 2018) ................................7

*Rajah v. Mukasey*,
   544 F.3d 427 (2d Cir. 2008) ...................................................................11, 24

*Reno v. American-Arab Anti-Discrimination Committee*,
    525 U.S. 471 (1999) ......................................................................... 8, 10, 11, 24

*Rosenberger v. Rector & Visitors of Univ. of Virginia*,
    515 U.S. 819 (1995) ...................................................................................26

*Rothstein v. UBS AG*,
    708 F.3d 82 (2d Cir. 2013) .......................................................................14

*Snyder v. Phelps*,
    562 U.S. 443 (2011) ...................................................................................22

*Sorrell v. IMS Health Inc.*,
    564 U.S. 552 (2011) ...................................................................................27

*Tefel v. Reno*,
    972 F. Supp. 608 (S.D. Fla. 1997) ...........................................................13

*United Food & Commercial Workers Union Local 751 v. Brown Grp.*,
    517 U.S. 544 (1996) ...................................................................................19

*Warth v. Seldin*,
    422 U.S. 490 (1975) ...................................................................................19

*Webster v. Doe*,
    486 U.S. 592 (1988) ...........................................................................10, 13

*Wilkie v. Robbins*,
    551 U.S. 537 (2007) ...............................................................................1, 21

*Ying Fong v. Ashcroft*,
    317 F. Supp. 2d 398 (S.D.N.Y. 2004) .......................................................7

**Statutes and Regulations**

8 U.S.C. § 1221-31.........................................................................................13

8 U.S.C. § 1252(b)(9).............................................................................. 11, 12

8 U.S.C. § 1252(f)(1) .....................................................................................13

8 U.S.C. § 1252(g) ............................................................................ 8, 9, 10, 11

28 U.S.C. § 1331...............................................................................................9

28 U.S.C. § 2241.........................................................................................9, 10

8 C.F.R. § 241.2, 241.3(a).................................................................................6

8 C.F.R. § 241.22 ...................................................................................................7

**Other Authorities**

Alex Olgin & Nick de la Canal, *ICE Warns if 287(g) Ends, It Will Ramp Up Enforcement*, WFAE (May 9, 2018), https://bit.ly/2JFNfWX ...............................24

Chantal Da Silva, *ICE Arrests Journalist Who Covered Protest Against Agency's Policies*, Newsweek (Apr. 16, 2018)........................................................................24

John Burnett, *Immigrant Advocates Warn ICE Is Retaliating for Activism*, NPR (Mar. 16, 2018), https://goo.gl/nFhvei ..................................................................23

Marisa Schultz, *White House Slams California's Sanctuary City Policy Ahead of Trump Visit*, N.Y. Post (Mar. 12, 2018) ...............................................................24

Nick Pinto, *Behind ICE's Closed Doors, "The Most Un-American Thing I've Seen,"* Village Voice (Mar. 10, 2017)...............................................................4

Ray Stern, *Latina Activist Alejandra Pablos Jailed by ICE*, Phoenix New Times (Mar. 7, 2018) .......................................................................................................24

Ruth Weissman & Anna Sander, *Rally Held as Immigrant Activist Granted Deportation Stay*, N.Y. Post (Feb. 10, 2018), https://nyp.st/2wdRu7p.................25

# INTRODUCTION

Plaintiffs' claims in this case stem from a simple legal principle: the government "may not retaliate for exercising First Amendment speech rights." *Wilkie v. Robbins*, 551 U.S. 537, 555 (2007). Yet Defendants have done just that. In their Amended Complaint, Plaintiffs identify an ongoing, egregious pattern and practice of blatantly unconstitutional behavior: Defendants' surveillance, intimidation, arrest, detention, isolation, and attempted removal of immigrant-rights activists in retaliation for core protected political advocacy and activism. Plaintiffs' allegations are more than just plausible. Defendants have taken dozens of enforcement actions against outspoken activists in response to protected speech; they have invoked protected speech in official enforcement records and other statements about their actions; and two different federal courts already have found it credible that immigrations officials acted with retaliatory intent.

No provision of any immigration statute strips this Court of jurisdiction to hear Plaintiffs' pattern-and-practice. Holding otherwise would leave Plaintiffs with no forum in which to seek vindication of fundamental constitutional rights. And Plaintiffs have standing to sue to remedy the grave harms Defendants' actions are causing to Mr. Ragbir, the organizational Plaintiffs' other members, and to the missions and operations of the organizational Plaintiffs themselves.

Because Plaintiffs adequately allege widespread, ongoing constitutional violations, which this Court can and should adjudicate, Defendants' motion to dismiss should be denied in full.

# BACKGROUND

## I. Defendants Have Targeted Immigrant-Rights Activists for Protected Speech

Since approximately 2017, Defendants ICE, the Department of Justice, and the Department of Homeland Security have specifically targeted prominent and outspoken immigrant-rights activists across the country on the basis of their speech and political advocacy on behalf of immigrants' rights. These activists have been surveilled, intimidated, harassed,

detained, and isolated from their families.  Some have had immigration proceedings commenced against them; others have been removed.  Though the experiences of these activists differ in detail, there is one common thread—they were identified and targeted for retaliatory immigration enforcement because they exercised their right to express core political speech in the United States.  Defendants' retaliatory actions violate the First Amendment.

The Amended Complaint cites many instances of this pattern and practice of retaliatory behavior, including without limitation the following examples:

- Daniela Vargas, a 22-year-old activist who came from Argentina when she was 7, was detained by ICE agents in March 2017, as she was leaving a news conference in Jackson, Mississippi, where she had spoken out in support of DACA.  Am. Compl. ¶¶ 88-89.

- The same month, in Vermont, ICE arrested José Enrique Balcazar Sanchez and Zully Victoria Palacios Rodriguez, two leading organizers with Migrant Justice, a workers-rights organization.  Palacios was held without bail, which is extremely unusual for an immigrant who has merely overstayed a visa.  *Id.* ¶ 92.

- In December 2017, ICE attempted to deport Emilio Gutiérrez Soto, an award-winning Mexican journalist, and his son after Mr. Soto publicly criticized the U.S. government and its immigration policies.  *Id.* ¶¶ 96-105. A federal district court recently held that there was "a genuine issue of material fact regarding whether [immigration officials] retaliated against [Mr. Soto and his son] for Mr. Gutierrez-Soto's comments," based in part on officials' "pattern" of "retaliat[ing] against immigration activists who criticized the government's policies."  *Gutierrez-Soto v. Sessions*, 317 F. Supp. 3d 917, 934 (W.D. Tex. 2018)

- In December 2017, ICE initiated removal proceedings in Seattle against Maru Mora-Villalpando, an outspoken critic of ICE's removal and detention practices.  Am. Compl. ¶¶ 106-11.  ICE noted Ms. Villalpando's "extensive involvement with anti-ICE protest and Latino advocacy programs" on the I-213 form describing her alleged removability.

- Also in December 2017, ICE arrested Baltazar Aburto Gutierrez, a clam harvester in Washington State, after he was quoted in local papers talking about his girlfriend's recent deportation.  "You're the one from the newspaper," an ICE agent who detained him reportedly said.  "My supervisor asked me to come find you because of what appeared in the newspaper."  *Id.* ¶¶ 112-14.

- In January 2018, Amer Othman Adi, a 57-year-old deli owner, began a hunger strike while in ICE custody.  As his case began to draw media attention, his local Congressman introduced a private bill to allow Adi to stay.  After the bill was approved by the House Judiciary Committee but before it was enacted, ICE deported Adi to Jordan.  *Id.* ¶¶ 117-18.

- In March 2018, ICE detained Alejandra Pablos, a member of Plaintiff DWN, and an activist well known for her anti-ICE protests, during a protest, while speaking in front of an ICE building. *Id.* ¶¶ 121-22.

Consistent with its targeting of individual activists, ICE has also targeted "sanctuary cities" to punish those communities for taking legislative, municipal, and political action to limit official cooperation with federal immigration enforcement. *Id.* ¶ 144. ICE has raided those cities under a program titled "Operation Safe City," and it has issued public statements that it will target cities and regions "where ICE deportation officers are denied access to jails and prisons to interview suspected immigration violators or jurisdictions where ICE detainers are not honored." *Id.* ¶¶ 145-47.

## II.     ICE Targeted Plaintiff Ravidath Ragbir on the Basis of His Protected Speech

As part of the same pattern and practice of retaliation against protected political advocacy, Defendants targeted Plaintiffs Ravi Ragbir and the New Sanctuary Coalition of New York City (the "Coalition"), where Mr. Ragbir is Executive Director. ICE initiated removal proceedings against Mr. Ragbir in 2006; an order of removal against him became final in 2007. But for over ten years, Defendants chose not to detain, arrest, or deport Mr. Ragbir. Instead, Mr. Ragbir continued to live and work lawfully in the United States with the express authorization of federal immigration authorities. Am. Compl. ¶ 45. For over a decade, Mr. Ragbir has complied with all conditions of his Order of Supervision and "has lived a life of a redeemed man." *Ragbir*, 2018 WL 623557, at *3 n.11; *see also* Am. Compl. ¶ 47.

On March 9, 2017, Mr. Ragbir reported to the ICE Field Office for a scheduled check-in. Am. Compl. ¶ 52. Hundreds of members of the community gathered to support Mr. Ragbir, with media present. Mr. Ragbir was accompanied inside by family, lawyers, faith leaders, and local elected officials. *Id.* ICE officials demanded that Mr. Ragbir's supporters leave the hallway

outside the check-in room.  *Id.*  After the check-in, Mr. Ragbir and elected officials spoke out against ICE, generating significant negative public attention for the agency.  *Id.* ¶¶ 57-60.[1]

Following Mr. Ragbir's check-in and its extensive coverage by the media, ICE's approach to Mr. Ragbir and the Coalition began to mirror Defendants' actions against other immigrant rights activists, discussed above.  By April 2017, Plaintiffs realized that ICE had begun surveilling the Coalition, and in January 2018, Coalition members again observed ICE officers surveilling their offices.  *Id.* ¶ 62.  ICE officers also arrested Jean Montrevil, Mr. Ragbir's fellow activist and co-founder of the Coalition, while he was on a lunch break outside his home, and deported him.  Like Mr. Ragbir, Mr. Montrevil had remained in the United States lawfully for decades under an Order of Supervision issued by ICE and had a pending motion to reopen his removal proceedings.  *Id.* ¶ 63.  And while ICE had previously given Coalition volunteers open access to check-in appointments and immigration court appearances, this changed after Mr. Ragbir's March 2017 check-in.  ICE began to limit access, even posting a security guard outside the formerly public check-in room to turn away faith leaders and other volunteers.  *Id.* ¶ 61.

ICE made no secret of its intention to target Mr. Ragbir and other activists as a result of their protected speech.  On January 5, 2018, faith leaders associated with the Coalition met with ICE New York Field Office Deputy Director Scott Mechkowski to discuss Mr. Montrevil's case. At that meeting, Deputy Director Mechkowski, unprompted, brought up Mr. Ragbir and his public remarks after his March 2017 check-in, stating that Mr. Ragbir's and Mr. Montrevil's

---

[1] A city councilmember later described the check-in room as "the most un-American thing I've seen in a very long time.  It's one thing to hear about people with no legal representation.  It is another thing to see a roomful of terrified people facing deportation with no legal representation at all."  Nick Pinto, *Behind ICE's Closed Doors, "The Most Un-American Thing I've Seen,"* Village Voice (Mar. 10, 2017), https://bit.ly/2PzqMhy.

cases were the two "highest profile" cases in his office, and that ICE had planned Mr.

Montrevil's arrest to avoid public outcry—ICE "didn't want the display of wailing kids and

wailing clergy." *Id.* ¶ 67. Mr. Mechkowski also stated that he had warned Mr. Montrevil

directly: "You don't want to make matters worse by saying things." Dkt. 73 at 1. During this

same period, ICE officers communicated similar messages to immigrant-rights activists around

the country.[2] In subsequent conversations with Mr. Ragbir's counsel, Mr. Mechkowski stated

that he had heard Mr. Ragbir's public statements and continued to see him at vigils at 26 Federal

Plaza. Mr. Mechkowski expressed "resentment" about the March 2017 check-in and anger about

the presence of elected officials. Am. Compl. ¶ 68.

Defendants escalated their retaliation against Mr. Ragbir and the Coalition when Mr.

Ragbir reported for his next scheduled check-in on January 11, 2018. In a departure from

standard practice, Mr. Mechkowski instructed Mr. Ragbir to report not to the assigned

Deportation Officer, but directly to Mr. Mechkowski himself.[3] Am. Compl. ¶ 72. At the check-

in, Mr. Mechkowski stated that a decision had been made that morning to deny Mr. Ragbir's

application for a renewed stay, that ICE would not wait any longer for a decision on Mr.

---

[2] ICE's Supervising Detention and Deportation Officer Derrick Watson informed CASA member Karen Julissa Fiallos Ramos that CASA's marches and press work on her behalf may be detrimental to her case. Am. Compl. ¶¶ 132-36. ICE's Supervising Detention and Deportation Officer Katie Reisner, has on multiple occasions stated to CASA member Roxana Elizabeth Orellana Santos that CASA's clients are not benefitted by the group's advocacy. *Id.* ¶ 140.

[3] ICE has departed from its standard policies and practices frequently in its treatment of immigrant activists and public figures since 2017. For instance, ICE arrested Ms. Daniela Vargas, a DACA applicant, despite its policy that DACA recipients are typically a lower level of enforcement priority. Am. Compl. ¶¶ 88-89. Ms. Zully Victoria Palacios Rodriguez was arrested for overstaying her visa and held without bail, which is extremely atypical treatment for an immigrant who has merely overstayed a visa. *Id.* ¶ 93. In an extraordinary move, ICE rejected a congressional request to stay Mr. Amer Othman Adi's deportation, promptly deporting him. *Id.* ¶¶ 117-18. ICE also departed from its usual practice when it shackled Mr. Manuel Duran Ortega's wrists, ankles, and waist, and transferred him to a facility eight hours away although several detention facilities were available in the immediate vicinity. *Id.* ¶¶ 123-27.

Ragbir's pending motion to reopen, and that Mr. Mechkowski would be "enforcing the order." *Id.* ¶ 73. Mr. Mechkowski had Mr. Ragbir arrested then and there.

Contrary to applicable regulations and standard ICE practice, Defendants did not provide Mr. Ragbir with an arrest warrant, *see* 8 C.F.R. § 241.2, 241.3(a), notice of the revocation of his Order of Supervision, *see id.* § 241.4(1), or any notice or explanation for revoking his existing administrative stay, which by its terms did not expire for another week. Am. Compl. ¶ 73. ICE separated Mr. Ragbir from his wife and, bypassing several local detention facilities, flew Mr. Ragbir to a detention facility in Florida that afternoon. Am. Compl. ¶ 74.[4] ICE intended to deport Mr. Ragbir the following morning, again in violation of applicable regulations. *Id.*; *see* 8 C.F.R. § 241.22; *Ying Fong v. Ashcroft*, 317 F. Supp. 2d 398, 403 (S.D.N.Y. 2004). Only a federal district court's temporary stay prevented Mr. Ragbir's immediate deportation. *See Ragbir v. Sessions*, No. 1:18-cv-236-KBF, Dkt. 16 (S.D.N.Y. Jan. 11, 2018).

Mr. Ragbir was not subsequently deported, but only because on January 29, 2018, this Court (Forrest, J.) granted habeas relief and ordered Mr. Ragbir's immediate release. The Court noted that "this country allowed [Mr. Ragbir] to become a part of our community fabric … [and] to build a life with and among us," and it found that ICE's actions evinced "unnecessary cruelty" and violated due process. *Ragbir*, 2018 WL 623557, at *2. The Court described ICE's conduct towards Mr. Ragbir as "treatment we associate with regimes we revile as unjust." *Id.* at *1. The Court further "note[d] with grave concern the argument that [Mr. Ragbir] has been targeted as a result of his speech and political advocacy on behalf of immigrants' rights." *Id.* at *1 n.1.

---

[4] The Amended Complaint identifies several other instances in which ICE isolated immigrant activists by sending them to detention centers far from their family, attorneys, and communities.

**III.     The Organizational Plaintiffs Have Been Injured by ICE's Unlawful Conduct**

Beyond the individuals ICE has targeted, immigrant-rights organizations have suffered from Defendants' nationwide pattern and practice of targeting activists on the basis of their protected political speech.  For example, members of the Coalition for Human Immigrant Rights have been detained and others can no longer share their experiences publicly as immigration activists due to their fear of retaliation.  Am. Compl. ¶¶ 128-31.  Similarly, several members of CASA have been targeted by immigration enforcement authorities as a result of their membership and active roles in the organization.  *Id.* ¶¶ 132-43.  And all of the organizational Plaintiffs have had to divert enormous resources to mitigate the harms suffered by their leaders, members, and the communities they serve as a result of Defendants' retaliatory actions.  *Id.*

**IV.     Plaintiffs Seek to Enjoin Defendants' Unconstitutional Actions**

Plaintiffs filed this action for declaratory, injunctive, and habeas relief on February 9, 2018.  Dkt. 1, ¶¶ 125-28.  In lieu of litigating a temporary restraining order, Defendants consented to a stay of Mr. Ragbir's removal pending resolution of Plaintiffs' motion for a preliminary injunction.  Dkt. 11.

On May 23, 2018, this Court denied in part the preliminary injunction motion and dismissed "all claims … to declare unlawful and to enjoin execution of Ragbir's final order of removal" based on a lack of subject matter jurisdiction.  Dkt. 83 at 2, 20.  Plaintiffs' appeal of that decision is pending.  *See Ragbir v. Homan*, No. 18-1597 (2d Cir.).  This Court did not address Plaintiffs' claims seeking relief beyond an injunction against Mr. Ragbir's removal, which remain pending.  Dkt. 83 at 19.  And the Court made clear that its decision under section 1252(g) "does not bar all claims pertaining to an order of removal," and that that statute applies "'only to three discrete actions'—the commencement of proceedings, the adjudication of cases,

and the execution of removal orders." *Id.* (citing *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471, 482, 487 (1999)).

On July 17, 2018—in response to supposed pleading deficiencies in Plaintiffs' initial complaint, and to enable the Court to evaluate the legal sufficiency of Plaintiffs' claims based on Plaintiffs' full factual allegations—Plaintiffs filed the Amended Complaint.  Dkt. 99.  On July 19, 2018, at the request of the clerk's office, Plaintiffs refiled the Amended Complaint again to correct an administrative issue relating to a change in the named parties.[5]  Dkt. 100.  On September 14, 2018, Defendants moved to dismiss Plaintiffs' Amended Complaint.  Dkt. 106.

## ARGUMENT

## I.    THIS COURT HAS JURISDICTION OVER PLAINTIFFS' FIRST AMENDMENT CLAIMS CHALLENGING ICE'S NATIONWIDE PATTERN AND PRACTICE OF RETALIATION AGAINST IMMIGRANT-RIGHTS ACTIVITISTS

### A.    This Court Has Federal-Question Jurisdiction

This Court has subject jurisdiction over Plaintiffs' claims under 28 U.S.C. § 1331 because they "aris[e] under the Constitution, laws, or treaties of the United States"—specifically, the First Amendment.  Plaintiffs claim that Defendants' nationwide pattern and practice of targeting immigrant-right activities on the basis of their protected political speech constitutes both retaliation (Am. Compl. ¶¶ 199-204) and content- and viewpoint-based discrimination (Am. Compl. ¶¶ 205-12) in violation of the First Amendment.  These pattern-and-practice claims are independent of Plaintiffs' other claims challenging the retaliatory execution of Mr. Ragbir's final order of removal.  They are "wholly collateral to [] the removal process" and challenge a broad

---

[5] Defendants point out that there are minor differences between the Amended Complaints filed on July 17, 2018 and July 19, 2018.  Those differences were caused by a ministerial error.  The differences between the two versions of the Amended Complaint have no impact on Defendants' motion to dismiss or Plaintiffs' opposition.  All citations remain the same, and the two versions of the Amended Complaint are not substantively different.

pattern and practice of unconstitutional action by ICE that chills the speech of all Plaintiffs and impedes the missions and operations of the organizational Plaintiffs. *Aguilar v. Ice*, 510 F.3d 1, 11 (1st Cir. 2007). As such, this Court has jurisdiction to evaluate these claims under Section 1331, and it should not read Section 1252(g) to strip it of such jurisdiction.[6]

## B. Section 1252(g) Does Not and Cannot Strip This Court of Jurisdiction Over Plaintiffs' Pattern-and-Practice Claims

In arguing that § 1252(g) strips this Court of jurisdiction over Plaintiffs' claims, Defendants in effect ask this Court to rule that Plaintiffs have no forum in which to pursue their claims. That is not and cannot be the law. Congress did not intend Section 1252(g) "to deny any judicial forum for a colorable constitutional claim," *Webster v. Doe*, 486 U.S. 592, 603 (1988), and Defendants cannot demonstrate the contrary by "clear and convincing" evidence, *Johnson v. Robison*, 415 U.S. 361, 373-74 (1974).

Even under this Court's May 23, 2018 ruling, § 1252(g) does not bar Plaintiffs' First Amendment pattern-and-practice claims. As this Court recognized, the Supreme Court held in *Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999) ("*AADC*"), that Section 1252(g) reaches only "'three discrete actions that the Attorney General may take: her decision or action "commence proceedings, adjudicate cases, or execute removal orders."'" Dkt. 83 at 8-9 (quoting *AADC*, 525 U.S. at 482, in turn quoting 8 U.S.C. § 1252(g)).

Plaintiffs' pattern-and-practice claims challenge actions not covered by § 1252(g). Plaintiffs allege that "Defendants have engaged in a nationwide pattern and practice of targeting and selectively enforcing the immigration laws against Plaintiffs, their members and other immigration-rights activists and organizations on the basis of their protected speech regarding

_____

[6] Plaintiffs concede that this Court does not have habeas jurisdiction under to 28 U.S.C. § 2241 over claims other than those challenging Mr. Ragbir's removal.

U.S. immigration law and policy." Am. Compl. ¶ 202.  In support, Plaintiffs provide a litany of examples of unconstitutional action by Defendants.  Specifically, Plaintiffs allege that Defendants have "arrested activists following press appearances and news conferences," including Daniela Vargas, Jose Victor Garcia Diaz, Jose Enrique Balcazar Sanchez, Zully Victoria Palacios Rodriguez, Jesus Chavez Flores, and Alejandra Pablos, *id.* ¶¶ 29, 88-89, 91-93, 119-22; "detained spokespeople and directors of immigration advocacy organizations," including Mr. Ragbir and Mr. Montrevil, *id.* ¶¶ 29, 63-64, 67, 71-79; "instructed activists that their immigration rights organizations may be detrimental to them," *id.* ¶¶ 29, 133, 136; and "targeted communities identified by the federal government as 'sanctuary cities' to punish those communities for taking legislative, municipal, and political action to limit official cooperation with federal immigration enforcement, *id.* ¶¶ 29, 144-47.

Not one of these examples constitutes a decision or action by Defendants to commence a proceeding, adjudicate a case, or execute a removal order, and not one of them arises from such a decision or action.  Defendants cannot credibly claim otherwise.

### C.    Section 1252(b)(9) Does Not Apply to Plaintiffs' Pattern-and-Practice Claims

Defendants assert that § 1252(b)(9) requires that Plaintiffs' pattern-and-practice claims be channeled to the Second Circuit because they somehow "aris[e] from an[] action taken or proceeding brought to remove an alien from the United States…."  Mem. at 8, quoting 8 U.S.C. § 1252(b)(9).  Not so.

The Supreme Court in *INS v. St. Cyr* held § 1252(b)(9) applies *only* "'[w]ith respect to review of an order of removal.'"  533 U.S. 289, 313 (2001) (quoting 1252(b)(9)).  Defendants' suggestion (at 9) that a majority of the justices in *Jennings v. Rodriguez*, 138 S. Ct. 830 (2018), indicated otherwise is immaterial.  *Jennings* did not expressly overrule *St. Cyr*, and this Court must "leave to [the Supreme Court] the prerogative of overruling its own decisions."  *Agostini v.*

*Felton*, 521 U.S. 203, 237 (1997). Plaintiffs' pattern-and-practice claims do not arise from a removal proceeding or challenge a removal order. These claims, rather, challenge Defendants' pattern and practice of silencing critics of their immigration policies. As such, this Court has jurisdiction. *Delgado v. Quarantillo*, 643 F.3d 52, 55 (2d Cir. 2011) ("A suit against immigration authorities is not *per se* a challenge to a removal order; whether the district court has jurisdiction will turn on the substance of the relief that a plaintiff is seeking.").

The mere fact that these claims relate to litigation regarding removal does not change the analysis. As a plurality of the Supreme Court found in *Jennings*, many legal questions would never arise but for removal proceedings, "but cramming judicial review of those questions into the review of final removal orders would be absurd." 138 S. Ct. at 840. It would be particularly absurd here to interpret Plaintiffs' allegations as arising from a removal proceeding. Mr. Ragbir seeks to enjoin actions *other than* the execution of his removal order, including the type of "unnecessarily cruel" actions Defendants have already taken. *Ragbir v. Sessions*, 2018 WL 623557, at *1 (S.D.N.Y. Jan. 29, 2018). And the organizational Plaintiffs—who are not party to any removal proceedings—challenge actions such as threats, surveillance, detention, and arrests. Plaintiffs, therefore, "are not asking for review of an order of removal… and they are not even challenging any part of the process by which their removability will be determined." *Jennings*, 138 S. Ct. at 841. In such circumstances, Section 1252(b)(9) "does not present a jurisdictional bar." *Id.*; *see also Ragbir v. Sessions*, 2018 WL 1446407, at *8-9 (D.N.J. Mar. 23, 2018).

### D.     Section 1252(f)(1) Does Not Apply to Plaintiffs' Pattern-and-Practice Claims

Similarly, Section 1252(f)(1) does not bar Plaintiffs' claims. That statutory provision provides that "no court (other than the Supreme Court) shall have jurisdiction or authority to enjoin or restrain the operation of [8 U.S.C. § 1221-31]." But actions such as surveillance and the making of explicit threats are not governed by §§ 1221-31 and therefore fall outside the

purview of § 1252(f)(1).  *See*, *e.g.*, *Duran Gonzales v. DHS*, 508 F.3d 1227, 1232-33 (9th Cir. 2007).  Further, even for actions that are covered by §§ 1221-31, Plaintiffs do not seek to "enjoin or restrain the operation" of any statutory provision; they simply "are seeking [the statutory provisions'] implementation under the appropriate standard."  *Tefel v. Reno*, 972 F. Supp. 608, 618 (S.D. Fla. 1997).  Plaintiffs do not ask this Court to strike down any statutory provision, or to bar Defendants from invoking their statutory authority for non-retaliatory reasons.  Plaintiffs seek only to invalidate Defendants' retaliatory and unconstitutional actions, while still allowing §§ 1221-31 to operate within their permissible scope.

Further, any reading of § 1252(f)(1) as barring Plaintiffs' request for injunctive relief would raise a "serious constitutional question," *Webster*, 486 U.S. at 603.  Even if the Supreme Court ultimately were to grant review and enter an injunction, such action would come too late to prevent the ongoing burden and chill on Plaintiffs' protected speech.  Ultimately, it would leave Plaintiffs with no effective remedy for serious constitutional violations.  In other words, it would effectively dictate that Defendants can adopt express policies of harassment and surveillance of non-citizens for speech protected by the First Amendment without judicial review.

## II.     THE ORGANIZATIONAL PLAINTIFFS' CLAIMS ARE JUSTICIABLE

### A.     Organizational Plaintiffs Have Standing To Sue on Their Own Behalf

Defendants misstate Plaintiffs' allegations and the relevant precedent in arguing that organizational Plaintiffs do not have standing to bring claims on their own behalf.  Contrary to Defendants' assertions, Plaintiffs have stated sufficient facts to establish that their injuries are traceable to Defendants' conduct, and that the relief requested will redress those injuries.  *Cf.* Mem. at 14-16.

Plaintiffs have sufficiently alleged that their injuries are "fairly traceable" to Defendants' actions.  To meet this standard, "[a] plaintiff must simply demonstrate a causal nexus between

the defendant's conduct and the injury." *Id.* In the Second Circuit, the standard for traceability is "relatively modest." *Rothstein v. UBS AG*, 708 F.3d 82, 91 (2d Cir. 2013) (quoting *Bennett v. Spear*, 520 U.S. 154, 171 (1997). And at the pleading stage, general factual allegations of injury resulting from the Defendant's conduct suffice to establish standing, as courts "presum[e] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561, (1992).

Plaintiffs have met their burden here. Plaintiffs allege that they have been injured as a result of Defendants' unlawful actions in at least three ways. First, as a direct result of Defendants' retaliatory actions against immigrant activists such as Mr. Ragbir, Ms. Villalpando, and others, the organizational Plaintiffs have had to dedicate significant resources to the defense of their own members. NIPNLG further specifies that it would not normally represent someone like Ms. Villalpando; it has done so because Ms. Villalpando was targeted for her activism. Am. Compl. ¶ 170. The Second Circuit has found standing in such circumstances. *See Nnebe v. Daus*, 644 F.3d 147, 157–58 (2d Cir. 2011) (taxi driver advocacy group established that its injury was fairly traceable to a City's policy regarding suspension of cab drivers because it allocated resources to assist drivers when the City initiated proceedings against one of its members).

Second, the organizational Plaintiffs have alleged that Defendants' retaliatory actions have directly impeded their missions. The Coalition alleges that as a result of Defendants' unlawful arrest and detention of Mr. Ragbir in January 2018, it was deprived of its sole full time employee and Executive Director for several weeks. Am. Compl. ¶¶ 154. In addition, the Coalition's long-standing accompaniment program was effectively shut down as a result of the Coalition's support for Mr. Ragbir on March 9, 2017. *Id.* ¶¶ 52, 61, 160 (describing ICE's

actions regarding the accompaniment program as a reaction to the March 9 check-in, and as an example of ICE's pattern and practice of targeting immigrant rights activists).

Third, Defendants' retaliatory actions have forced Plaintiffs to divert resources and time from their day-to-day activities. Specifically, as a result of Defendants' surveillance, the Coalition was forced to create a buddy system to allow members, volunteers, and community members to travel safely to and from its weekly clinics, and to train staff on how to watch out for surveillance vehicles. Am. Compl ¶¶ 163-64. Likewise, in addition to the resources expended in defense of Ms. Villalpando, NIPNLG has diverted resources to identify and recruit counsel for other activists that it anticipates will be victims of retaliation. *Id.* ¶ 168. Several NIPNLG attorneys now dedicate a significant portion of their time, previously allocated to other projects, to anti-retaliation work needed to address Defendants' pattern and practice of targeting immigrant activists. *Id.* ¶ 169. This attorney time has resulted in, *inter alia*, publications and legal advice that specifically address the pattern of enforcement actions laid out in the Amended Complaint, such as the report titled "Terminating Removal Proceedings for Activists Targeted for Political Speech." *Id.* ¶ 172.

On the basis of these well-pleaded allegations, Plaintiffs have readily met the burden of demonstrating that they have suffered injuries fairly traceable to the unlawful conduct of Defendants. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982) (organizational plaintiff established standing by alleging that the challenged conduct "perceptibly impaired [the plaintiff]'s ability to provide counseling and referral services for low-and moderate-income homeseekers"); *Centro de la Comunidad Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 110 (2d Cir. 2017) (organizational plaintiff established standing by alleging that

enforcement of the action would adversely impact its ability to organize day laborers, divert resources from other of its activities, and expose its advocates to the risk of arrest).

Further, Plaintiffs seek injunctive relief that will directly redress these injuries and inure to the benefit of all of their members. Plaintiffs seek, *inter alia*, to declare that Defendants' pattern and practice of discriminatorily targeting and/or enforcing the immigration laws against any immigrant-rights activists based on the content and viewpoint of their speech violates the First Amendment. Plaintiffs also seek to enjoin Defendants from targeting and/or selectively enforcing the immigration laws against any individual—including, without limitation, through investigation, surveillance, detention, deportation, or any other adverse enforcement action— based on an individual's protected political speech. Am. Compl. ¶¶ 59-60. By putting an end to Defendants' unlawful policies and practices, this injunctive relief will allow all organizational Plaintiffs to expend fewer resources fighting and preparing to fight retaliatory enforcement actions by Defendants and focus on the rest of their missions and operations. Injunctive relief also would allow Plaintiffs' members and volunteers to participate in political speech without considering whether the words they choose will subject them to arrest, detention and isolation from their family. Am. Compl. ¶¶ 157-59, 185, 198.

Because Plaintiffs have pleaded concrete and particularized facts showing injuries that are traceable to Defendants' unlawful conduct and will continue in the absence of injunctive relief, Defendants' arguments regarding Plaintiffs' standing to bring suit on their own behalf must be rejected.

### B. Organizational Plaintiffs Have Standing to Sue on Behalf of their Members

Plaintiffs also have alleged sufficient facts to establish associational standing. An association has standing to bring suit on behalf of its members when it has established that: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to

protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Adver. Com'n*, 432 U.S. 333, 343 (1977). Defendants concede that Plaintiffs have satisfied the second prong of the *Hunt* test. But they argue that Plaintiffs have not established that certain individual members of the organizational Plaintiffs would have standing to sue. Further, they argue that Plaintiffs' claims require the participation of individual members. Defendants are wrong on both counts.

Defendants assert (at 17) that organizational Plaintiffs must establish the standing of particular identified members "whose claims are not barred by 1252(g)[.]" Not so. At the pleading stage, an association bringing suit on behalf of its members need only "allege that one or more of its members has suffered a concrete and particularized injury" that is "actual and imminent," fairly traceable to the Defendants, and redressable by the relief sought. *Bldg. & Const. Trades Council of Buffalo, New York & Vicinity v. Downtown Dev., Inc.*, 448 F.3d 138, 144-5 (2d Cir. 2006). Plaintiffs are not required to identify that member or members. Instead, general allegations encompassing the specific facts necessary to support the claim will suffice. *See Ass'n of Am. Physicians & Surgeons, Inc. v. Sebelius*, 901 F. Supp. 2d 19, 31 (D.D.C. 2012), aff'd, 746 F.3d 468 (D.C. Cir. 2014).

Plaintiffs have alleged the facts necessary to explain why individual members of their organization (named or otherwise) have standing to challenge Defendants' violations of the First Amendment. Plaintiff DWN explains that its membership includes several activists already targeted by Defendants, and several activists who are likely to be targeted in the future, and require emergency plans to prepare for that event. Am. Compl. ¶¶ 193-194. The Coalition, CASA, and NYIC similarly allege that they must protect certain members from potential

immigration enforcement actions initiated as a result of their protected speech. *Id.* ¶¶ 162-67, 177, 181, 185, 191. Because these members of Plaintiffs' organizations are activists who speak out publically against current immigration policies, they are in imminent danger of, at minimum, arrest and detention, not to mention other retaliatory actions. But injunctive or declaratory relief will prevent Defendants from retaliating against and targeting Plaintiffs' members and allow members to participate in each organization's activities without fear.

Plaintiffs also meet the standard of *Hunt*'s "prudential" third prong because this Court can adjudicate their claims without resort to individualized proof. *United Food & Commercial Workers Union Local 751 v. Brown Grp.*, 517 U.S. 544, 555 (1996).[7] Defendants assert (at 18) that Plaintiffs' pattern-and-practice claims will "require an investigation into the alien's activities and the alleged enforcement actions taken against him or her." Not so. It is the unlawful conduct of Defendants—not the immigrants they target—that will be the primary subject of this case when it proceeds to the merits. *See All. for Open Soc'y Int'l, Inc. v. U.S. Agency for Int'l Dev.*, 651 F.3d 218, 229 (2d Cir. 2011), *aff'd sub nom. Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205 (2013). Even if some individual detail is required, "[t]he fact that a limited amount of individuated proof may be necessary does not in itself preclude associational standing[.]" *Nat'l Ass'n of Coll. Bookstores v. Cambridge Univ. Press*, 990 F. Supp. 245, 250 (S.D.N.Y.1997). Here too, the need for some limited amount of individual participation should not prevent this court from adjudicating Plaintiffs' claims.

---

[7] Defendants do not argue that the injunctive relief requested would require individualized proof. *See Warth v. Seldin*, 422 U.S. 490, 515–16 (1975) (relief element of *Hunt*'s third prong satisfied when injunctive relief is sought because "it can reasonably be supposed that the remedy, if granted, will inure to the benefit of those members of the association actually injured."). The Supreme Court, moreover, has long held that prudential limitations on standing are relaxed in First Amendment cases. *See, e.g.*, *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004).

### C.    *Laird v. Tatum* **Does Not Bar Plaintiffs' Pattern-and-Practice Claims**

Lastly, Defendants assert (at 12-13) that Plaintiffs' claims are barred by *Laird v. Tatum*, 408 U.S. 1 (1972), because they involve "broad allegations of patterns of surveillance and investigation that Plaintiffs have not connected with any concrete, reviewable enforcement action." Defendants are wrong.

In *Laird*, plaintiffs claimed that their speech was chilled "*not* by any specific action of the Army against them, but *only* by the existence and operation of the intelligence gathering and distributing system, which is confined to the Army and related civilian investigative agencies." 408 U.S. at 3 (emphases added). The plaintiffs "freely admit[ted] that they complain[ed] of no specific action of the Army against them," and there was "no evidence of illegal or unlawful surveillance activities." *Id.* at 9. Nor was there any allegation that the challenged Army intelligence-gathering program involved retaliation of any kind or targeting of any particular speaker or speech. *See id.* In that context, the Supreme Court concluded that the plaintiffs lacked standing to challenge "the mere existence, *without more*, of a governmental investigative and data-gathering activity that is alleged to be broader in scope than is reasonably necessary for the accomplishment of a valid governmental purpose. *Id.* at 10 (emphasis added).

By contrast, here, there is much, much more. The surveillance at issue targets core protected political advocacy on the basis of its content and viewpoint criticizing U.S. immigration law, policy, and enforcement. And the surveillance is only one part of broader pattern and practice that includes other forms of targeting protected speech such as harassment, detention, and even deportation. In contrast to the *Laird* plaintiffs' generalized objections to the very notion of the Army's intelligence-gathering program, Plaintiffs here challenge Defendants'

use of surveillance and multiple other tactics to identify, intimidate, and ultimately silence immigrant-right activists.  For these reasons, this case is nothing like *Laird*.[8]

What's more, the Amended Complaint alleges that organizational Plaintiffs' members have been harmed by ICE's retaliatory surveillance and that the surveillance is not lawful because it is intended to restrict protected speech.  As *Laird* emphatically concluded, such unlawful activities are not shielded from judicial review: "there is nothing in our Nation's history or in this Court's decided cases, including our holding today, that can properly be seen as giving any indication that actual or threatened injury by reason of unlawful activities of the military would go unnoticed or unremedied."  408 U.S. at 15-16.

## III. THE AMENDED COMPLAINT STATES VIABLE FIRST AMENDMENT CLAIMS CHALLENGING ICE'S RETALIATORY PATTERN AND PRACTICE

Contrary to the Government's arguments (at 19-25), the Amended Complaint properly states claims for both retaliation against core protected political advocacy as well content- and viewpoint-based discrimination in violation of the First Amendment.

### A. The Amended Complaint States a First Amendment Retaliation Claim

"[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out."  *Hartman v. Moore*, 547 U.S. 250, 256 (2006).  For purposes of the First Amendment, it makes no difference whether the speaker otherwise has an independent "right" to be free from the adverse action taken by the government.  Even if the government could lawfully take an adverse action against an individual, for "any number of [other] reasons," the government may not do so "because of his constitutionally protected speech or associations."  *Perry*, 408 U.S. at 597.  Put simply, the government "may not retaliate for

---

[8] Likewise, Plaintiffs point to Operation Safe City as additional *evidence* of Defendants' pattern and practice.  Defendants' argument that Plaintiffs lack standing to challenge Operation Safe City is inconsequential.

exercising First Amendment speech rights." *Wilkie v. Robbins*, 551 U.S. 537, 555 (2007).

Relevant here, "[a]n official retaliatory policy is a particularly troubling and potent form of

retaliation, for a policy can be long term and pervasive, unlike an ad hoc, on-the-spot decision by

an individual officer." *Lozman*, 138 S. Ct. 1945, 1954 (2018). "An official policy also can be

difficult to dislodge," since "there may be little practical recourse when the government itself

orchestrates the retaliation." *Id.* "For these reasons, when retaliation against protected speech is

elevated to the level of official policy, there is a compelling need for adequate avenues of

redress." *Id.*

"In order to state a claim for retaliation in violation of the First Amendment, a plaintiff

must allege '(1) that the speech or conduct at issue was protected, (2) that the Defendant took

adverse action against the plaintiff, and (3) that there was a causal connection between the

protected speech and the adverse action.'" *Gonzalez v. Hasty*, 802 F.3d 212, 222 (2d Cir. 2015)

(quotation marks omitted). Defendants do not dispute that Plaintiffs have satisfied the first

element. Mem. at 19. Nor could they. All Plaintiffs have engaged in protected speech. They

have criticized U.S. immigration law and policy, organized rallies and protests against the U.S.

immigration system, assisted noncitizens affected by that system, and urged government officials

to change it. *See* Am. Compl. ¶¶ 15-19, 33-35, 58-60. Such speech on matters of public concern

"occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special

protection." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quotation marks omitted). Indeed, the

speech at issue here is "the type of interactive communication concerning political change that is

appropriately described as 'core political speech,'" *Meyer v. Grant*, 486 U.S. 414, 422 (1988),

where "First Amendment protection is at its zenith." *Buckley v. Am. Constitutional Law Found.,

Inc.*, 525 U.S. 182, 183 (1999).

Further, Defendants have taken severe adverse actions against Mr. Ragbir, the Coalition, among many other immigrant-rights advocates. *See supra* pp.1-7. And the Amended Complaint more than adequately alleges a causal connection between their protected speech and Defendants' actions. Defendants have taken a series of enforcement actions against two of the Coalition's prominent leaders, and Defendants themselves have repeatedly linked their actions against Mr. Montrevil and Mr. Ragbir. *See* Am. Compl. ¶¶ 67-70. The Government does not dispute that it departed significantly from normal procedures in the cases of both Mr. Montrevil and Mr. Ragbir. Defendant Mechkowski also expressed "resentment" at the publicity surrounding Mr. Ragbir's March 9, 2017 check-in, *id.* ¶ 68; Das Decl., Dkt. 74, ¶ 16, and has stated that he instructed Mr. Montrevil not to repeat the "harsh statements" he had made against ICE so as to "not make matters worse by saying things," Bucey Decl., Dkt. 73, ¶¶ 3-4.

It is not just Mr. Ragbir and the Coalition. All the organizational Plaintiffs are likely to prevail on their challenge to Defendants' nationwide pattern and practice of taking enforcement actions based on protected speech. The Government does not appear to dispute that such a pattern would violate the First Amendment. And for good reason—it represents a blatant form of content-, viewpoint-, and speaker-based discrimination.

The Government instead contests (at 8-9) the evidence of any pattern and practice. But even beyond Defendants' retaliation against Mr. Montrevil, Mr. Ragbir, and the Coalition, Plaintiffs' evidence is strong and only growing stronger. To begin with, in multiple instances, ICE itself has indicated that it took enforcement actions based on protected expression. The ICE agent who detained Baltazar "Rosas" Aburto Gutierrez, for example, stated that "[m]y supervisor asked me to come find you because of what appeared in the newspaper." Am. Compl. ¶ 114. A formal ICE record documenting the arrest of Mora-Villalpando expressly notes that she "has

become a public figure" and "has extensive involvement with anti-ICE protests and Latino advocacy programs." *Id.* ¶ 108. In yet another case, "ICE noted in the charging document that the subject … is 'a member and associate of Migrant Justice, a local immigrant advocate group.'" John Burnett, *Immigrant Advocates Warn ICE Is Retaliating for Activism*, NPR (Mar. 16, 2018), https://goo.gl/nFhvei. Activists also "have witnessed ICE coming to events like [press conferences] and asking random bystanders or participants what organizations they are affiliated with." Remer-Thamert Decl., Dkt. No. 47-5 ¶ 17. The sheer number of enforcement actions taken against immigrant-rights activists further corroborates the existence of a retaliatory pattern and practice. *See supra* pp. 1-3. Those troubling enforcement actions have continued even after Plaintiffs filed their original complaint.[9] And two different federal district courts have found evidence that Defendants acted with retaliatory intent to be plausible. *See Gutierrez-Soto*, 317 F. Supp. 3d at 934; *Ragbir*, 2018 WL 623557, at *1 n.1.

Defendants' reliance (at 19-20) on *AADC* is misplaced. While the Supreme Court in *AADC* held "[a]s a general matter" that noncitizens have "no constitutional right to assert selective enforcement as a defense against [their] deportation," the Court carefully preserved "the possibility of a rare case in which the alleged basis of discrimination is so outrageous" as to allow such a defense. 525 U.S. at 491. And in *Rajah v. Mukasey*, the Second Circuit made clear that *AADC*'s exception for "outrageous" discrimination is not merely theoretical. Confronted with allegations of discrimination based on noncitizens' "religion, ethnicity, gender, and race,"

---

[9] *See* Ray Stern, *Latina Activist Alejandra Pablos Jailed by ICE*, Phoenix New Times (Mar. 7, 2018), https://bit.ly/2tnK2ro; Chantal Da Silva, *ICE Arrests Journalist Who Covered Protest Against Agency's Policies*, Newsweek (Apr. 16, 2018), https://bit.ly/2JzuKYv; Marisa Schultz, *White House Slams California's Sanctuary City Policy Ahead of Trump Visit*, N.Y. Post (Mar. 12, 2018), https://nyp.st/2LKOBQU; Alex Olgin & Nick de la Canal, *ICE Warns if 287(g) Ends, It Will Ramp Up Enforcement*, WFAE (May 9, 2018), https://bit.ly/2JFNfWX.

the court of appeals expressly "agree[d]" that "a selective prosecution based on an animus of that kind would call for some remedy."  544 F.3d 427, 438 (2d Cir. 2008).

Here, it is "outrageous" for immigration officials to seek to banish a leading activist from this country, based on public criticism of those same officials and their powers, pursuant to a widespread retaliatory pattern and practice.  *Rajah* recognized certain forms of discrimination as "outrageous" because they violate a basic tenet of our democracy—that religious, ethnic, gender, and racial differences have no valid bearing on a person's dignity or status.  The retaliation here violates an equally "fundamental" principle—the "right of free public discussion of the stewardship of public officials."  *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 274-75 (1964).  Indeed, "[t]he freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state."  *City of Houston v. Hill*, 482 U.S. 451, 462-63 (1987).

Defendants' retaliation here, moreover, is calculated to chill public debate and insulate immigration officials and the laws and policies they enforce from public criticism and democratic accountability.  To some extent, they are succeeding in that aim.  In the wake of Mr. Ragbir's detention and Mr. Montrevil's deportation, citizens and noncitizens alike are increasingly reluctant to participate in the Coalition's activities out of fear of retaliation by ICE.  Am. Compl. ¶¶ 163-66.  Organizational Plaintiffs have had to overhaul their programs to respond to frequent inquiries from noncitizens about the risks of participating in rallies and other protected political expression.  *Id.* ¶¶ 168-98.  Immigration officials "can't deport a movement," Ruth Weissman & Anna Sander, *Rally Held as Immigrant Activist Granted Deportation Stay*, N.Y. Post (Feb. 10, 2018), https://nyp.st/2wdRu7p, but they can and have chilled public debate.

Defendants' other failure-to-state-a-claim arguments are unavailing. With respect to Mr. Ragbir, Defendants assert (at 20) that his "residual claims of surveillance are insufficient to support a First Amendment claim," citing *Laird v. Tatum*. But as explained above, this case is nothing like that one. And regardless, Mr. Ragbir's claims concern more than surveillance— they also concern arrest, detention, accelerating proceedings, and other retaliatory actions not necessary to effectuate removal. Indeed, another judge of this Court has held that Defendants' initial attempt to deport Mr. Ragbir evinced "unnecessary cruelty." *Ragbir*, 2018 WL 623557, at *2. Defendants correctly note (at 20) this Court's holding that, to the extent Plaintiffs' seek to enjoin Mr. Ragbir's removal, *that* "asserted injury flows from [his] final order of removal." Dkt. 83 at 15. But Plaintiffs have appealed that ruling, and regardless, this Court has never addressed any actions going beyond what is necessary to effectuate Mr. Ragbir's deportation.

As to the organizational Plaintiffs' claims, Defendants assert (at 20-21) that the Coalition has not adequately alleged that *its* speech—"as opposed to Ragbir's or his supporters'— motivated defendants to take any enforcement action." But Mr. Ragbir's speech *is* the Coalition's speech—he is the Coalition's Executive Director, and speaks on the Coalition's behalf. *See, e.g.*, Am. Compl. ¶ 155. And to the extent Defendants' retaliated against the speech of Mr. Ragbir's supporters, those supporter spoke out at rallies and protests organized by Mr. Ragbir on behalf of the Coalition. *Id.* ¶¶ 52-61. Retaliation against speech at a Coalition rally is retaliation against the Coalition.[10]

---

[10] As for the non-Coalition organizational Plaintiffs, they are asserting only discrimination claims, not retaliation claims. *Contra* Mem. at 20-21. And no organizational Plaintiff is asserting any claim on behalf any noncitizen who is not a member of one of the organizational Plaintiffs. *Contra* Mem. at 16-18. Of course, Plaintiffs' allegations regarding retaliatory and discriminatory actions against nonparty, nonmember noncitizens provide factual support for Plaintiffs' allegations that Defendants have engaged in an unconstitutional pattern and practice.

## B. The Amended Complaint States a First Amendment Claim for Content- and Viewpoint-Based Discrimination

Defendants contend (at 25) that Plaintiffs cannot state an independent claim that ICE's pattern and practice of selectively enforcing the immigrations laws against outspoken immigrant-rights advocates constitutes content- and viewpoint-based discrimination in violation of the First Amendment. Defendants are wrong. Government actions that restrict or burden speech "based on its communicative content" are "presumptively unconstitutional." *Nat'l Inst. of Family & Life Advocates v. Becerra ("NIFLA")*, 138 S. Ct. 2361, 2371 (2018). And Defendants here have targeted speech based not just on its content, but its viewpoint—a particularly "egregious form of content discrimination." *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995). "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Id.* Such viewpoint discrimination is always unconstitutional. *See, e.g.*, *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011). The retaliatory actions here thus violate "the fundamental principle that governments have no power to restrict expression because of its message, its ideas, its subject matter, or its content." *NIFLA*, 138 S. Ct. at 2371 (quotation marks omitted).

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss should be denied.

September 28, 2018

Alina Das, Esq. (AD8805)
Jessica Rofé, Esq. (JR5231)
Brittany Castle, Legal Intern
Jeremy Cutting, Legal Intern
WASHINGTON SQUARE
    LEGAL SERVICES, INC.
Immigrant Rights Clinic
New York University School of Law
245 Sullivan Street, 5th floor
New York, New York 10012
Tel: (212) 998-6430
alina.das@nyu.edu
jessica.rofe@nyu.edu

Respectfully submitted,

/s/  R. Stanton Jones

R. Stanton Jones
John L. Freedman
William C. Perdue
Daniel F. Jacobson
Sally Pei
Stephen K. Wirth
Andrew T. Tutt
ARNOLD & PORTER
    KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
(202) 942-5999 (fax)
stanton.jones@arnoldporter.com

Anthony Boccanfuso
Ada Añon
ARNOLD & PORTER
    KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019
(212) 836-8000
(303) 836-8689 (fax)
anthony.boccanfuso@arnoldporter.com

Emily Newhouse Dillingham
ARNOLD & PORTER
    KAYE SCHOLER LLP
70 West Madison Street
Suite 4200
Chicago, IL 60602
(312) 583-2300
(312) 583-2360 (fax)
emily.dillingham@arnoldporter.com

*Attorneys for Plaintiffs*

## AFFIRMATION OF SERVICE

      I, R. Stanton Jones, the undersigned attorney at law duly admitted to practice in the State of New York, respectfully show that on the 28th day of September, 2018, I caused a copy of the attached to be electronically filed, and that service was accomplished on all counsel of record by operation of CM/ECF.

                            /s/ R. Stanton Jones